**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LEANDRA ENGLISH,

                Plaintiff,

    v.

DONALD J. TRUMP and
JOHN M. MULVANEY,

                Defendants.

Civil Action No. 17-2534 (TJK)

**BRIEF OF CURRENT AND FORMER MEMBERS OF CONGRESS**
**AS *AMICI CURIAE* IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY
   CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Members of Congress*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................. ii

INTEREST OF AMICI ....................................................................................................... 1

INTRODUCTION .............................................................................................................. 1

ARGUMENT ...................................................................................................................... 4

The CFPB's Successor Provision Supplants the Federal Vacancies Reform Act,
Providing the Sole Means of Temporarily Filling a Vacancy in the Position of CFPB
Director Until Senate Confirmation of a New Director .................................................... 4

I.      Dodd-Frank's Mandatory Language Displaces the FVRA's Default Rules ......... 5

II.     Congress's Decision to Displace the FVRA Default Rules Is Consistent with
Its Statutory Plan for the CFPB and Supported by Dodd-Frank's Legislative
History .............................................................................................................. 9

CONCLUSION ................................................................................................................... 13

APPENDIX ......................................................................................................................... 1A

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*HCSC-Laundry v. United States*,
  450 U.S. 1 (1981) ................................................................................................ 8

*Humphrey's Ex'r v. United States*,
  295 U.S. 602 (1935) ............................................................................................ 10

*King v. Burwell*,
  135 S. Ct. 2480 (2015) ........................................................................................ 11

*Kingdomware Techs., Inc. v. United States*,
  136 S. Ct. 1969 (2016) ........................................................................................ 6, 7

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998) .............................................................................................. 6-7

*Morrison, v. Olson*,
  487 U.S. 654 (1988) ............................................................................................ 10

*PHH Corp. v. CFPB*,
  No. 15-1177 (D.C. Cir.) ...................................................................................... 10

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
  566 U.S. 560 (2012) ............................................................................................ 4

*Util. Air Regulatory Grp. v. EPA*,
  134 S. Ct. 2427 (2014) ........................................................................................ 11-12

STATUTES, REGULATIONS, AND LEGISLATIVE MATERIALS

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"),
  Pub. L. No. 111-203, 124 Stat. 1376 .................................................................. 1

Federal Vacancies Reform Act ("FVRA"),
  Pub. L. No. 105-277 § 151, 112 Stat. 2681 (1998) ............................................ 2

H.R. 4173, 111th Cong. § 4102(b)(6)(B)(1) (engrossed version, Dec. 11, 2009) ......... 12

House-Senate Joint Conference on H.R. 4173, Wall Street Reform and Consumer
  Protection Act 161 (June 10, 2010) .................................................................... 12

5 U.S.C. § 3345(a)(1) ................................................................................................ 8

5 U.S.C. § 3345(a)(2) ................................................................................................ 2, 8

5 U.S.C. § 3345(a)(3) ................................................................................................ 8

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

5 U.S.C. § 3347(a)(1)(B) ........................................................... 2

5 U.S.C. § 3349c(1) ................................................................... 11

12 U.S.C. § 4 ............................................................................. 4

12 U.S.C. § 4512(f)................................................................... 4-5, 11

12 U.S.C. § 5491 ...................................................................... 8

12 U.S.C. § 5491(b)(5) ............................................................. 4, 5

12 U.S.C. § 5491(b)(5)(A) ........................................................ 1

12 U.S.C. § 5491(b)(5)(B) ........................................................ 2

12 U.S.C. § 5491(c)(3)............................................................... 3, 10

15 U.S.C. § 78d ........................................................................ 11

31 U.S.C. § 502(f)..................................................................... 6

52 U.S.C. § 30106..................................................................... 11

S. 3217, 111th Cong. § 1011(b)(5)(B) (2010) ............................ 12

S. Rep. No. 105-250 (1998)....................................................... 7

S. Rep. No. 111-176 (2010)....................................................... 2, 9, 10

OTHER AUTHORITIES

Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*,
    89 Tex. L. Rev. 15 (2010) ......................................................... 9

