# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEANDRA ENGLISH,
                        *Plaintiff,*

    v.

DONALD J. TRUMP and
JOHN M. MULVANEY,
                        *Defendants.*

Civil Action No. 1:17-cv-02534

**AMICUS BRIEF OF PETER CONTI-BROWN IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Statement of Amicus ................................................................................................ 1

Summary of Argument ............................................................................................ 1

Argument .................................................................................................................. 2

     I.      Congress created the Bureau to be insulated from the President. ...................... 4

     II.     Independence as a legal category is about the extent of the President's control over personnel. ............................................................................................ 8

     III.    Independence is guaranteed by law, but implemented by norm and tradition. President Trump's appointment of Mr. Mulvaney risks a substantial assault on the norms of independence for other entities like the U.S. Federal Reserve System and the Federal Deposit Insurance Corporation. .......................................................................................................... 11

     IV.    There are other candidates the President could name who would not violate the law. ....................................................................................................... 13

     V.     President Trump, like other presidents before him, would prefer to maximize his freedom of movement at Congress's expense. The judiciary should not be party to that threat to the separation of powers .......... 16

Conclusion ............................................................................................................... 19

# TABLE OF AUTHORITIES

## Cases

*Edmond v. United States,*
  520 U.S. 651, 659 (1997) ........................................................................................10

*Free Enterprise Fund v. PCAOB,*
  561 U.S. 477 (2010) ..................................................................................................9

*Humphrey's Executor,*
  295 U.S. 602 (1935) ..................................................................................................9

*Morrison v. Olson,*
  487 U.S. 654 (1988) ..................................................................................................9

*Myers v. United States,*
  272 U.S. 52 (1926) ....................................................................................................9

## Statutes

12 U.S.C. § 1816 ............................................................................................................11

12 U.S.C. § 1818 ......................................................................................................11, 12

12 U.S.C. § 5491 ..............................................................................................................4

12 U.S.C. § 225 ..............................................................................................................13

12 U.S.C. § 5497 ..............................................................................................................6

5 U.S.C. § 3345 ..............................................................................................................14

5 U.S.C. § 3349 ..............................................................................................................18

H.R. 3126 § 111. ..............................................................................................................4

## Other Authorities

Adrian Vermeule,
  *Conventions of Agency Independence*, 113 Colum. L. Rev. 1163 (2013) ..........................9

Aziz Z. Huq,
  *Removal as a Political Question*, 65 Stan. L. Rev. 1, 23-31 (2013) ..........................9, 10

Binyamin Appelbaum,
  *Randal Quarles Confirmed as Federal Reserve Governor*, New York Times, Oct 5, 2017 ............15

Elizabeth Warren,
  *Unsafe at Any Rate*, Democracy, Summer 2007, No. 5.................................................4

Jacob E. Gersen,
  *Designing Agencies*, Research Handbook on Public Choice and Public Law 333, 347-48
  (Daniel A. Farber & Anne Joseph O'Connell eds., 2010) ........................................8

Jerry L. Mashaw,
　　*Creating the Administrative Constitution: The Lost One Hundred Years of American
　　Administrative Law* (2012) ..................................................................................8

Jody Freeman and Jim Rossi,
　　*Agency Coordination in Shared Regulatory Space*, 125 Harv. L. Rev. (2012) .................10

Kirti Datla and Richard L. Revesz,
　　*Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769 (2013) .....10

Lisa Schultz Bressman & Robert B. Thompson,
　　*The Future of Agency Independence*, 63 Vand. L. Rev. 599 (2010) ...........................9, 10

M. Elizabeth Magill and Adrian Vermeule,
　　*Allocating Power Within Agencies*, 120 Yale L. J. 1032 (2011) .....................................10

Patrick Rucker and Pete Schroeder,
　　*Wells Fargo sanctions on ice under Trump official – sources*, Reuters, December 7, 2017 ..........6, 15

Peter Conti-Brown, *Does the New Fed Governor Serve at the Pleasure of the President?*, Yale J. on
　　Reg Notice and Comment Blog, October 17, 2017 ..................................................13

