# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LEANDRA ENGLISH,

                Plaintiff,

     v.

DONALD J. TRUMP and
JOHN M. MULVANEY,

                Defendants.

Civil Action No. 17-2534 (TJK)

## BRIEF OF CURRENT AND FORMER MEMBERS OF CONGRESS
## AS *AMICI CURIAE* IN SUPPORT OF
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY
   CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Members of Congress*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ ii

INTEREST OF *AMICI* .................................................................................................. 1

INTRODUCTION .......................................................................................................... 1

ARGUMENT.................................................................................................................. 4

    The CFPB's Successor Provision Supplants the Federal Vacancies Reform Act,
    Providing the Sole Means of Temporarily Filling a Vacancy in the Position of CFPB
    Director Until Senate Confirmation of a New Director..................................................... 4

    I.      Dodd-Frank's Mandatory Language Displaces the FVRA................................. 6

    II.    Congress's Decision To Displace the FVRA Is Consistent with Its Statutory
          Plan for the CFPB and Supported by Dodd-Frank's Legislative History............. 15

CONCLUSION.............................................................................................................. 21

APPENDIX.................................................................................................................... 1A

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Fund for Animals, Inc. v. Kempthorne,*
　472 F.3d 872 (D.C. Cir. 2006) ................................................................. 12

*HCSC-Laundry v. United States,*
　450 U.S. 1 (1981) ...................................................................................... 13

*Hooks v. Kitsap Tenant Support Servs., Inc.,*
　816 F.3d 550 (9th Cir. 2016)...................................................................... 8

*Humphrey's Ex'r v. United States,*
　295 U.S. 602 (1935) .................................................................................. 16

*Kappus v. Comm'r of Intern. Rev.,*
　337 F.3d 1053 (D.C. Cir. 2003) ................................................................ 12

*King v. Burwell,*
　135 S. Ct. 2480 (2015) .............................................................................. 19

*Kingdomware Techs., Inc. v. United States,*
　136 S. Ct. 1969 (2016) .............................................................................. 8

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
　523 U.S. 26 (1998) .................................................................................... 8

*Milner v. Dep't of Navy,*
　562 U.S. 562 (2011) .................................................................................. 9

*Morales v. Trans World Airlines, Inc.,*
　504 U.S. 374 (1992) .................................................................................. 13

*Morrison v. Olson,*
　487 U.S. 654 (1988) .................................................................................. 16

*N.L.R.B. v. SW Gen., Inc.,*
　137 S. Ct. 929 (2017) ................................................................. 2, 9, 11, 12

*PHH Corp. v. CFPB,*
　No. 15-1177 (D.C. Cir.) ............................................................................ 16

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
　566 U.S. 639 (2012) .................................................................................. 13

*Taniguchi v. Kan Pacific Saipan, Ltd.,*
　566 U.S. 560 (2012) .................................................................................. 5

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Util. Air Regulatory Grp. v. EPA,*
   134 S. Ct. 2427 (2014) ................................................................................... 19

*Whitney v. Robertson,*
   124 U.S. 190 (1888) ....................................................................................... 12

STATUTES AND LEGISLATIVE MATERIALS

144 Cong. Rec. S12823 (daily ed. Oct. 21, 1998) ........................................... 5

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   Pub. L. No. 111-203, 124 Stat. 1376 (2010) ................................................. 1

Federal Vacancies Reform Act,
   Pub. L. No. 105-277 § 151, 112 Stat. 2681 (1998) ...................................... 2

H.R. 4173, 111th Cong. § 4102(b)(6)(B)(1) (engrossed version, Dec. 11, 2009) ........ 19

S. 3217, 111th Cong. § 1011(b)(5)(B) (2010) ................................................ 20

S. Rep. No. 105-250 (1998) ........................................................................... 9, 10

S. Rep. No. 111-176 (2010) ................................................................ 3, 15, 16, 17

Transcript of the House-Senate Joint Conference on H.R. 4173, Wall Street Reform and
   Consumer Protection Act (June 10, 2010) ................................................... 20

5 U.S.C. § 3345(a) ......................................................................................... 5, 14

5 U.S.C. § 3345(a)(1) ..................................................................................... 2, 11

5 U.S.C. § 3345(a)(2) ................................................................................. 2, 11, 13

5 U.S.C. § 3345(a)(3) ..................................................................................... 2, 11

5 U.S.C. § 3345(a)(3)(A) ................................................................................... 13

5 U.S.C. § 3345(c)(1) ..................................................................................... 2, 11

5 U.S.C. § 3347(a) ............................................................................................. 2

5 U.S.C. § 3347(a)(1)(B) ................................................................................. 2, 7

5 U.S.C. § 3349c(1) ........................................................................................... 18

12 U.S.C. § 4 ..................................................................................................... 5

12 U.S.C. § 4512(f) ......................................................................................... 5, 18

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

12 U.S.C. § 5491 ........................................................................................ 11

12 U.S.C. § 5491(a) ................................................................................... 14

12 U.S.C. § 5491(b)(5)(A) ........................................................................... 1

12 U.S.C. § 5491(b)(5)(B) ......................................................... 2, 3, 4, 6, 12, 14

12 U.S.C. § 5491(c)(1) ............................................................................... 12

12 U.S.C. § 5491(c)(2) ............................................................................... 17

12 U.S.C. § 5491(c)(3) ......................................................................... 3, 12, 16

12 U.S.C. § 5492(c)(4) ............................................................................... 17

12 U.S.C. § 5497(a)(1) ................................................................................. 3

12 U.S.C. § 5497(a)(4)(E) ........................................................................... 17

15 U.S.C. § 78d ......................................................................................... 18

28 U.S.C. § 508(a) ....................................................................................... 7

29 U.S.C. § 153(d) .................................................................................. 7-8, 18

31 U.S.C. § 502(b)(2) ................................................................................... 7

42 U.S.C. § 902(b)(4) .............................................................................. 12, 18

52 U.S.C. § 30106 ..................................................................................... 18

OFFICE OF LEGAL COUNSEL OPINIONS

31 Op. O.L.C. 208 (2007) ............................................................................. 8

27 Op. O.L.C. 121 (2003) ............................................................................. 8

*Memorandum from Steven A. Engel, Assist. Att'y Gen., Office of Legal Counsel, to
Donald F. McGahn II, Counsel to the President* (Nov. 25, 2017) ........................... 5