Susan Block-Lieb, *Accountability and the Bureau of Consumer Financial Protection*, 7
    Brook. J. Corp. Fin. & Com. L. 25 (2012) ................................. 10

Cong. Research Serv., *Independence of Federal Financial Regulators: Structure,
    Funding, and Other Issues* (2017).............................................. 10

Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* (2011) .................. 9

Adam J. Levitin, *The Consumer Financial Protection Bureau: An Introduction*,
    32 Rev. Banking & Fin. L. 321 (2013) ....................................... 9, 10

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Memorandum for Donald F. McGahn II, Counsel to the President, from Steven A. Engel,*
*Assistant Attorney General, Office of Legal Counsel* (Nov. 25, 2017) .............. 5, 6, 7, 8, 11

Merriam Webster Online Dictionary ........................................................................ 4

Arthur E. Wilmarth, *The Financial Services Industry's Misguided Quest to Undermine the*
*Consumer Financial Protection Bureau*, 31 Rev. Banking & Fin. L. 881 (2012).... 10

### INTEREST OF *AMICI*[1]

*Amici* are current and former members of Congress who are familiar with the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), Pub. L. No. 111-203, 124 Stat. 1376.  Indeed, *amici* were sponsors of Dodd-Frank, participated in drafting it, serve or served on committees with jurisdiction over the federal financial regulatory agencies and the banking industry, currently serve in the leadership, or served in the leadership when Dodd-Frank was passed.  They are thus familiar with the critical role that the Consumer Financial Protection Bureau plays in the legislative plan that Congress put in place when it enacted Dodd-Frank to prevent future financial crises like the Great Recession of 2008, as well as with Congress's considered decisions about how best to structure the CFPB so that it could play that critical role. Significantly, based on their experiences, *amici* know that Congress drafted Dodd-Frank to make clear that the Bureau's Deputy Director would, in the event of a vacancy in the office of Director, serve as acting Director until the President nominated a new Director and that individual was confirmed by the Senate.  Only that structure is consistent with the independence that was so central to Congress's design in establishing the Bureau as a primary protector for American consumers.  *Amici* thus have an interest in this case.

A full listing of *amici* appears in the Appendix.

### INTRODUCTION

On November 24, 2017, Richard Cordray resigned as Director of the Consumer Financial Protection Bureau ("CFPB").  Prior to resigning, and pursuant to his authority under Dodd-Frank, *see* 12 U.S.C. § 5491(b)(5)(A), he appointed the Bureau's Chief of Staff Leandra English (who has served in a number of leadership roles at the CFPB) as Deputy Director of the Bureau.  Under

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

Dodd-Frank, the Bureau's Deputy Director "shall . . . serve as acting Director in the absence or unavailability of the Director."  12 U.S.C. § 5491(b)(5)(B).

Notwithstanding this clear and mandatory language, President Donald Trump has ordered Mick Mulvaney, currently head of the Office of Management and Budget, to serve as acting Director of the Bureau, purportedly pursuant to the Federal Vacancies Reform Act ("FVRA"), Pub. L. No. 105-277 § 151, 112 Stat. 2681 (1998).  The FVRA establishes default rules that are the exclusive means by which presidents can temporarily fill vacant executive offices unless a statute "designates an officer or employee to perform the functions and duties of [the] specified office temporarily in an acting capacity."  5 U.S.C. § 3347(a)(1)(B).  Under those default rules, the President "may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity," subject to certain time limits. *Id*. § 3345(a)(2).

Deputy Director English now seeks an order from this Court maintaining the status quo until the courts can determine the CFPB's rightful head.  This Court should grant her that relief. Because Dodd-Frank's mandatory succession provision displaces the FVRA's default rules, the President's purported appointment of Mulvaney is unlawful, and Deputy Director English should succeed on the merits.

In 2010, Congress enacted the Dodd-Frank Act in response to the financial crisis of 2008, a crisis that "shattered" lives, "shuttered" businesses, "evaporated" savings, and caused millions of families to lose their homes. S. Rep. No. 111-176, at 39 (2010); *see id.* ("the financial crisis has torn at the very fiber of our middle class").  After extensively studying the roots of this crisis, Congress determined that, despite an abundance of legal authority to combat the mortgage abuses

that were largely responsible, the manner in which this authority was dispersed among numerous federal regulators led to inaction and delay.