Peter Conti-Brown,
　　*The Institutions of Federal Reserve Independence*, 32 Yale J. on Reg (2015) .....................8

Peter Conti-Brown,
　　The Power and Independence of the Federal Reserve (2016) ........................................10, 13

Rachel Barkow,
　　*Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15 (2010)....10

Robert Kaiser,
　　Act of Congress: How America's Essential Institution Works and How It Doesn't (2012) 5

## Constitutional Provisions

U.S. Constitution Article 2, § 2..............................................................................8

## STATEMENT OF AMICUS

Amicus Peter Conti-Brown is an assistant professor at the Wharton School of the University of Pennsylvania. He is a scholar of the structure, history, and evolution of financial regulatory institutions, including especially the U.S. Federal Reserve System. The interest of amicus is the sound development of laws relating to financial regulation. He offers no opinion on defendant John Michael Mulvaney as an individual or Mr. Mulvaney's perspective on consumer finance law or policy, and offers no opinion on the Consumer Financial Protection Bureau's institutional design beyond the legislative requirement of "independence" and its status within the Federal Reserve System.

No party's counsel authored this brief, in whole or in part. Neither party nor any party's counsel contributed money that was intended to fund the preparation or submission of this brief. No person other than amicus curiae contributed money that was intended to fund the preparation of the brief.

## SUMMARY OF ARGUMENT

Although the primary statutory question the parties dispute involves the Federal Vacancies Reform Act (FVRA) and its relationship to the Wall Street Reform and Consumer Protection Act (Dodd-Frank), this case in fact hinges on a different question. Congress established the Consumer Financial Protection Bureau (CFPB) as an independent bureau within the Federal Reserve System. Even if the FVRA applies to the director of the CFPB, President Donald J. Trump's decision to appoint a White House official to act as the Bureau's director eliminates the independence that Congress has required for that Bureau. The CFPB is today an executive bureau within the White House, in plain contravention to

the statute. The President has many other options to avoid the illegality of Mr. Mulvaney's appointment, including by naming a permanent director who will be subject to a public vetting and Senate confirmation. If the court interprets the "independence" required by statute to allow a White House official to direct every aspect of the CFPB's policies, the independence of other institutions, including especially the Federal Deposit Insurance Corporation and the U.S. Federal Reserve System, will face substantial threat.

## ARGUMENT

The parties ask the court to decide whether the FVRA of 1998 or Dodd-Frank applies to the CFPB. If Dodd-Frank applies, the plaintiff Leandra English is the rightful acting director. If the FVRA applies, the defendants argue, the rightful acting director is John Michael Mulvaney.

The FVRA, however important, does not in fact resolve this case. Even if the FVRA applies, President Trump does not have the legal authority to appoint a White House official to lead the CFPB. This brief explains why the statutory requirements that the CFPB be "independent" and "in the Federal Reserve System" trigger limits on the identity of those whom the President may appoint to serve as an acting director.

The independence of administrative agencies is a fraught concept as a matter of history and political theory. As a matter of law, though, it is clear. Whatever else it means, "independence" refers at least to no presidential control over top agency personnel. The CFPB under Mr. Mulvaney is not independent, as required by Congress. And it is no longer within the Federal Reserve System, as required by Congress. As long as Mr. Mulvaney

continues to assert this authority, he and President Trump openly flout Congress's legislative mandate.

I explain this argument in five brief parts. First, I explain the statutory framework as Congress developed it with respect to the CFPB. This part also discusses the statutory relationship between the CFPB and the Office of Management and Budget that Mr. Mulvaney continues to lead. Second, I discuss the law and scholarship associated with independence and why President Trump's decision to appoint Mr. Mulvaney disobeys the congressional mandate for CFPB independence, a legal concept that focuses exclusively on the President's relationship to top personnel. Third, I discuss how allowing President Trump to flout the legal requirement of independence can erode norms of independence for other institutions, including the U.S. Federal Reserve and more directly, the Federal Deposit Insurance Corporation. Fourth, I list the other candidates President Trump could select as acting director of the CFPB who would satisfy the legal demands of independence that Mr. Mulvaney cannot perform by virtue of his continued employment within the White House organization. And finally, I explain why those candidates and the obvious solution to this problem—that the President advance a nomination to be considered by the U.S. Senate for a permanent director—are not as appealing to a president who would seek to control legislative prerogatives more completely than the law allows him to do. This is not a personal accusation against President Trump: Through history, many presidents have sought to expand executive prerogatives at congressional expense. It is up to the judiciary to enforce that constitutional and legislative separation.