OTHER AUTHORITIES

Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*,
89 Tex. L. Rev. 15 (2010) ......................................................................... 16, 18

Susan Block-Lieb, *Accountability and the Bureau of Consumer Financial Protection*,
7 Brook. J. Corp. Fin. & Com. L. 25 (2012) ................................................. 16, 19

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* (2011) ................... 15

Henry B. Hogue *et al.*, Cong. Research Serv., *Independence of Federal Financial
    Regulators: Structure, Funding, and Other Issues* (2017) ........................................ 16

Adam J. Levitin, *The Consumer Financial Protection Bureau: An Introduction*,
    32 Rev. Banking & Fin. L. 321 (2013) ...................................................... 15, 16, 19

Merriam Webster Online Dictionary ............................................................. 4, 5

Morton Rosenberg, Cong. Research Serv., *The New Vacancies Act: Congress Acts to
    Protect the Senate's Confirmation Prerogative* (1998) ............................................ 9

Antonin Scalia & Bryan Garner,
    *Reading Law: The Interpretation of Legal Texts* (2012) ........................................... 11

Arthur E. Wilmarth, Jr., *The Financial Services Industry's Misguided
    Quest to Undermine the Consumer Financial Protection Bureau*,
    31 Rev. Banking & Fin. L. 881 (2012) ...................................................... 16, 19

## INTEREST OF *AMICI*[1]

*Amici* are current and former members of Congress who are familiar with the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), Pub. L. No. 111-203, 124 Stat. 1376.  Indeed, *amici* were sponsors of Dodd-Frank, participated in drafting it, serve or served on committees with jurisdiction over the federal financial regulatory agencies and the banking industry, currently serve in the leadership, or served in the leadership when Dodd-Frank was passed.  They are thus familiar with the critical role that the Consumer Financial Protection Bureau plays in the legislative plan that Congress put in place when it enacted Dodd-Frank to prevent future financial crises like the Great Recession of 2008, as well as with Congress's considered decisions about how best to structure the CFPB so that it could play that critical role. Significantly, based on their experiences, *amici* know that Congress drafted Dodd-Frank to make clear that the Bureau's Deputy Director would, in the event of a vacancy in the office of Director, serve as acting Director.  Only that structure is consistent with the independence that was so central to Congress's design in establishing the Bureau as a primary protector for American consumers. *Amici* thus have an interest in this case.

A full listing of *amici* appears in the Appendix.

## INTRODUCTION

On November 24, 2017, Richard Cordray resigned as Director of the Consumer Financial Protection Bureau ("CFPB").  Prior to resigning, and pursuant to his authority under Dodd-Frank, *see* 12 U.S.C. § 5491(b)(5)(A), he appointed the Bureau's Chief of Staff Leandra English (who had previously served in a number of leadership roles at the CFPB) as Deputy Director of the Bureau.  Under Dodd-Frank, the Bureau's Deputy Director "shall . . . serve as acting Director in

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

the absence or unavailability of the Director." 12 U.S.C. § 5491(b)(5)(B). Notwithstanding this clear and mandatory language, President Donald Trump has named Mick Mulvaney, currently head of the Office of Management and Budget, to serve as acting Director of the Bureau, purportedly pursuant to the Federal Vacancies Reform Act ("FVRA"), Pub. L. No. 105-277 § 151, 112 Stat. 2681 (1998).

The FVRA establishes procedures for temporarily filling vacant executive offices. It begins with a default rule, under which "the first assistant to the office" automatically assumes its functions and duties temporarily in an acting capacity. 5 U.S.C. § 3345(a)(1); *see N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 934-35 (2017) ("The general rule is that the first assistant to a vacant office shall become the acting officer."). This rule is "self-executing," but the same section of the FVRA supplies three mechanisms by which "[t]he President may override that default rule." *Id.* at 940, 935; *see* 5 U.S.C. § 3345(a)(2), (a)(3), (c)(1). As relevant here, one of those options is that the President "may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity," subject to certain time limits. *Id.* § 3345(a)(2).

The FVRA's procedures are generally "the exclusive means" by which vacant executive offices may be filled—but not when another statute "designates an officer or employee to perform the functions and duties of [the] specified office temporarily in an acting capacity." *Id.* § 3347(a)(1)(B). Dodd-Frank is just such a statute, as it designates the CFPB's Deputy Director as the officer who is to perform the functions and duties of the Director in an acting capacity when the Director is absent or unavailable. 12 U.S.C. § 5491(b)(5)(B). This alone, under the FVRA's plain terms, means that the FVRA is not the exclusive means by which someone may become

acting Director of the Bureau.  But Dodd-Frank does more.   Unlike similar statutes governing succession in other offices, it mandates that the Deputy Director "shall" serve as acting Director. *Id*.  This mandatory and unqualified language means that a vacancy in the Director's office must be filled by the Deputy Director and no one else.  In other words, Dodd-Frank's language displaces the FVRA entirely as the means by which a vacancy in the position of Bureau Director may be filled temporarily.