To solve this problem and prevent similar crises in the future, Congress established a consolidated federal agency, the CFPB, with the sole mission of protecting Americans from harmful practices of the financial services industry.  In creating the Bureau, lawmakers determined that it needed to have some degree of independence in order to fulfill its mission and thus provided that the President could remove the Bureau's Director only for good cause—"inefficiency, neglect of duty, or malfeasance in office," 12 U.S.C. § 5491(c)(3)—but not for policy differences alone.

To ensure that the Bureau would maintain its independence even when its Director position was vacant, Congress also designated who would serve as acting Director in the event of a vacancy: the Bureau's Deputy Director.  By using mandatory language to inscribe this order of succession in statute, Congress supplanted the FVRA's default rules for temporarily filling vacancies.  As Congress recognized at the time, allowing the FVRA to govern succession at the Bureau in the event of a vacancy would mean that the Bureau could be headed—potentially for many months— by an acting Director hand-picked by the President without the check of Senate confirmation, thus depriving the Bureau of the independence that was central to Congress's plan in establishing it. Significantly, in the Administration's view, an acting Director chosen unilaterally by the President could head the CFPB for as long as permitted by the FVRA and then designate his own Deputy Director, who would be able to serve as acting Director indefinitely.  That cannot be right.

The Administration takes the position that "shall" does not mean "shall," and that Dodd-Frank's mandatory succession provision merely provides an alternative to the FVRA's default rules.  This position is at odds with the text, structure, and history of Dodd-Frank and should be rejected.  At a minimum, this Court should grant Deputy Director English the temporary injunctive

3

relief she is now seeking to ensure that the status quo is maintained until these issues can be fully briefed and resolved by the courts.

## ARGUMENT

### The CFPB's Successor Provision Supplants the Federal Vacancies Reform Act, Providing the Sole Means of Temporarily Filling a Vacancy in the Position of CFPB Director Until Senate Confirmation of a New Director

Dodd-Frank establishes for the CFPB "the position of Deputy Director, who shall . . . be appointed by the Director . . . and serve as acting Director in the absence or unavailability of the Director." 12 U.S.C. § 5491(b)(5). Under a plain reading of this language, Dodd-Frank requires the CFPB's Deputy Director to serve as acting Director of the Bureau when the Director leaves office and is thus "absen[t]" or "unavailab[le]." *See, e.g.*, *Absent*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/absent (defining "absent" as "not existing: lacking" and as "not present at a usual or expected place: missing"); *Unavailable*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/unavailable (defining "unavailable" as "not available: such as . . . unable or unwilling to do something"); *see generally Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").

These ordinary definitions of "absent" and "unavailable" cover situations in which a Director has resigned, leaving the office of the Director unoccupied. As the Department of Justice has acknowledged, the broad meanings of these terms must not be artificially narrowed simply because Dodd-Frank does not expressly refer to a *vacancy* in that office. While some statutes governing succession in office refer explicitly to vacancies or resignations, *see, e.g.*, 12 U.S.C. § 4 (providing order of succession for the Comptroller of the Currency "[d]uring a vacancy in the office or during the absence or disability of the Comptroller"); *id.* § 4512(f) (providing for

4

appointment of Acting Director of the Federal Housing Finance Agency "[i]n the event of the death, resignation, sickness, or absence of the Director"), the legislators who drafted and voted on Dodd-Frank chose expansive language—"absence or unavailability"—that naturally encompasses the resignation of a CFPB Director. *See Memorandum for Donald F. McGahn II, Counsel to the President, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel* 3 (Nov. 25, 2017) ("OLC Memo") ("the provision's reference to 'unavailability' is best read to refer both to a temporary unavailability . . . and to the Director's being unavailable because of a resignation or other vacancy in office").