3

For these reasons, even if the court accepts the defendants' argument that the FVRA controls the appointment process, the defendants should still lose. In that event, President Trump must be required to choose an acting director—or, much better, to nominate a permanent one—without the conflicts that violate the congressional requirement of CFPB independence.

## I.   Congress created the Bureau to be insulated from the President.

The Bureau began its life as a proposed "Financial Product Safety Commission" from then Professor Elizabeth Warren.[1] By the time it became a legislative proposal, the entity was called the Consumer Financial Protection Agency, created by the House of Representatives to be "an independent agency in the executive branch" with a five-person structure. Consumer Financial Protection Agency Act of 2009, H.R. 3126 § 111. Only during the final negotiations did Senate Republicans succeed in proposing the Consumer Financial Protection Bureau, located within the Federal Reserve System.[2] The proposal was met with some skepticism from liberal Democrats but was seen as a bridge to compromise with Republican colleagues in hopes of passing a bipartisan bill.

Although bipartisan efforts broke down, the Bureau structure remained. What Congress finally created and President Barack Obama signed into law was a guarantee: "There is established in the Federal Reserve System an independent bureau to be known as the 'Bureau of Consumer Financial Protection." 12 U.S.C. § 5491. The point for that structural innovation was not to put the new Bureau under the thumb of the Federal Reserve. The Fed

[1] Elizabeth Warren, "Unsafe at Any Rate," *Democracy*, Summer 2007, No. 5.
[2] See the definitive history of the Dodd-Frank Act for more details, ROBERT KAISER, Act of Congress: How America's Essential Institution Works and How It Doesn't, 250-255 (2012)

would not have control over the new Bureau's budget, although that budget would originate with the Fed's own financial portfolio and would be determined by the CFPB Director subject to statutory limits. Nor would the Fed have any formal authority over the appointment of its personnel. The idea was to establish the bureau on its own footing, but with a connection to an institution known for its expertise and insulation from partisan politics. Indeed, that connection away from political meddling made it unpopular for some Senators from both parties.[3]

It is important to emphasize how tenuous the connection between the CFPB and the Fed has become in practice, exactly as envisioned by Congress. Besides the budget already mentioned, the Fed and CFPB share an inspector general: nothing more. The CFPB is placed within the Fed not to increase the relationship between the entities, but to create a legal mandate aimed at changing public perceptions and, therefore, presidential behavior. The expectation of independence that the Fed enjoys largely by tradition is extended to the CFPB. This tenuous connection only highlights the CFPB's insulation, and how easily replaced the Fed is as the overarching administrative umbrella for the CFPB.

That connection has now been displaced by the purported appointment of Mr. Mulvaney as the Bureau's acting director. The White House now can dictate the CFPB's budget, since the director issues its budget request to the Federal Reserve System. The White House can dictate personnel decisions within the Bureau, as the Director has done.[4] The White House

---

[3] *Id.*

[4] Andrew Restuccia, "Mulvaney imposes temporary hiring, regulations freeze on CFPB," Politico, November 27, 2017, available at https://www.politico.com/story/2017/11/27/mulvaney-hiring-freeze-consumer-protections-192306

can control regulatory decisions, as it indeed has already done.[5] And the White House can control enforcement decisions, as it indeed has already done.[6]

Under Mr. Mulvaney, the Consumer Financial Protection Bureau is not "established in the Federal Reserve System an independent bureau." There instead is established an executive department of the White House, overseen by the White House Office of Management and Budget. President Trump has ignored the contrary congressional mandate. He has created a new law, not executed an old one.