Congress drafted Dodd-Frank in this way for a reason.  The legislation was a response to the financial crisis of 2008, a crisis that "shattered" lives, "shuttered" businesses, "evaporated" savings, and caused millions of families to lose their homes. S. Rep. No. 111-176, at 39 (2010); *see id.* ("the financial crisis has torn at the very fiber of our middle class").  After extensively studying the roots of this crisis, Congress determined that, despite an abundance of legal authority to combat the mortgage abuses that were largely responsible, the manner in which this authority was dispersed among numerous federal regulators led to inaction and delay.

To solve this problem and prevent similar crises in the future, Congress established a consolidated federal agency, the CFPB, with the sole mission of protecting Americans from harmful practices of the financial services industry.  In creating the Bureau, lawmakers determined that it needed to be independent in order to fulfill its mission.  Thus, Congress provided that the President could remove the Bureau's Director only for good cause—"inefficiency, neglect of duty, or malfeasance in office," 12 U.S.C. § 5491(c)(3)—but not for policy differences alone; it provided the Bureau with independent funding outside the annual congressional appropriations process, *id.* § 5497(a)(1); and it established other features designed to promote the Bureau's independence, *see infra*.

Congress did something else, as well.  To ensure that the Bureau would maintain its independence even when its Director position was vacant, Congress designated who would serve as acting Director in the event of a vacancy: the Bureau's Deputy Director.  By using mandatory language to inscribe this order of succession in statute, Congress supplanted the FVRA's procedures for temporarily filling vacancies.  After all, as Congress recognized at the time, those procedures would permit the President to hand-pick an acting Director without the check of Senate confirmation, allowing that acting Director, no matter how close his ties to the President, to head the Bureau for many months.  Such a result would plainly undermine the independence that was so critical to Congress's plan in designing the Bureau.

Thus, because Dodd-Frank's mandatory and unqualified successor provision displaces the FVRA as the means by which a vacancy in the position of Bureau Director may be filled temporarily, the President's purported appointment of Mulvaney is unlawful, and Deputy Director English is the lawful acting Director of the Bureau.  This Court should grant her motion for a preliminary injunction.

## ARGUMENT

### The CFPB's Successor Provision Supplants the Federal Vacancies Reform Act, Providing the Sole Means of Temporarily Filling a Vacancy in the Position of CFPB Director Until Senate Confirmation of a New Director

Dodd-Frank establishes for the CFPB "the position of Deputy Director, who shall . . . be appointed by the Director . . . and serve as acting Director in the absence or unavailability of the Director."  12 U.S.C. § 5491(b)(5)(B).  Under a plain reading of this language, Dodd-Frank requires the CFPB's Deputy Director to serve as acting Director of the Bureau when the Director leaves office and is thus "absen[t]" or "unavailab[le]."  *See, e.g.*, *Absent*, Merriam Webster Online Dictionary,  https://www.merriam-webster.com/dictionary/absent  (defining "absent" as "not

existing: lacking" and as "not present at a usual or expected place: missing"); *Unavailable*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/unavailable (defining "unavailable" as "not available: such as . . . unable or unwilling to do something"); *see generally Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").

These ordinary definitions of "absent" and "unavailable" cover situations in which a Director has resigned, leaving the office of the Director vacant.  As the Department of Justice's Office of Legal Counsel has acknowledged, the broad meanings of these terms must not be artificially narrowed simply because Dodd-Frank does not use the word "vacancy" or "resignation."  While some statutes governing succession in office include those terms, *see, e.g.*, 12 U.S.C. § 4 (providing order of succession for the Comptroller of the Currency "[d]uring a vacancy in the office or during the absence or disability of the Comptroller"); *id.* § 4512(f) (providing for appointment of acting director of the Federal Housing Finance Agency "[i]n the event of the death, resignation, sickness, or absence of the Director"), the legislators who drafted and voted on Dodd-Frank relied upon expansive language—"absence or unavailability"—that naturally encompasses the resignation of a CFPB Director.  *See Memorandum from Steven A. Engel, Assist. Att'y Gen., Office of Legal Counsel, to Donald F. McGahn II, Counsel to the President* 3 (Nov. 25, 2017) ("OLC Memo") ("the provision's reference to 'unavailability' is best read to refer both to a temporary unavailability . . . and to the Director's being unavailable because of a resignation or other vacancy in office").[2]

---

[2] The FVRA uses a similarly broad phrase and, significantly, makes clear that such broad wording encompasses vacancies.  *See* 5 U.S.C. § 3345(a) (establishing rules for when an officer "dies, resigns, or is *otherwise* unable to perform the functions and duties of the office" (emphasis added)); *see also* 144 Cong. Rec. S12823 (daily ed. Oct. 21, 1998) (Sen. Thompson) ("To make the law cover all situations when the officer cannot perform his duties, the 'unable to perform the

Notwithstanding Dodd-Frank's unambiguous successor provision, the President has ordered Mick Mulvaney to serve as acting Director of the Bureau pursuant to the FVRA. According to the Defendants, Mulvaney's appointment is lawful because the FVRA "remains available even when there are agency-specific succession statutes." Defs.' Opp'n to Pl.'s Mot. for a TRO, *English v. Trump*, at 2 (D.D.C. Nov. 27, 2017) ("Def. TRO Opp."); *accord* OLC Memo at 3. This reasoning has a critical flaw: the FVRA remains available in the presence of an agency-specific statute *only when that statute's language is compatible with the FVRA's procedures*—not when its language plainly overrides those procedures. The latter is true here, as demonstrated by the text, structure, and history of Dodd-Frank.