Notwithstanding Dodd-Frank's successor provision, the President has ordered Mick Mulvaney to serve as acting Director of the Bureau pursuant to the FVRA. According to the Office of Legal Counsel ("OLC"), Mulvaney's appointment is lawful because, even though the "Vacancies Reform Act is not the 'exclusive means' for the temporary designation of an Acting Director . . . it remains available to the President as one means for fulfilling a vacancy in the Director position." OLC Memo at 3. This conclusion is at odds with the text, structure, and history of Dodd-Frank.

## I.      Dodd-Frank's Mandatory Language Displaces the FVRA's Default Rules

As noted earlier, Dodd-Frank establishes the position of CFPB Deputy Director, "who shall . . . serve as acting Director in the absence or unavailability of the Director."  12 U.S.C. § 5491(b)(5). This mandatory language, enacted after the FVRA default rules were adopted, expressly displaces those default rules.  OLC concludes otherwise only by dramatically downplaying the significance of Dodd-Frank's mandatory language.

OLC argues that the effect of Dodd-Frank's successor provision is not to displace the FVRA entirely, but only to establish that the FVRA is not the *exclusive* means of providing for an

acting Director of the CFPB.   Thus, OLC acknowledges that Deputy Director English automatically serves as acting Director of the Bureau upon the resignation of the Director, but maintains that the President may remove her from that role by naming his own acting Director. OLC begins its analysis of this point with the unremarkable proposition that "there will be cases where the Vacancies Reform Act is non-exclusive, *i.e.*, one available option, together with [an] office-specific statute."  OLC Memo 4.  According to OLC, "[i]f Congress had intended to make the Vacancies Reform Act *unavailable* whenever another statute provided an alternative mechanism for acting service, then it would have said so."  *Id.*  While this may be true, it is also beside the point.  The fact that Congress did not want to make the FVRA unavailable any time another statute provided an alternative mechanism for acting service does not mean that Congress wanted the FVRA to be available in *all* such cases.  Many agencies' organic statutes provide—in permissive terms—that a designated official "may" serve as an acting officer in the event of a vacancy.  *See, e.g.*, 31 U.S.C. § 502(f) ("When the Director and Deputy Director [of the Office of Management and Budget] are absent or unable to serve or when the offices of Director and Deputy Director are vacant, the President may designate an officer of the Office to act as Director.").  Under those statutes, the successor provision supplements, rather than replaces, the FVRA's default rules.

But Dodd-Frank is written differently.  It does not say that the "Deputy Director may serve as acting Director"; it says that she "shall" serve as acting Director.  Thus, to comply with Dodd-Frank, the Deputy Director must serve as acting Director.  *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) ("Congress' use of the word 'shall' demonstrates that § 8127(d) mandates the use of the Rule of Two in all contracting before using competitive

procedures."); *cf. Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("the mandatory 'shall[]' . . . normally creates an obligation impervious to judicial discretion").

To undermine this textual imperative, OLC is forced to rely heavily on the FVRA's legislative history, claiming that a Senate Report shows that "Congress plainly intended . . . that the President could invoke the Vacancies Reform Act as 'an alternative procedure' and depart from the statutory order of succession" in cases like this one involving mandatory "shall" language. OLC Memo 5-6.  Significantly, however, the Senate report actually makes a much more limited claim: "even with respect to the specific positions in which temporary officers *may* serve under the specific statutes this bill retains, the Vacancies Act would continue to provide an alternative procedure for temporarily occupying the office."  S. Rep. No. 105-250, at 17 (1998) (emphasis added).  "Shall" and "may" are not interchangeable.  *Cf. Kingdomware Technologies*, 136 S. Ct. at 1977 ("When a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty.").

If anything, the FVRA's legislative history supports Deputy Director English here, because the Administration's position would enhance the President's ability to sidestep or delay the requirement of Senate confirmation for the office of Director—the very practice that the FVRA was meant to curtail.  The Act was a direct response to perceived violations of the Constitution's Appointments Clause by the executive branch, adopted to prevent presidents from circumventing the Senate's advice-and-consent role, while at the same time ensuring that agencies could continue to function effectively while the Senate confirmation process was ongoing.  *See, e.g.*, S. Rep. No. 105-250, at 5 (1998) ("the Senate's confirmation power is being undermined as never before"). OLC's view would ironically expand the President's flexibility to delay a Senate confirmation vote on the CFPB Director, while Deputy Director English's would encourage the President to quickly

nominate someone to fill the vacancy—an action that President Trump has notably not yet taken, even though former Director Cordray announced weeks ago that he would be resigning at the end of this month.