The illegality of Mr. Mulvaney's appointment is even more apparent given the specific relationship—or lack of relationship—that Congress created between the Bureau and the Office of Management and Budget. In announcing how the CFPB would handle its budgetary and financial management, Congress announced a rule of construction in 12 U.S.C. § 5497(a)(4)(E). It is worth quoting in full:

> This subsection may not be construed as implying any obligation on the part of the Director to consult with or obtain the consent or approval of the Director of the Office of Management and Budget with respect to any report, plan, forecast, or other information referred to in subparagraph (A) or any jurisdiction or oversight over the affairs or operations of the Bureau.

It is difficult to imagine clearer statutory text than this. Not only does the CFPB Director have no obligation to consult with the OMB Director, the OMB has no jurisdiction or oversight over the affairs or operations of the Bureau. This provision provides even more flesh to the bones of independence that Congress required for the

---

[5] *Id.*

[6] Patrick Rucker and Pete Schroeder, "Wells Fargo sanctions on ice under Trump official – sources," Reuters, December 7, 2017, available at https://www.reuters.com/article/us-usa-trump-wells-fargo-exclusive/exclusive-wells-fargo-sanctions-are-on-ice-under-trump-official-sources-idUSKBN1E12Y5?il=0

Bureau. It is to be independent of the White House—including the Office of Management and Budget. The White House has engaged in a rule of construction, in a sense, that puts the OMB in direct "oversight over the affairs or operations of the Bureau." *Id.*

Congress only writes the laws; it is up to the President to execute them. Here the President has abrogated, rather than executed, the legal requirement of CFPB independence. By giving Mr. Mulvaney the two hats of OMB director and CFPB director, the CFPB is now squarely and literally under the management of the OMB, much more directly than any other agency of government. Indeed, Mr. Mulvaney's appointment takes the OMB at its most political and least technical, and imposes it on the CFPB. The OMB houses a large body of civil servants who prepare technical reports about the costs and benefits of regulations and other consultations required by legislation and regulation. President Trump has accomplished an end-run around this technical process and imposed only the political bottom line: the OMB head now has the unilateral veto over every aspect of the CFPB's decision-making.

There is a proposal to dramatically change the CFPB's governance structure, mandate, relationship to the White House (and the OMB), and funding structure: HR 10 – Financial CHOICE Act of 2017, introduced April 26, 2017. That proposal has already passed the U.S. House of Representatives and awaits action in the U.S. Senate. I offer no opinion on whether a legislative change of the kinds anticipated here is sound as a policy matter. Policy decisions of these kinds are left for Congress to decide. But so far, Congress has reached the opposite conclusion and not passed this and many other repeated efforts at changing the

Bureau's structure. Until Congress passes a law that abrogates that earlier determination, the President is not at liberty to do so himself. Appointing Mr. Mulvaney as acting director is precisely this kind of presidential legislation.

## II.      Independence as a legal category is about the extent of the President's control over personnel.[7]

Congress has mandated CFPB independence, but what "independence" means is often an elusive concept as a matter of political and historical practice. The idea that there should be administrative agencies as something other than the alter ego of the President is nearly as old as the U.S. Republic.[8] The U.S. Constitution itself outlines some kind of separation by creating "executive Departments" that are separate from the Presidency. U.S. Constitution Article 2, § 2. As a matter of law, however, the concept of "independence" is something very specific. As Harvard Law Professor Jacob Gersen has noted, agency independence is a "legal term of art in public law, referring to agencies headed by officials that the President may not remove without cause. Such agencies are, by definition, independent agencies; all other agencies are not."[9] Thus, "agency independence" is not concerned with "independence" in some kind of colloquial sense, of pure autonomy with no possibility of outside interference. The question is only the President's ability to directly control the agency's agenda through top personnel.

---

[7] Sections of this portion of the brief are drawn from Peter Conti-Brown, "The Institutions of Federal Reserve Independence," 32 Yale J. on Reg (2015).

[8] *See* Jerry L. Mashaw, Creating the Administrative Constitution: The Lost One Hundred Years of American Administrative Law (2012).

[9] Jacob E. Gersen, *Designing Agencies*, in RESEARCH HANDBOOK ON PUBLIC CHOICE AND PUBLIC LAW 333, 347-48 (Daniel A. Farber & Anne Joseph O'Connell eds., 2010).