## I.    Dodd-Frank's Mandatory Language Displaces the FVRA

As noted earlier, Dodd-Frank creates the position of CFPB Deputy Director, "who shall . . . serve as acting Director in the absence or unavailability of the Director." 12 U.S.C. § 5491(b)(5)(B). This mandatory succession language expressly displaces any other procedures for filling the vacancy, including those established years earlier by the FVRA. The Defendants maintain otherwise only by dramatically downplaying the significance of Dodd-Frank's mandatory language—and by overlooking the distinction between this mandatory language and the permissive language used in other succession statutes.

The Defendants argue that the effect of Dodd-Frank's successor provision is not to displace the FVRA, but only to establish that the FVRA is not the *exclusive* means of providing for an acting Director of the CFPB. Thus, the Defendants acknowledge that Deputy Director English automatically serves as acting Director of the Bureau upon the resignation of the Director, pursuant

---

functions and duties of the office' language was selected."); *id.* (citing "when the officer is fired" as one such situation).

to Dodd-Frank, but they maintain that the President may remove her from that role—or prevent her from ever assuming it—by naming his own acting Director under the FVRA.

The crux of this argument is that Dodd-Frank's successor provision is nothing more than the type of provision referred to in 5 U.S.C. § 3347, which governs the exclusivity of the FVRA. That section provides that the FVRA's procedures are not "the exclusive means for temporarily authorizing an acting official to perform the functions and duties" of a vacant office when, as relevant here, "a statutory provision expressly . . . designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." *Id.* § 3347(a)(1)(B). Pointing to this language, the Defendants argue that "the only consequence" of Dodd-Frank's successor provision "is that the VRA is not the '*exclusive* means' of filling the vacancy," and that therefore the President may still use the FVRA to name a different acting Director than the one provided for in Dodd-Frank. Def. TRO Opp. 10.

This might be correct if Dodd-Frank did nothing more than identify, in permissive terms, which particular CFPB employee may perform the Director's functions and duties in his absence. Indeed, many successor statutes are written in exactly that way. Unlike Dodd-Frank, they use permissive language that does not clash with the terms of the FVRA—and in some cases indicates that it is meant to work in conjunction with those terms. Such language allows those statutes to be read in tandem with the FVRA as merely providing an alternative mode of appointment. *See, e.g.*, 28 U.S.C. § 508(a) ("In case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office, and for the purpose of section 3345 of title 5 the Deputy Attorney General is the first assistant to the Attorney General."); 31 U.S.C. § 502(b)(2) ("The Deputy Director [of the Office of Management and Budget] . . . acts as the Director when the Director is absent or unable to serve[.]"); 29 U.S.C.

§ 153(d) ("In case of a vacancy in the office of the General Counsel [of the National Labor Relations Board] the President is authorized to designate the officer or employee who shall act as General Counsel during such vacancy[.]").

On their face, these succession provisions pose no barrier to the operation of the FVRA. Read alongside 5 U.S.C. § 3347(a)(1), they supplement rather than supplant the FVRA process for filing vacancies. And significantly, these are *precisely* the statutes addressed by the OLC and Ninth Circuit opinions on which the Defendants chiefly rely, opinions in which agency-specific statutes were found compatible with the FVRA. *See* Def. TRO Opp. 10 (citing 31 Op. O.L.C. 208, 209-11 (2007) (regarding Attorney General); 27 Op. O.L.C. 121, 121 n.1 (2003) (regarding OMB Director); *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 555-56 (9th Cir. 2016) (regarding NLRB General Counsel)).

Dodd-Frank is written differently. It does not say that the Deputy Director "may serve as acting Director," or identify her as the Director's "first assistant" for purposes of the FVRA, or simply allow her to perform the Director's functions in his absence—it says that she "shall" serve as acting Director. "Shall" is a mandatory term that is not interchangeable with "may" or other permissive words. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("the mandatory 'shall[]' . . . normally creates an obligation impervious to judicial discretion"); *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) ("When a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty. . . . Congress' use of the word 'shall' demonstrates that § 8127(d) mandates the use of the Rule of Two in all contracting before using competitive procedures."). Dodd-Frank's language, therefore, does more than simply fit the CFPB's successor provision within the

8

exception to the FVRA's exclusivity in 5 U.S.C. § 3347(a)(1)(B).  It requires the Deputy Director, and no one else, to serve as acting Director when there is a vacancy in the Director position.

To undermine this clear textual imperative, the Defendants (and OLC) repeatedly revert to legislative history—specifically one portion of a Senate committee report discussing an earlier version of the FVRA that was never enacted.  *See* Def. TRO Opp. 1, 5, 10, 11 (citing S. Rep. No. 105-250, at 15-17 (1998)).  This report notes that the bill would have "retain[ed] existing statutes that are in effect on the date of enactment of the Vacancies Act . . . that expressly provide for the temporary performance of the functions and duties of an office by a particular officer or employee."  S. Rep. No. 105-250, at 15.  The report further states that, "with respect to the specific positions in which temporary officers may serve under the specific statutes this bill retains, the Vacancies Act would continue to provide an alternative procedure for temporarily occupying the office."  *Id*. at 17.