Further attempting to dismiss the significance of Dodd-Frank's mandatory language, OLC unpersuasively equates this language with a provision found in the FVRA's default rules that also uses the word "shall." *See* 5 U.S.C. § 3345(a)(1) (providing that when an executive officer is not available, the "first assistant" to that officer "shall perform" the functions and duties of the office temporarily). According to OLC, because this provision "similarly uses mandatory terms . . . . we cannot view either statute as more mandatory than the other." OLC Memo 5. But in pointed contrast to Dodd-Frank, the section of the FVRA that OLC discusses carves out two exceptions to the "shall" language in its first paragraph, both of which expressly provide alternative options to the president "notwithstanding paragraph (1)." 5 U.S.C. § 3345(a)(2), (a)(3). OLC's comparison undercuts its own position by highlighting the absence of any similar carve-outs in the relevant section of Dodd-Frank. *See* 12 U.S.C. § 5491.

Moreover, Dodd-Frank was enacted after the FVRA and is also more specific, given that it applies only to the head of one particular agency, rather than providing general rules for all executive offices. "'[I]t is a commonplace of statutory construction that the specific governs the general.'" *See, e.g.*, *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) ("a specific statute . . . controls over a general provision"). Given its later enactment, its greater specificity, and its failure to include any exceptions to its successor provision—or to hint in any way that it is meant to work in tandem with the FVRA—Dodd-Frank's "shall" language must be taken at face value.

Thus, Dodd-Frank's plain text dictates that its successor provision displaces the FVRA's default rules. That understanding of Dodd-Frank is also the most consistent with the statute's structure and history, as the next Section discusses.

## II. Congress's Decision To Displace the FVRA Default Rules Is Consistent with Its Statutory Plan for the CFPB and Supported by Dodd-Frank's Legislative History

As *amici* well know, there was a reason that Congress, acting against the backdrop of the FVRA's default rule, chose to include in Dodd-Frank a mandatory provision designating who should serve as acting Director in the event of a vacancy. The alternative approach—allowing the President to hand-pick someone without the check of Senate confirmation—would undermine Congress's overall statutory plan for the CFPB. In establishing the Bureau, lawmakers determined that the Bureau needed to be an independent regulator to remain a vigilant guardian of consumers' interests. Before the financial crisis, the political branches intensely pressured the financial regulatory agencies at the behest of industry lobbyists to prevent robust oversight. *See, e.g.*, Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* 53 (2011) (discussing industry-prompted congressional demands that consumed agency time and discouraged regulations). After the crisis, in debates over the Bureau, "consumer advocates urged a more independent agency, fearing industry capture and heavy-handed political interference by Congress and the White House." Adam J. Levitin, *The Consumer Financial Protection Bureau: An Introduction*, 32 Rev. Banking & Fin. L. 321, 339 (2013); *see, e.g.*, S. Rep. No. 111-176, at 24 (recounting testimony recommending "improving regulatory independence"). Such independence "allow[s] an agency to protect the diffuse interest of the general public" that otherwise would be "outgunned" by "well-financed and politically influential special interests." Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 17 (2010).