Scholars have documented the removability focus in administrative law's historical development,[10] but the doctrinal gist is simple. Congress may not require the President to seek Senate advice and consent prior to firing an agency head, as the "reasonable construction of the Constitution" would forbid that kind of blending of legislative and executive functions. *Myers v. United States*, 272 U.S. 52, 116, 176 (1926). But Congress may condition presidential removal of an agency head to a more limited range of causes, depending on the nature of the office in question. For offices that are created to "perform . . . specified duties as a legislative or as a judicial aid," the Court deemed removability conditions on agency heads constitutionally permissible. *Humphrey's Executor*, 295 U.S. 602, 627-28 (1935). So too for lower-level executive appointees like the independent counsel, *Morrison v. Olson*, 487 U.S. 654 (1988), but not if the agency head and the lower-level appointee are both deemed to be protected by for-cause removability protection. *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010).

As a matter of black-letter law, then, agency independence has a laser-like focus on the relationship between the president and the head of the agency in question. Criticizing this narrow focus on personnel control has become something of a boom industry for scholars of administration in the last decade. For example, the personnel focus looks at the wrong mechanisms of independence,[11] creates meaningless distinctions between executive and

---

[10] *See* Aziz Z. Huq, *Removal as a Political Question*, 65 Stan. L. Rev. 1, 23-31 (2013). Rachel Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15 (2010). Adrian Vermeule, *Conventions of Agency Independence*, 113 Colum. L. Rev. 1163 (2013).
[11] *See* Lisa Schultz Bressman & Robert B. Thompson, *The Future of Agency Independence*, 63 Vand. L. Rev. 599, 631-37 (2010).

independent agencies,[12] is focused on the wrong problems[13] and the wrong parties,[14] reflects a misunderstanding of how the administrative state actually functions,[15] elides ways in which the President controls independent agencies beyond removability,[16] and gives to courts review of decisions that are fundamentally incompatible with judicial review.[17]

I've also joined that scholarly criticism with respect to the U.S. Federal Reserve System.[18] But this collective criticism focuses on the practical realities that agencies confront: it is not the law. As the Supreme Court has instructed, this personnel focus is not merely a matter of "etiquette or protocol," but "is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997) (citing *Buckley v. Valeo*, 424 U.S. 1, 125 (1976)). Whatever the criticism, the Supreme Court has held that the personnel focus is nearly exclusive. And here, President Trump has installed a member of the Executive Office of the President, under his direct control and supervision, to lead an entity Congress designated as "independent." By this action, the President has flouted the law.

---

[12] Kirti Datla and Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769 (2013).
[13] *See* Barkow, *supra* note 10.
[14] M. Elizabeth Magill and Adrian Vermeule, *Allocating Power Within Agencies*, 120 YALE L. J. 1032 (2011).
[15] Jody Freeman and Jim Rossi, *Agency Coordination in Shared Regulatory Space*, 125 HARV. L. REV. (2012).
[16] Bressman and Thompson, *supra* note 11.
[17] Huq, *supra* note 10.
[18] Peter Conti-Brown, The Power and Independence of the Federal Reserve (2016).

### III. Independence is guaranteed by law, but implemented by norm and tradition. President Trump's appointment of Mr. Mulvaney risks a substantial assault on the norms of independence for other entities like the U.S. Federal Reserve System and the Federal Deposit Insurance Corporation.

If the legislative mandate for "independence" and the judicial focus on personnel are clear, how courts guarantee that independence is not as clearly specified. Given that the informal concept of agency independence in administrative law is so difficult to define with precision and so dependent on context, it is unsurprising that the implementation of independence is governed by norms and traditions. The legal question the court must decide is whether a White House official acting as CFPB director guarantee the CFPB's required independence, but this question cannot be answered in a vacuum. If this court permits the President to override the legislative mandate of CFPB independence by installing a White House official to lead the Bureau, the norms and traditions associated with other independent agencies will also be under attack.