Particularly because this report pertains to a bill that was modified significantly before passage, *see id.* at 25-29 (text of failed bill), the probative value of this lone sentence is slight when compared with the unambiguous text of Dodd-Frank.  *See SW Gen.*, 137 S. Ct. at 942 ("'[A] period of intense negotiations' took place after Senators demanded changes to the original draft of the FVRA, and the final bill was 'a compromise measure.'" (quoting Morton Rosenberg, Cong. Research Serv., *The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative* 9 (1998))); *cf. Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text.  We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language.").  Moreover, the quoted sentence from the Senate report makes a much more limited claim than the Defendants suggest—it says that the Vacancies Act will

9

continue to provide an alternative procedure "with respect to the specific positions in which temporary officers *may* serve under the specific statutes this bill retains." S. Rep. No. 105-250, at 17 (emphasis added). As discussed above, that description characterizes many succession statutes, but not the one governing the Director of the CFPB.

If anything, the FVRA's legislative history supports Deputy Director English here because the Administration's position would enhance the President's ability to sidestep or delay the requirement of Senate confirmation for the office of Director—the very practice that the FVRA was meant to curtail. That Act was a direct response to perceived violations of the Constitution's Appointments Clause by the executive branch, adopted to prevent presidents from circumventing the Senate's advice-and-consent role, while at the same time ensuring that agencies could continue to function effectively while the Senate confirmation process was ongoing. *See, e.g.*, S. Rep. No. 105-250, at 5 (stating that previous legislation "unfortunately has not succeeded in encouraging presidents to submit nominees in a timely fashion" and that "the Senate's confirmation power is being undermined as never before"); *id*. at 7-8 (stating that "the fundamental purpose of the Vacancies Act . . . is . . . to limit the power of the President to name acting officials, as well as the length of service of those officials"). The Defendants' view would ironically expand the President's capacity to delay a Senate confirmation vote on the CFPB Director, while Deputy Director English's would encourage the President to quickly nominate someone to fill the vacancy—an action that President Trump has notably not yet taken, even though former Director Cordray announced his resignation weeks before he officially resigned.[3]

---

[3] To the extent the FVRA's legislative history is relevant here, another aspect of that history also weighs in favor of Deputy Director English. The bill discussed in the Senate report—unlike the bill that was enacted—specified that the FVRA would apply to all relevant offices unless "another statutory provision expressly provides that the [*sic*] such provision supersedes sections 3345 and 3346." S. Rep. No. 105-250, at 26 (quoting the bill's proposed version of 5 U.S.C.

Further attempting to dismiss the significance of Dodd-Frank's mandatory language, the Defendants unpersuasively equate Dodd-Frank with other statutes in which a command that is expressed using the word "shall" is subject to being overridden.  For instance, they point to the FVRA's default rule in which the "first assistant" to an officer "shall perform" the functions and duties of the office temporarily when a vacancy occurs.  5 U.S.C. § 3345(a)(1).  Because this provision and Dodd-Frank's successor provision both use the word "shall," the Defendants say, it would be wrong to interpret "one statute to be more mandatory than the other."  Def. TRO Opp. 12.  But the comparison actually undercuts the Defendants' own argument.  In pointed contrast to Dodd-Frank, the section of the FVRA cited by the Defendants carves out three exceptions that explicitly qualify the "shall" language found in its first paragraph.  These exceptions provide alternative options to the President "notwithstanding paragraph (1)."  5 U.S.C. § 3345(a)(2), (a)(3), (c)(1).  The function of the word "notwithstanding" is to "show[] which provision prevails in the event of a clash."  *SW Gen.*, 137 S. Ct. at 939 (quoting Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 126-27 (2012)).  And thus, "[t]he 'notwithstanding' clause clarifies that the language of (a)(1) does not prevail if that conflict occurs."  *Id*. at 940.  The Defendants' comparison only highlights the absence of any similar carve-outs or qualifying language in the relevant section of Dodd-Frank.  *See* 12 U.S.C. § 5491.

Indeed, the same section of Dodd-Frank that contains the CFPB Director's successor provision provides another illustration of how a statute can limit its own use of the word "shall."

---

§ 3347); *see id.* at 10 (stating that Senator Strom Thurmond, as a hearing witness, advocated for "requiring statutes exempting particular positions from the Vacancies Act to specifically cite the Vacancies Act").  This requirement of an express reference to Sections 3345 and 3346 was eliminated from the FVRA before passage.  Yet the Defendants' arguments in this case would, in effect, reinstate that requirement, demanding such language before a later-enacted statute, like Dodd-Frank, could displace the FVRA.  *See, e.g.*, Def. TRO Opp. 12.

This section provides that the Director "shall serve for a term of 5 years," *id.* § 5491(c)(1), but qualifies this command in the same subsection by allowing the President to remove the Director for specified reasons, *id.* § 5491(c)(3).   Again, this highlights the absence of any language qualifying the same section's command that the Deputy Director serve as acting Director.   Had Congress wanted to qualify that command, it had no shortage of models. *Compare id.* § 5491(b)(5)(B) (the Deputy Director "shall . . . serve as acting Director in the absence or unavailability of the Director"), *with* 42 U.S.C. § 902(b)(4) ("The Deputy Commissioner [of Social Security] shall be Acting Commissioner of the Administration during the absence or disability of the Commissioner and, *unless the President designates another officer of the Government as Acting Commissioner*, in the event of a vacancy in the office of the Commissioner." (emphasis added)).