Heeding this imperative, Congress made the Bureau's leader removable by the President only for good cause: "inefficiency, neglect of duty, or malfeasance in office."   12 U.S.C. § 5491(c)(3).[2]   As *amici* well know, virtually all financial regulators are headed by officers with fixed terms who are removable only for cause, *see* Cong. Research Serv., Independence of Federal Financial Regulators: Structure, Funding, and Other Issues 15-17 (2017), and Congress appreciated that good-cause tenure would give the Bureau the independence necessary to regulate effectively, *see, e.g.*, *Morrison, v. Olson*, 487 U.S. 654, 687-88 (1988) ("Were the President to have the power to remove FTC Commissioners at will, the 'coercive influence' of the removal power would 'threate[n] the independence of [the] commission.'" (quoting *Humphrey's Ex'r v. United States*, 295 U.S. 602, 630 (1935)); Susan Block-Lieb, *Accountability and the Bureau of Consumer Financial Protection*, 7 Brook. J. Corp. Fin. & Com. L. 25, 38 (2012) (removal limits "are intended to permit appointees both to develop expertise on technical subjects and to take politically unpopular action").[3]

To ensure that the Bureau would continue to enjoy independence even in the event of a vacancy in the Director position, Congress also chose to designate in advance the officer that would serve as acting Director, rather than allowing the President to put in place an official who had not

---

[2] Congress's choice to limit the grounds for removing the Director is presently the subject of a constitutional challenge.  *See PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir.).

[3] To further promote a "strong and independent Bureau," S. Rep. No. 111-176, at 174, Congress also funded the CFPB outside "the opaque horse-trading of the appropriations process," Levitin, *supra*, at 341; see 12 U.S.C. § 5497(a)(1).  Nearly all financial regulatory agencies have this feature, Arthur E. Wilmarth, *The Financial Services Industry's Misguided Quest to Undermine the Consumer Financial Protection Bureau*, 31 Rev. Banking & Fin. L. 881, 951 (2012), and lawmakers explained that "the assurance of adequate funding, independent of the Congressional appropriations process, is absolutely essential to the independent operations of any financial regulator," S. Rep. No. 111-176, at 163; *see id.* (citing the "hard learned lesson" of the precursor to the Federal Housing Finance Agency, whose "effectiveness" was "widely acknowledged" to have been harmed by its need for congressional appropriations).

been confirmed by the Senate to head the Bureau.  In making this choice, Congress was not doing anything novel.  Nearly all independent agencies are structured so as to prevent presidents from achieving what President Trump is attempting here.  Most such agencies are headed by multi-member boards or commissions, with authorizing statutes that do not provide for the temporary replacement by the President of board members or commissioners who leave office before the end of their terms.  *See, e.g.*, 15 U.S.C. § 78d (Securities and Exchange Commission); 52 U.S.C. § 30106 (Federal Election Commission).  The FVRA likewise withholds from the President the authority to temporarily replace board members and commissioners of multi-member independent agencies.  5 U.S.C. § 3349c(1).[4]  The legislation creating the Federal Housing Finance Agency, one of the few independent agencies besides the CFPB led by a single director, similarly restricts the President's choice of a temporary replacement when the director leaves office: the President is limited to choosing among three existing Deputy Directors of the agency.  12 U.S.C. § 4512(f).

These considerations bolster the plain reading of Dodd-Frank's clear language: the Deputy Director automatically becomes acting Director in the event of a vacancy, and the President therefore lacks authority under the FVRA to make his own choice of acting Director instead.  *See King v. Burwell*, 135 S. Ct. 2480, 2492 (2015) ("the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (quoting *Util. Air Regulatory Grp.*

---

[4] OLC acknowledges that "Congress has indeed determined that some positions with hallmarks of independence should not be filled on an acting basis through the Vacancies Reform Act," but notes that the "Director does not appear among the other specifically enumerated positions."  OLC Memo 7.  According to OLC, "[t]he fact that the Director's position did not exist when the Vacancies Reform Act was enacted does not change the analysis" because it "reinforces the proposition that Congress could have excluded the Director of the CFPB from coverage upon creating the office, but did not do so."  *Id.* at 7 n.5.  Yet that is exactly what Congress did, in fact, do—by providing a mandatory succession provision in Dodd-Frank itself.