This attack is most direct for the Federal Deposit Insurance Corporation, a federal agency created in the aftermath of the banking crises of the Great Depression to guarantee bank deposits nationwide. The FDIC's power is extraordinary. In addition to certifying every recipient of federal deposit insurance—whether state banks, national banks, or foreign banks doing business in the United States, *see* 12 U.S.C. § 1816—the FDIC must take extraordinary actions with the banks who receive this insurance. This includes an involuntary termination of deposit insurance, 12 U.S.C. § 1818(a)(2), issuing cease-and-desist letters to individual banks covering a broad array of activities, *id.* § 1818(b); "remov[ing] . . . from office or to prohibit any further participation by such party, in any manner, in the conduct of the affairs

of any insured depository institution" of any officer of any relevant bank, *id.* § 1818(e)(1); and seizing the assets, liquidating the interests, and running a bank that it deems in sufficient distress, *id.* § 1821. Dodd-Frank has only expanded the FDIC's role in the individual supervision and regulation of the nation's largest banks. The FDIC exercises staggering governmental authority over individual private actors.

That power requires significant insulation from those actors who would seek either to unjustly avoid its use or to deploy it against disfavored parties for reasons other than the safety and soundness of those depository institutions. For this reason, Congress took care in the FDIC's institutional design to ensure an insulation from partisan meddling, but with an appropriate level of political accountability.

The balance struck is clearest in the representation on the Corporation's Board of Directors. The Board consists of five members. Three are appointed specifically to that role, including a Chair and Vice Chair. The other two serve *ex officio*, as the Comptroller of the Currency and as the Director of the Consumer Financial Protection Bureau. All appointments are nominated by the president and confirmed by the Senate. None works in the White House.

None, that is, until President Trump appointed Mr. Mulvaney as acting director of the CFPB. The White House now has a vote to determine some of the most politically sensitive questions that face the banking industry, on individual cases. It is one of the most significant political changes to the FDIC's structure in the corporation's history.[19]

---

[19] For more details on this relationship, *see* Aaron Klein, Why the CFPB showdown threatens the independence of financial regulators, Brookings Institution Blog, November 28, 2017, available at

The President's decision also directly influences the independence of the U.S. Federal Reserve System. The Fed's Board of Governors is not subject to the FVRA, so the precise issue of an interim director is not relevant. But for both the CFPB and the Fed, the question of *how* independence will be maintained is up for grabs. Indeed, while the Fed is sometimes held as the paragon of independence, most of that "independence" comes not from legal guarantees but from tradition. The CFPB is on even stronger statutory footing: there is no parallel guarantee of "independence" in the Federal Reserve Act. The term is only used in reference to auditing requirements. *See, e.g.*, 12 U.S.C. § 225(b).[20]

President Trump, like presidents before him, has already attempted to push the Fed's independence to outer boundaries.[21] The CFPB is formally a part of the Federal Reserve System. If the President succeeds in eliminating the CFPB's independence through the temporary appointment of Mr. Mulvaney—despite the legislative guarantee of that independence—it will embolden him to violate the norms and traditions that insulate the Fed from partisan politics in other ways.

## IV.   There are other candidates the President could name who would not violate the law.

If the court concludes that Dodd-Frank dictates the process for controlling the Bureau in the absence of a permanent director, Ms. English is the Bureau's acting director. If the FVRA does, and the court agrees that Mr. Mulvaney's part-time status as an OMB director

---

https://www.brookings.edu/blog/up-front/2017/11/28/why-the-cfpb-showdown-threatens-the-independence-of-financial-regulators/.
[20] Peter Conti-Brown, The Power and Independence of the Federal Reserve (2016).
[21] Peter Conti-Brown, "Does the New Fed Governor Serve at the Pleasure of the President?" Yale Journal on Regulation Notice and Comment Blog, October 17, 2017, available at http://yalejreg.com/nc/does-the-new-fed-governor-serve-at-the-pleasure-of-the-president/.

eliminates the CFPB's independence, President Trump has a number of other candidates he can tap to serve on this basis.