Because Dodd-Frank does not itself qualify its statement that the Deputy Director "shall" serve as acting Director, and thus clashes with the FVRA, ordinary interpretive methods must resolve "which provision prevails." *SW Gen.*, 137 S. Ct. at 939.   The result is straightforward. First, Dodd-Frank was enacted after the FVRA, and when two federal laws conflict, "the later of the two enactments prevails over the earlier." *Kappus v. Comm'r of Intern. Rev.*, 337 F.3d 1053, 1057 (D.C. Cir. 2003).   Of course, "the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other." *Whitney v. Robertson*, 124 U.S. 190, 194 (1888).   Here, Dodd-Frank's mandatory and unqualified language cannot be given effect unless it displaces the FVRA, and so this Court "would have to *distort* the plain meaning of [the] statute in an attempt to make it consistent with a prior [law]." *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 879 (D.C. Cir. 2006).   "The Supreme Court has not extended the canon that far." *Id.*

Second, Dodd-Frank's CFPB successor provision is more specific than the FVRA, given that it applies only to vacancies in one particular office at one particular agency, rather than providing general procedures for temporarily filling all executive offices.  "[I]t is a commonplace of statutory construction that the specific governs the general."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)); *see, e.g.*, *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) ("a specific statute . . . controls over a general provision").  As discussed in the next section, Congress took great care to structure the CFPB and the office of its Director so as to promote certain policy goals, and those goals are furthered in discernable ways by Dodd-Frank's exclusive and automatic successor provision for the Director.  Clearly, Congress spoke with greater specificity in Dodd-Frank regarding who should serve as acting CFPB Director than it did in the FVRA.

While the Defendants suggest that the FVRA is actually the more specific statute, Def. TRO Opp. 12, that contention is unpersuasive.  The FVRA certainly contains a more *detailed* scheme for the naming of acting officers, but complexity is different from specificity—indeed, the FVRA's complexity is necessary precisely because it establishes general background procedures that govern all executive offices in the absence of contrary legislation.  Nor does the FVRA's use of the words "vacant office" and "resign[]" make it more specific than Dodd-Frank.  5 U.S.C. § 3345(a)(2), (a)(3)(A).  A succession provision either applies to vacancies or it does not.  As explained earlier, Dodd-Frank's provision applies to vacancies (as OLC has acknowledged) and therefore is no different from the FVRA in this regard.  Indeed, the only reason to compare the two statutes' levels of specificity and dates of enactment is because both statutes apply to vacancies, and are thus in conflict.  Moreover, the FVRA, like Dodd-Frank, covers more than just vacancies— it applies when an officer "dies, resigns, *or is otherwise unable to perform the functions and duties*

*of the office.*"  *Id.* § 3345(a) (emphasis added).  Like Dodd-Frank, therefore, the FRVA is not limited to vacancies—and thus it is no more specific than Dodd-Frank in that respect either.[4]

In sum, given its later enactment, its greater specificity, and its failure to include any exceptions to its successor provision—or to hint in any way that it is meant to work in tandem with the FVRA—Dodd-Frank's mandatory language must be taken at face value.  Thus the Deputy Director, and no one else, "shall" serve as acting Director.

The Defendants raise one last textual argument, but it fails to salvage their position.  Dodd-Frank says that "[e]xcept as otherwise provided expressly by law, all Federal laws dealing with . . . Federal . . . officers . . . shall apply to the exercise of the powers of the Bureau."  12 U.S.C. § 5491(a).  Because the FVRA is a federal law dealing with federal officers, the Defendants argue that its procedures apply by virtue of this subsection, and they further maintain that the CFPB's successor provision does not expressly provide otherwise.  Def. TRO Opp. 12-13.  But they fail to explain why that is so.  As discussed above, the successor provision clearly "provides otherwise," because it sets forth a different and incompatible rule, and it does so "by law."  It also does so "expressly," using language that is clear and unambiguous: it says the Deputy Director "shall . . . serve as acting Director."  12 U.S.C. § 5491(b)(5)(B).  This is an explicit command regarding who "shall" serve as acting Director, not an implicit requirement or an inference gleaned from textual clues.  The only possible basis for the Defendants' argument is that the successor provision does not cite the FVRA.  But the Defendants offer no authority for the proposition that a requirement like that in Section 5491(a) is satisfied only by cross-referencing every federal law that a provision

---

[4] Even if Dodd-Frank and the FVRA were deemed equally specific with regard to the temporary filling of the CFPB Director's office, Dodd-Frank is still the later-enacted statute, and it still uses the mandatory term "shall" without any exceptions or qualifications.

overrides.  And Section 5491(a) does not purport to require that; it demands only that a statute provide otherwise and do so expressly.

Thus, despite the Defendants' claims, Dodd-Frank's plain text dictates that its successor provision displaces the FVRA's procedures.  That understanding of Dodd-Frank is also the most consistent with the statute's structure and history, as the next Section discusses.

## II.    Congress's Decision To Displace the FVRA Is Consistent with Its Statutory Plan for the CFPB and Supported by Dodd-Frank's Legislative History

As *amici* well know, there was a reason that Congress, acting against the backdrop of the FVRA, chose to include in Dodd-Frank a mandatory provision designating who would serve as the Bureau's acting Director in the event of a vacancy.  The alternative approach—allowing the President to hand-pick someone without the check of Senate confirmation—would undermine Congress's overall statutory plan for the CFPB.

In establishing the Bureau, lawmakers concluded that the Bureau should be independent in order to ensure that it could zealously protect consumers' interests.  Before the financial crisis, the political branches intensely pressured the financial regulatory agencies at the behest of industry lobbyists to prevent robust oversight.  *See, e.g.*, Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* 53 (2011) (discussing industry-prompted congressional demands that consumed agency time and discouraged regulations).  After the crisis, in debates over the Bureau, "consumer advocates urged a more independent agency, fearing industry capture and heavy-handed political interference by Congress and the White House."  Adam J. Levitin, *The Consumer Financial Protection Bureau: An Introduction*, 32 Rev. Banking & Fin. L. 321, 339 (2013); *see, e.g.*, S. Rep. No. 111-176, at 24 (recounting testimony recommending "improving regulatory independence").  Such independence "allow[s] an agency to protect the diffuse interest of the general public" that otherwise would be "outgunned" by "well-financed and politically influential special interests."

Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 17 (2010).

Heeding this imperative, Congress made the Bureau's leader removable by the President only for good cause: "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3).[5] As *amici* well know, virtually all financial regulators are headed by officers with fixed terms who are removable only for cause, *see* Henry B. Hogue *et al.*, Cong. Research Serv., *Independence of Federal Financial Regulators: Structure, Funding, and Other Issues* 15-17 (2017), and Congress appreciated that good-cause tenure would give the Bureau the independence necessary to regulate effectively, *see, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 687-88 (1988) ("Were the President to have the power to remove FTC Commissioners at will, the 'coercive influence' of the removal power would 'threate[n] the independence of [the] commission.'" (quoting *Humphrey's Ex'r v. United States*, 295 U.S. 602, 630 (1935)); Susan Block-Lieb, *Accountability and the Bureau of Consumer Financial Protection*, 7 Brook. J. Corp. Fin. & Com. L. 25, 38 (2012) (removal limits "are intended to permit appointees both to develop expertise on technical subjects and to take politically unpopular action").

To further promote a "strong and independent Bureau," S. Rep. No. 111-176, at 174, Congress also funded the CFPB outside "the opaque horse-trading of the appropriations process," Levitin, *supra*, at 341; *see* 12 U.S.C. § 5497(a)(1). Nearly all financial regulatory agencies have this feature, Arthur E. Wilmarth, Jr., *The Financial Services Industry's Misguided Quest to Undermine the Consumer Financial Protection Bureau*, 31 Rev. Banking & Fin. L. 881, 951 (2012), and lawmakers explained that "the assurance of adequate funding, independent of the

---

[5] Congress's choice to limit the grounds for removing the Director is presently the subject of a constitutional challenge. *See PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir.).

Congressional appropriations process, is absolutely essential to the independent operations of any financial regulator," S. Rep. No. 111-176, at 163; *see id.* (citing the "hard learned lesson" of the precursor to the Federal Housing Finance Agency, whose "effectiveness" was "widely acknowledged" to have been harmed by its need for congressional appropriations).

Congress did even more to secure the Bureau's independence.  It limited the executive branch's ability to control the Bureau's communications with Congress.  12 U.S.C. § 5492(c)(4).  It allowed a Director whose five-year term expires to continue serving until Senate confirmation of a successor.  *Id.* § 5491(c)(2).  And—especially noteworthy in the context of this case—it ensured that the Bureau would have no obligation "to consult with or obtain the consent or approval of the Director of the Office of Management and Budget" with respect to its financial operating plans and forecasts, while clarifying that, apart from certain disclosure obligations imposed on the Bureau, OMB would not exercise "any jurisdiction or oversight over the affairs or operations of the Bureau."  *Id.* § 5497(a)(4)(E).[6]

Finally, to ensure that the Bureau would continue to enjoy independence even in the event of a vacancy in the Director position, Congress also chose to designate in advance the officer who would serve as acting Director, rather than allow the President to put in place a designee who has not been confirmed by the Senate to head the Bureau.  In making this choice, Congress was not doing anything novel.  Nearly all independent agencies are structured so as to prevent presidents from achieving what President Trump is attempting here.  Most such agencies are headed by multi-

---

[6] For these reasons, the President's selection of the head of OMB to lead the Bureau underscores what is wrong with the Administration's position.  As the director of an agency located within the Executive Office of the President, Mulvaney works closely with the President on a range of issues and serves at the pleasure of the President.  It is difficult to imagine a figure with less independence from the White House and its policy preferences serving at the helm of the Bureau.  This is precisely the type of situation that Congress sought to avoid by designating in advance who would serve as acting Director of the Bureau in the event of a vacancy.

member boards or commissions, with authorizing statutes that do not provide for the temporary replacement by the President of board members or commissioners who leave office before the end of their terms.  *See, e.g.*, 15 U.S.C. § 78d (Securities and Exchange Commission); 52 U.S.C. § 30106 (Federal Election Commission).  The FVRA likewise withholds from the President the authority to temporarily replace board members and commissioners of multi-member independent agencies.  5 U.S.C. § 3349c(1).  And the legislation creating the Federal Housing Finance Agency, one of the few independent agencies besides the CFPB led by a single director, similarly restricts the President's choice of a temporary replacement when the director leaves office: the President is limited to selecting among three existing deputy directors of the agency.  12 U.S.C. § 4512(f).

To be sure, there are exceptions.  With respect to a few leadership positions in independent agencies, Congress has authorized the President to appoint acting successors.  *See, e.g.*, 42 U.S.C. § 902(b)(4) (Social Security Commissioner); 29 U.S.C. § 153(d) (National Labor Relations Board General Counsel).  But that only highlights how Dodd-Frank differs.  Not only did Congress decline to authorize the President to appoint an acting CFPB Director, or to specify that the FVRA would apply to a vacancy in that position, Congress instead took affirmative steps in the opposite direction, specifying in mandatory language that the Deputy Director "shall" serve as acting Director.