*v. EPA,* 134 S. Ct. 2427, 2441 (2014))).[5]

Finally, as *amici* well know, the legislative history of Dodd-Frank also supports this conclusion. The bill that passed the House of Representatives in December 2009 did not provide for a Deputy Director of the CFPB. Instead, it explicitly stated that when the Director's office became vacant any temporary replacement would be appointed pursuant to the FVRA. *See* H.R. 4173, 111th Cong. § 4102(b)(6)(B)(1) (engrossed version, Dec. 11, 2009). The Senate bill introduced and passed months later, whose language prevailed in conference, was the origin of the present statutory language. *See* S. 3217, 111th Cong. § 1011(b)(5)(B) (2010); *see also* House-Senate Joint Conference on H.R. 4173, Wall Street Reform and Consumer Protection Act 161 (June 10, 2010). This change reflects Congress's considered decision that the FVRA should not govern succession in the event of a vacancy in the Director position; instead, as the language of the statute indicates, the Bureau's second-in-command should take over until a new Director is appointed by the President and confirmed by the Senate.

\* \* \*

In sum, the plain text, structure, and legislative history of Dodd-Frank all point to the same conclusion: the CFPB's Deputy Director serves as acting Director of the Bureau when a vacancy occurs, a mandatory order of succession that Congress established to prevent exactly what the Administration is attempting here: temporarily filling the role—and delaying the nomination of a

---

[5] The President's selection of Mick Mulvaney, Director of the Office of Management and Budget, only underscores what is wrong with the Administration's position. As the head of an agency located within the Executive Office of the President, Mulvaney works closely with the President on a range of issues and serves at the pleasure of the President. It is difficult to imagine a figure with less independence from the White House and its policy preferences serving at the helm of the Bureau. This is precisely the type of situation that Congress sought to avoid by designating in advance who would serve as acting Director of the Bureau in the event of a vacancy.

permanent successor—with a designee who reflects the President's policy preferences but has not been subject to the check of Senate confirmation.  President Trump is entitled to choose who the next Director of the Bureau will be, but he must nominate that person, and the Senate must agree to confirm him or her.  Until that happens, Dodd-Frank makes clear who should be running the Bureau: its Deputy Director.

## CONCLUSION

For the foregoing reasons, the court should grant plaintiff's motion for a temporary restraining order.

Respectfully submitted,

Dated:  November 27, 2017                /s/ Brianne J. Gorod
                                        Brianne J. Gorod

                                        Elizabeth B. Wydra (DC Bar No. 483298)
                                        Brianne J. Gorod (DC Bar No. 982075)
                                        Brian R. Frazelle (DC Bar No. 1014116)
                                        CONSTITUTIONAL ACCOUNTABILITY CENTER
                                        1200 18th Street, N.W., Suite 501
                                        Washington, D.C. 20036
                                        (202) 296-6889
                                        brianne@theusconstitution.org

                                        *Counsel for Amici*

**APPENDIX:**

LIST OF *AMICI*

Brown, Sherrod
    Senator of Ohio

Capuano, Michael E.
    Representative of Massachusetts

Cortez Masto, Catherine
    Senator of Nevada

Crist, Charlie
    Representative of Florida

Delaney, John K.
    Representative of Maryland

Ellison, Keith
    Representative of Minnesota

Foster, Bill
    Representative of Illinois

Frank, Barney
    Former Representative of Massachusetts

Gonzalez, Vicente
    Representative of Texas

Heck, Denny
    Representative of Washington

Himes, Jim
    Representative of Connecticut

Hoyer, Steny
    Representative of Maryland

Kihuen, Ruben J.
    Representative of Nevada

Kildee, Dan
    Representative of Michigan

Maloney, Carolyn B.
    Representative of New York

Menendez, Bob
    Senator of New Jersey

Moore, Gwen S.
    Representative of Wisconsin

Pelosi, Nancy
    Representative of California

Schatz, Brian
    Senator of Hawaii

Schumer, Charles E.
    Senator of New York

Sherman, Brad
    Representative of California

Van Hollen, Chris
    Senator of Maryland

Vargas, Juan
    Representative of California

Velázquez, Nydia M.
    Representative of New York

Warren, Elizabeth
    Senator of Massachusetts

Waters, Maxine
    Representative of California

**CERTIFICATE OF SERVICE**

I hereby certify that on November 27, 2017, the foregoing document was filed with the Clerk of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: November 27, 2017

/s/ Brianne J. Gorod
Brianne J. Gorod