The most obvious choices would be the four currently serving Governors on the Fed's Board of Governors: Lael Brainard, Jerome Powell, Randal Quarles, or Janet Yellen. They are individuals "who serve[] in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate," as required by the FVRA. 5 U.S.C. § 3345. Given the CFPB's formal status within the Federal Reserve System, a member of the Fed's Board of Governors is the most logical choice. Indeed, the Senate only recently confirmed Randal Quarles, President Trump's nominee to the Fed's Board of Governors as Vice Chair for Supervision. The Vice Chair for Supervision is also a new position created under Dodd-Frank and one anticipated to have an enormous influence on the way financial regulation and supervision are conducted.[22] He presumably passes muster with President Trump given the recent nomination and would pose none of the concerns raised by Mr. Mulvaney's appointment, even if his regulatory and supervisory priorities are likely to differ from a CFPB director appointed by Barack Obama.

President Trump could also tap the many other Senate-confirmed financial regulators, whether on the FDIC Board, the Comptroller of the Currency, the Securities and Exchange Commission, or the Commodities Futures Trading Commission. None of these candidates would remove the Bureau's independent status within the Federal Reserve System. And none would violate the CFPB's independence by virtue of the office she holds.

---

[22] Binyamin Appelbaum, *Randal Quarles Confirmed as Federal Reserve Governor*, New York Times, Oct 5, 2017.

The reason to insist on the preservation of the CFPB's independence from White House personnel is not to privilege one partisan agenda over another. Randal Quarles, Jerome Powell, Thomas Hoenig (Vice Chair of the FDIC), or Joseph Otting (Comptroller of the Currency) are all Republicans. The point is to prevent the administration of the CFPB's and FDIC's extraordinary powers from becoming, in appearance or in fact, the tools of political operatives who would reward their friends or penalize their enemies.

We are already seeing the direct effects of this violation of the CFPB's independence. On Thursday, December 7, 2017, *Reuters* reported that Mr. Mulvaney was pulling back on the fines and oversight that the CFPB had imposed on Wells Fargo following the bank's admission that it had committed fraud against hundreds of thousands of its customers.[23] On Friday, December 8, 2017—the same day of the filing of this brief—President Trump issued the following statement from his Twitter account:

> Fines and penalties against Wells Fargo Bank for their bad acts against their customers and others will not be dropped, as has incorrectly been reported, but will be pursued and, if anything, substantially increased. I will cut Regs but make penalties severe when caught cheating![24]

Note the structure of this extraordinary statement. Congress did not give the White House control over these enforcement decisions. It gave that authority to the CFPB. President Trump does not misstate his relationship to Mr. Mulvaney and the CFPB following this purported appointment. President Trump is directing the firm-specific enforcement and supervision decisions. He will cut "Regs" that Congress placed out of his reach, but will also "make

---

[23] *See* Rucker and Schroeder, *supra* note 6.
[24] Donald J. Trump, Twitter, December 8, 2017, 7:18am, available at https://twitter.com/realDonaldTrump/status/939152197090148352.

penalties severe when caught cheating," even though the White House has not received this authority.

Elections have consequences, and the 2016 election will have a strong consequence in the future direction of the CFPB. The point is not to rerun that election, as the Wells Fargo example illustrates—the CFPB under Director Richard Cordray is the one that initially set Wells Fargo's enforcement penalties. It is instead to send the signal to those who would face the power of these agencies that they are not the tools of partisan politicians, Republican or Democrat.

## V.    President Trump, like other presidents before him, would prefer to maximize his freedom of movement at Congress's expense. The judiciary should not be party to that threat to the separation of powers.

Despite the availability of these alternatives, it was not an accident that President Trump selected someone within the Executive Office of the President rather than relying on even one of his own selections elsewhere in the federal government. The elimination of the CFPB's independence was not an afterthought, but the fastest way to assert control over the regulatory, enforcement, and policy agendas of the agency. It is that speed and the extent of that control that Congress sought to check by creating the CFPB as an independent bureau of the Federal Reserve System. If the President wishes to reorient or even eliminate the CFPB's activities, he must follow Congress's institutional design.

Independence is not an absolute value of constitutional or statutory law. As the Supreme Court has held, there are limits to what Congress can do in structuring how the administrative state will be structured. The claim that President Trump has violated the law

by attempting to install Mr. Mulvaney as acting director is not to say that independence is some kind of hermetic seal around the CFPB into which no politician can tread.