Moreover, the point here is not simply that the Bureau is an independent agency, which generally means only that an agency's leader cannot be removed at will.  *See* Barkow, *supra*, at 16.  Rather, the point is that Dodd-Frank took special care to ensure, in a variety of ways, that the CFPB would exercise a special degree of independence that Congress determined was necessary

if it were to fulfill its critical mission and help prevent another devastating financial meltdown.[7] Yet the Defendants' position would erode the Bureau's independence and undermine that statutory plan by allowing a President to fill a vacancy—as President Trump has done here—with a designee who reflects his policy agenda, serves at his pleasure, and has not been confirmed by the Senate for the position of Bureau Director. Thus, if there were any doubt about how to resolve the conflict between the FVRA and Dodd-Frank's successor provision, consideration of Congress's statutory plan would tip the balance in favor of Deputy Director English. *See King v. Burwell*, 135 S. Ct. 2480, 2492 (2015) ("the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (quoting *Util. Air Regulatory Grp. v. EPA,* 134 S. Ct. 2427, 2441 (2014))).

These considerations all bolster the natural reading of Dodd-Frank's clear language: the Deputy Director automatically becomes acting Director in the event of a vacancy, and the President therefore lacks authority under the FVRA to make his own choice of acting Director instead.

Finally, as *amici* well know, the legislative history of Dodd-Frank also supports this conclusion. The bill that passed the House of Representatives in December 2009 did not provide for a Deputy Director of the CFPB. Instead, it explicitly stated that when the Director's office became vacant any temporary replacement would be appointed pursuant to the FVRA. *See* H.R. 4173, 111th Cong. § 4102(b)(6)(B)(1) (engrossed version, Dec. 11, 2009). The Senate bill

---

[7] To prevent overreach and ensure accountability, however, Congress incorporated other checks on the Bureau's authorities, some unprecedented among financial regulators. *See* Block-Lieb, *supra*, at 43-55; Levitin, *supra*, at 343-62; Wilmarth, *supra*, at 908-11. The CFPB, for instance, is the only financial regulator that is annually audited by the U.S. Government Accountability Office, forced to comply with key small-business requirements, and "whose regulations are subject to override by an appellate body composed of heads of other agencies." Wilmarth, *supra*, at 909-10.

introduced and passed months later, whose language prevailed in conference, was the origin of the present statutory language. *See* S. 3217, 111th Cong. § 1011(b)(5)(B) (2010); *see also* Transcript of the House-Senate Joint Conference on H.R. 4173, Wall Street Reform and Consumer Protection Act 161 (June 10, 2010).   In making this change, Congress deliberately rejected the idea of allowing the President to use the FVRA to name an acting Director of the Bureau.   Indeed, the change reflects Congress's considered decision that the FVRA should not govern succession in the event of a vacancy.   Instead, as the language of the statute indicates, the Bureau's second-in-command should take over until a new Director is appointed by the President and confirmed by the Senate.

\* \* \*

In sum, the text, structure, and history of Dodd-Frank all point to the same conclusion: the CFPB's Deputy Director serves as acting Director of the Bureau when a vacancy occurs.   Congress established this mandatory order of succession to prevent exactly what the Administration is attempting here: temporarily filling the role—and delaying the nomination of a permanent successor—with a designee who reflects the President's policy preferences but has not been subject to the check of Senate confirmation.   President Trump is entitled to choose who the next Director of the Bureau will be, but he must nominate that person, and the Senate must agree to confirm him or her.   Until that happens, Dodd-Frank makes clear who should be running the Bureau: its Deputy Director.

## CONCLUSION

For the foregoing reasons, the court should grant plaintiff's motion for a preliminary injunction.

Respectfully submitted,

Dated:  December 8, 2017

/s/ Brianne J. Gorod
Brianne J. Gorod

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici*

**APPENDIX:**

LIST OF *AMICI*

Beatty, Joyce
  Representative of Ohio

Brown, Sherrod
  Senator of Ohio

Capuano, Michael E.
  Representative of Massachusetts

Clay Jr., William "Lacy"
  Representative of Missouri

Cleaver, Emanuel
  Representative of Missouri

Cortez Masto, Catherine
  Senator of Nevada

Crist, Charlie
  Representative of Florida

Crowley, Joseph
  Representative of New York

Delaney, John K.
  Representative of Maryland

Dodd, Christopher
  Former Senator of Connecticut

Ellison, Keith
  Representative of Minnesota

Foster, Bill
  Representative of Illinois

Frank, Barney
  Former Representative of Massachusetts

Green, Al
  Representative of Texas

Heck, Denny
  Representative of Washington

Himes, Jim
   Representative of Connecticut

Hirono, Mazie K.
   Senator of Hawaiʻi

Hoyer, Steny
   Representative of Maryland

Johnson, Tim
   Former Senator of South Dakota

Kanjorski, Paul E.
   Former Representative of Pennsylvania

Kildee, Dan
   Representative of Michigan

Lynch, Stephen F.
   Representative of Massachusetts

Maloney, Carolyn
   Representative of New York

Meeks, Gregory W.
   Representative of New York

Menendez, Robert
   Senator of New Jersey

Merkley, Jeff
   Senator of Oregon

Miller, Brad
   Former Representative of North Carolina

Moore, Gwen
   Representative of Wisconsin

Pelosi, Nancy
   Representative of California

Schatz, Brian
   Senator of Hawaiʻi

Schumer, Charles E.
   Senator of New York

Sherman, Brad
   Representative of California

Van Hollen, Chris
  Senator of Maryland

Vargas, Juan
  Representative of California

Velázquez, Nydia M.
  Representative of New York

Warren, Elizabeth
  Senator of Massachusetts

Waters, Maxine
  Representative of California

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2017, the foregoing document was filed with the Clerk

of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: December 8, 2017

/s/ Brianne J. Gorod
Brianne J. Gorod