Requiring the President to appoint as acting director individuals who can, by virtue of their office, maintain the CFPB's insulation from the White House does not erode the CFPB's public accountability. A permanent director must still be appointed by the President and confirmed by the U.S. Senate, a highly public and accountable process that extends far beyond the formality of a nomination, confirmation hearings, and Senate vote.

Requiring the President to honor the law and maintain the CFPB's independence is in fact *more* consistent with public accountability, not less. It is often asserted that independence and accountability exist on a kind of continuum, such that more of one results, reciprocally, in less of another. This is not so. Independence is about relationships among diverse individual and institutional actors. We can have more independence for the CFPB to do the work Congress has instructed it to do and more accountability to Congress and the people for the choices the Bureau makes. Allowing President Trump to violate the law with respect to the CFPB's independence creates less of an opportunity for public input, exercised through public representatives in the U.S. Senate.

President Trump will one day nominate a permanent director of the Bureau, but that is a costly exercise. The public gets to weigh in, critically or in support, on that choice. He will face political costs with various parts of his own electoral coalition and other citizens who were not part of that coalition. He will have to negotiate with his own and potentially other party leaders in making this selection and navigating it through the confirmation process. This cumbersome, politically costly process is precisely the one designed in the U.S.

17

Constitution for officers of the United States. It is the costliness of the process that causes presidents of both parties to avoid it, whether through leaving positions vacant or by relying heavily on acting officials.

Permitting the President to use a White House official, even one confirmed to that position by the U.S. Senate, allows him to avoid that accountability until a time of his political choosing, subject only to the FVRA's time limits (which are, themselves, easily evaded). What the FVRA does not do, however, is give the President complete control over those appointments, including especially its inapplicability to multi-member commissions. 5 U.S.C. § 3349c. While the CFPB itself is not a multi-member commission, the principle of preserving the independence of these kinds of agencies motivates the FVRA. Limiting the President's choices to those whose concurrent appointment wouldn't abrogate the CFPB's independence gives added incentive for him to move toward the constitutional, publicly accountable procedure.

Appointing a Fed Governor or another closely related presidential appointee within an independent financial regulator, for example, as interim CFPB director would not accomplish President Trump's goals of reorganizing the CFPB from within at the same rate. Whatever the personal similarities or differences between, say, Jerome Powell and Mr. Mulvaney, Mr. Powell is not an employee of the White House and is not answerable to the White House for policy decisions. This kind of insulation is precisely the agency that Congress designed and, is why the President does not have untrammeled authority in choosing interim directors of the independent CFPB.

## CONCLUSION

Congress used its constitutional authority to design the CFPB. That legislative

prerogative belongs to Congress, which can adjust or eliminate that design as it will,

following the constitutional process. President Trump has attempted to eliminate the

legislative requirement that the CFPB be an independent bureau in the Federal Reserve

System. Should this court conclude that the FVRA governs this case, Ms. English should

prevail, and the President should be instructed to choose an acting director that does not

abrogate the legislative mandate.


Dated: December 8, 2017                    /s/ Anna C. Haac
                                           Anna C. Haac
                                           Tycko & Zavareei LLP
                                           1828 L St. NW
                                           Suite 1000
                                           Washington, DC 20036
                                           Telephone: (202) 973-0900
                                           Facsimile: (202) 973-0950
                                           Email: ahaac@tzlegal.com

                                           *Counsel for Peter Conti-Brown*

## CERTIFICATE OF SERVICE

I, Anna C. Haac, hereby certify that on December 8, 2017, I filed the foregoing

AMICUS BRIEF OF PETER CONTI-BROWN IN SUPPORT OF PLAINTIFF'S

MOTION FOR PRELIMINARY INJUNCTION using the court's electronic filing system,

causing it to be served on all counsel of record.


Dated:  December 8, 2017                    /s/ Anna C. Haac
                                            Tycko & Zavareei LLP
                                            1828 L St. NW
                                            Suite 1000
                                            Washington, DC 20036
                                            Telephone: (202) 973-0900
                                            Facsimile: (202) 973-0950
                                            Email: ahaac@tzlegal.com