IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LEANDRA ENGLISH,

               *Plaintiff*,

    v.

DONALD J. TRUMP and
JOHN M. MULVANEY,

           *Defendants*

Case No. 1:17-cv-02534

**BRIEF OF *AMICI CURIAE* CONSUMER FINANCE REGULATION SCHOLARS
IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

_____

Courtney Weiner (DC Bar No. 992797)
LAW OFFICE OF COURTNEY WEINER, PLLC
1629 K Street, Northwest, Suite 300
Washington, DC 20006
(202) 827-9980
cw@courtneyweinerlaw.com
*Counsel for Amici*

## Certificate of *Amici Curiae* under LCvR 7(o)(5)

*Amici* are scholars of financial regulation and consumer finance. *Amici* submit this brief to lend their expertise regarding the statutory independence of the Consumer Financial Protection Bureau mandated by Congress and the proper interpretation of federal succession statutes for leadership changes at the agency in light of Congress' intent. To our knowledge, no other brief addresses these questions from the perspective of consumer finance regulation scholars.

No party's counsel authored this brief, in whole or in part. Neither party nor any party's counsel contributed money that was intended to fund the preparation or submission of this brief. No person other than *amici curiae* contributed money that was intended to fund the preparation of the brief.

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ............................................................... 1

SUMMARY OF THE ARGUMENT ......................................................... 1

ARGUMENT ............................................................................................ 3

  **I.  The Text, Structure, Purpose, and Legislative History of the Dodd-Frank Act Show That It Is the Exclusive Mechanism Governing the Succession of the CFPB Director...... 3**

    A.  "Shall" Means "Shall":  Congress Unambiguously Chose to Specify a Succession Line for CFPB Director in the Dodd-Frank Act ............................................................... 3

    B.  The Legislative History of the Dodd-Frank Act Shows that Congress Rejected the Application of the FVRA to the CFPB Director .................................................... 4

    C.  The Dodd-Frank Act's CFPB Director Succession Provision Is Integral to the Agency Independence Mandated by Congress ...................................................................... 5

      1.  Congress Designed the CFPB to Have Maximum Independence from Political Interference ............................................................................................................ 5

        i.    Formal Independent Status ............................................................... 8

        ii.   Term and Tenure of CFPB Director .................................................. 8

        iii.  Organizational Situs .......................................................................... 9

        iv.  Independent Funding ....................................................................... 11

        v.   Limitations on Executive Oversight ............................................... 12

      2.  The Dodd-Frank Act's Directorship Succession Provision Is Integral to the Independence Congress Mandated for the CFPB ............................................ 13

  **II.  The FVRA Does Not Provide a Standing Alternative Method of Appointing an Acting Director for the CFPB. ...................................................................................................... 14**

    A.  The FVRA Does Not Apply When a Statutory Provision Expressly Designates an Acting Officer, as the Dodd-Frank Act Does. ...................................................... 14

    B.  The FVRA Does Not Apply to Members of Boards of Independent Agencies, and the CFPB Director Is a Member of the Board of an Independent Agency ................................ 15

    C.  The FVRA Does Not Apply to Subsequently Enacted Statutes that Expressly Provide for a Line of Succession.................................................................................... 17

      1.  Legislative History Indicates That the FVRA Is Not an Alternative Method of Filling a Vacancy If a Subsequently Enacted Statute Expressly Provides for Another Mandatory Mechanism for Filling a Vacancy.................................................................... 17

      2.  A Law Passed by an Earlier Congress Cannot Bind a Future Congress.................... 19

  **III. The Appointment of the OMB Director as Acting CFPB Director Violates the Dodd-Frank Act's Requirement of Statutory Independence for the CFPB. ............................... 20**

CONCLUSION......................................................................................... 25

APPENDIX OF *AMICI CURIAE* ..........................................................A-I

CERTIFICATE OF SERVICE ...............................................................A-II

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*FEC v. Nat'l Rifle Ass'n Political Victory Fund,* 6 F.3d 821
(D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Great N. Ry. Co. v. United States*, 208 U.S. 452, 465 (1908) . . . . . . . . . . . . . . . . . . . . 20

*Hooks v. Kitsap Tenant Support Services*, 186 F. 3d 550
(9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Lockhart v. United States*, 546 U.S. 142, 149 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Marcello* v. *Bonds,* 349 U.S. 302, 310 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*United States v. Shull*, 793 F. Supp. 2d 1048, 1061 (S.D. Ohio 2011) . . . . . . . . . . . . . . 20

**Statutes and Regulations**

5 U.S.C. App. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

5 U.S.C. § 609(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

5 U.S.C. § 609(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 23

5 U.S.C. §§ 801 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

5 U.S.C. § 3345(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5 U.S.C. § 3346(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5 U.S.C. § 3347. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17, 18

5 U.S.C. § 3349c(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16

12 U.S.C. § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

12 U.S.C. § 1812(a)(1)-(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

12 U.S.C. § 1812(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . .16

12 U.S.C. § 1827. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

12 U.S.C. § 3303. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

12 U.S.C. § 5321(b)(1)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

12 U.S.C. § 5321(c)(3) . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

12 U.S.C. § 5491(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 21

12 U.S.C. § 5491(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9, 14

12 U.S.C. § 5491(b)(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

12 U.S.C. § 5491(b)(5)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 14, 15

12 U.S.C. § 5491(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

12 U.S.C. § 5491(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

12 U.S.C. § 5492(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

12 U.S.C. § 5492(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

12 U.S. C. § 5492(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

12 U.S.C. § 5493(b)(3)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

12 U.S.C. § 5493(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

12 U.S.C. § 5493(d)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

12 U.S.C. § 5496 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

12 U.S.C. § 5496a(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

12 U.S.C. § 5497(a)(1)-(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

12 U.S.C. § 5497(a)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

12 U.S.C. § 5497(a)(4)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

12 U.S.C. § 5497(a)(4)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13, 21, 22

12 U.S.C. § 5497(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

12 U.S.C. § 5497(e)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

12 U.S.C. § 5513 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

12 U.S.C. § 5564(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

31 U.S.C. § 321(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

31 U.S.C. § 501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

31 U.S.C. § 505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

44 U.S.C. § 3502(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Legislative Materials**

Dodd-Frank Wall Street Reform and Consumer Protection Act, H.R.
    4173, 111th Cong. (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Restoring American Financial Stability Act of 2010, S. 3217,
    111th Cong. (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

S. Rep. No. 111-176 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11, 12

S. Rep. 105-250 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Joint Explanatory Statement of the Committee of Conference 874 (2011) . . . . . . . . . . . 8

Statement of Senator Cardin, *Wall Street Reform and Consumer
Protection Act—Conference Report*, Cong. Rec. S5870 (July 15, 2010) . . . . . . . . . . . . . 6

Statement of Sen. Kaufman, *Wall Street Reform and Consumer
Protection Act—Conference Report*, Cong. Rec. S5870 (July 15, 2010) . . . . . . . . . . . . . 6

**Executive Branch Materials**

*Acting Director of the Office of Management and Budget*, 27 Op.
    O.L.C. 121 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Authority of the President to Name an Acting Attorney General*, 31 Op.
    O.L.C. 208 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Executive Order 12,866: Regulatory Planning and Review,
    58 Fed. Reg. 51735 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13, 22

Memorandum from Assistant Attorney General Steven A. Engel to
Donald F. McGahn II, Counsel to the President, Nov. 25, 2017 . . . . . . . . . . . . 16

Memorandum from Mary McLeod, General Counsel to CFPB Senior
Leadership Team, Nov. 25, 2017. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

U.S. Dep't of the Treasury, *Financial Regulatory Reform: A New
Foundation: Rebuilding Financial Supervision and Regulation*
(2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States, Office of the Press Secretary, White House Statement on
Director Mulvaney's Status as Acting Director of the Consumer
Financial Protection Bureau, Nov. 27, 2017. . . . . . . . . . . . . . . . . . . . . . . . . .14

Tweet by @realDonald Trump, 7:18am, Dec. 8, 2017, *at* http://bit.ly/2jv1m6u . . . . . . . 23

The White House, *OMB Offices*, http://bit.ly/2B14gdL. . . . . . . . . . . . . . . . . . . . . . . . . . 22

## Other Authorities

Oren Bar-Gill & Elizabeth Warren, *Making Credit Safer*, 157 U. PA.
L. REV. 1 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Lydia Beyoud, *Mulvaney Wants More Political Appointees in Place
at CFPB*, BNA BANKING DAILY, Dec. 4, 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . .23

KATHLEEN C. ENGEL & PATRICIA A. MCCOY, THE SUBPRIME VIRUS:
RECKLESS CREDIT, REGULATORY FAILURE, AND NEXT
STEPS 14-148 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

THE FINANCIAL CRISIS INQUIRY REPORT:  FINAL REPORT OF THE
NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL
AND ECONOMIC CRISIS IN THE UNITED STATES (2011) . . . . . . . . . . . . . . . . . . . . . 6

Christopher J. Goodman & Stephen M. Marice, *Employment loss
and the 2007-09 recession: an overview*, MONTHLY
LABOR REV. 3 (Bureau of Labor Statistics, April 2011) . . . . . . . . . . . . . . . . .. . . . . 6

Yuka Hayashi, *New CFPB Chief Curbs Data Collection, Citing
Cybersecurity Worries*, WALL ST. J., Dec. 5, 2017 . . . . . . . . . . . . . . . . . . . . . . . .22

Henry B. Hogue, Marc Labonte & Baird Webel, *Independence of Federal
Financial Regulators: Structure, Funding, and Other Issues* 25
(Cong. Research Serv. R43391, Feb. 28, 2017) . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Adam J. Levitin, *The Consumer Financial Protection Bureau:*
 *An Introduction*, 32 ANN. REV. BANKING & FIN. SERV. L. 321 (2013) . . . . . . . . . 7

Adam J. Levitin, *The Politics of Financial Regulation and the Regulation*
 *of Financial Politics: A Review Essay*, 127 HARV. L. REV. 1991
 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Ian McKendry, *Mulvaney's first days at CFPB:  payday, personnel*
 *and a prank,* AM. BANKER, Dec. 4, 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Mick Mulvaney, News Conference, C-SPAN, Nov. 27, 2017,
 http://cs.pn/2AxVT65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Renae Merle, *Dueling officials spend chaotic day vying to lead*
 *federal consumer watchdog*, WASH. POST, Nov. 27, 2017 . . . . . . . . . . . . . . . . . .21

Jessica Silver-Greenberg & Stacy Cowley, *Consumer Bureau's New*
 *Leader Steers a Sudden Reversal,* N.Y.TIMES, Dec. 5, 2017 . . . . . . . . . . . . . . . . 3

Arthur E. Wilmarth Jr., *The Financial Services Industry's Misguided*
 *Quest to Undermine the Consumer Financial Protection Bureau*,
 31 REV. BANKING & FIN. L. 881, 907-908 (2012). . . . . . . . . . . . . . . . . . . . . . . . .5

## INTEREST OF *AMICI CURIAE*

*Amici* are leading scholars of financial regulation and consumer finance who submit this brief to lend their expertise regarding the statutory independence of the Consumer Financial Protection Bureau mandated by Congress and the proper interpretation of federal succession statutes for leadership changes at the agency in light of Congress' intent. *Amici* and their affiliations are listed in Appendix A.

## SUMMARY OF THE ARGUMENT

This case involves respect for law in two critical respects:  the mandate of agency independence and the orderly succession of agency leadership, which is a hallmark of American democracy. Plaintiff Leandra English took the high road by filling this suit and asking a neutral federal court to determine the outcome of this successorship dispute.  Defendants Donald J. Trump and Michael John Mulvaney instead opted to seize power at an agency rather than asking for a court to resolve the dispute. The preliminary injunction Plaintiff English seeks is appropriate to enable this dispute to be resolved in an orderly fashion through law rather than through a party's creation of facts on the ground.

The controversy in this case is who lawfully serves as the Acting Director of the Consumer Financial Protection Bureau (CFPB or the Bureau): the Deputy Director, Plaintiff English, or the Director of Office of Management and Budget (OMB), Defendant Mulvaney. Deputy Director English's appointment as Acting Director is authorized by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act), which states that the Deputy Director of the CFPB "shall . . . serve as acting Director in the absence or unavailability of the Director." 12 U.S.C. § 5491(b)(5)(B). In contrast, Defendant Mulvaney's claim rests on the Defendant Trump's invocation of the Federal Vacancies Reform Act of 1998 (FVRA) as

authority for the appointment of Defendant Mulvaney to be Acting CFPB Director. 5 U.S.C. § 3345(a).

As scholars of financial regulation, we believe that Deputy Director English's claim is correct for a simple reason:  the only applicable statute to the succession question is the Dodd-Frank Act. In the Dodd-Frank Act, Congress expressly provided for a mandatory line of succession for the position of CFPB Director, stating that the Deputy Director "shall" serve as the Acting Director in the event of a vacancy. Congress selected this provision after considering and rejecting the FVRA during the drafting of the Dodd-Frank Act, and Congress's selection of this succession provision is an integral part of its design of the CFPB as an agency with unique independence and protection from policy control by the White House.  Thus, the appointment of any White House official, but especially of the OMB Director as Acting CFPB Director is repugnant to the statutory design of the CFPB as an independent agency.

The FVRA has no application to the position of CFPB Director. By its own terms, the FVRA is inapplicable as it yields to subsequently enacted statutes with express mandatory provisions for filling vacancies at federal agencies.  This is apparent from the text of the FVRA, from the FVRA's legislative history, and from the need to comport with the basic constitutional principle that a law passed by an earlier Congress cannot bind a subsequent Congress. Moreover, the FVRA does not apply to "any member who is appointed by the President, by and with the advice and consent of the Senate to any" independent agencies with a multi-member board. 5 U.S.C. § 3349c(1). The CFPB Director is such a "member," because the CFPB Director also serves as a member of a separate multi-member independent agency:  the Board of Directors of the Federal Deposit Insurance Corporation (FDIC).

Deputy Director English is seeking a preliminary injunction, and it should be granted. As

will be shown, Deputy Director English has a high likelihood of success on the merits given the strength of her statutory arguments that the Dodd-Frank Act controls the CFPB Directorship succession. Unless the Court grants Deputy Director English's request for a preliminary injunction, the CFPB will suffer irreparable harm because it will be subjected to the direct political control by the White House that Congress took pains to forbid. Moreover, without a preliminary injunction, Defendant Mulvaney will continue to take actions that may compromise the CFPB's positions in litigation. *See, e.g.*, Jessica Silver-Greenberg & Stacy Cowley, *Consumer Bureau's New Leader Steers a Sudden Reversal,* N.Y.TIMES, Dec. 5, 2017. Nor will the President's rights be in any way limited by such a preliminary injunction:  the President remains able to seek Senate confirmation of a nominee for CFPB Director. All the President is being asked to do is fish or cut bait and proceed through normal constitutional order. The granting of a preliminary injunction is also very much in the public interest as it enables the controversy over the rightful claim to the CFPB Directorship to be resolved through an impartial court and not through a naked grab of power by the President.

## ARGUMENT

I.   **The Text, Structure, Purpose, and Legislative History of the Dodd-Frank Act Show That It Is the Exclusive Mechanism Governing the Succession of the CFPB Director**

A.   **"Shall" Means "Shall":  Congress Unambiguously Chose to Specify a Succession Line for CFPB Director in the Dodd-Frank Act**

The Dodd-Frank Act expressly provides a mandatory line of succession for the CFPB Director:  in the event of the "absence or unavailability" of the Director—a phrase that Defendants concede are capacious enough to readily encompass vacancy—the Deputy Director "*shall*" serve as Acting Director. 12 U.S.C. § 5491(b)(5)(B) (emphasis added). By using the word "shall" Congress could not have been clearer:  the Dodd-Frank Act provides a mandatory and therefore exclusive line of succession for the CFPB Director. The Dodd-Frank Act's

language does not brook any alternative method of appointment of an Acting Director for the

CFPB. Applying the FVRA to allow for Defendant Mulvaney's appointment would make a

nullity of Congress's express command.

### B. The Legislative History of the Dodd-Frank Act Shows that Congress Rejected the Application of the FVRA to the CFPB Director

The legislative history of the Dodd-Frank Act indicates that Congress deliberately

rejected the FVRA as a line of succession in favor of the Deputy Director automatically

becoming Acting Director. The version of the Dodd-Frank Act that passed the House envisioned

a "Consumer Financial Protection Agency" that would initially be led by a single Director prior

to the agency transitioning into a multi-member commission. H.R. 4173, 111th Cong. §

4102(b)(6)(B) (2010). The House Bill provided that the FVRA would apply during the period

when there was only a single Director. *Id.* Notably, the House Bill did not include make the

Director (or subsequent commission chair) a member of the FDIC Board.  In contrast to the

House Bill, the Senate Bill, S. 3217, contained the single Director structure and exact language

regarding line of succession that were adopted by the Conference Committee and ultimately

enacted as the Dodd-Frank Act.

The legislative history of the Dodd-Frank Act shows that Congress was fully aware of the

FVRA as a possibility, at least when the agency's Director did not also serve on what is

unquestionably a multi-member board of an independent agency, as discussed *infra* part II.B.  In

the final legislation, Congress deliberately elected not to use the FVRA as a line of succession,

instead making clear that the FVRA would not apply both by the use of mandatory "shall"

language in the line of succession and by placing the CFPB Director on a multi-member board of

an independent agency and thus outside the scope of the FVRA.

### C.  The Dodd-Frank Act's CFPB Director Succession Provision Is Integral to the Agency Independence Mandated by Congress

The Dodd-Frank Act's provision governing the succession of the CFPB Director is not happenstance, but is integral to the design of the CFPB as an agency with a unique structure (as reflected in the Senate Bill, the structure of which was ultimately adopted) whose goal is maximizing the agency's independence from the President while maintaining accountability to Congress and the public.[1]

### 1.  Congress Designed the CFPB to Have Maximum Independence from Political Interference

Independence from political control by the White House has been a cornerstone of federal bank regulation since the 1863 enactment of the National Bank Act. Congress has endowed all federal bank regulators with independence to ensure the safety and soundness of our nation's banking system and the financial health of American citizens. *See, e.g.,* Arthur E. Wilmarth Jr., *The Financial Services Industry's Misguided Quest to Undermine the Consumer Financial Protection Bureau*, 31 REV. BANKING & FIN. L. 881, 907-908 (2012). Absent such independence from political interference, the President could readily goose the economy for short-term political gain via control of the credit channel or even direct financing to favored political groups and away from disfavored groups. The independence of federal bank regulators from daily political control by the White House is essential for ensuring financial stability and that financial institutions are not used for political ends.

When Congress created the CFPB in the Dodd-Frank Act in 2010, it was particularly concerned with ensuring the agency's independence. *See* S. REP. No. 111-176, at 11 (2010); *id.* at 174 (a "strong and independent Bureau with a clear mission to keep consumer protections up-

---

[1] We note that there is controversy about the constitutionality of the CFPB's structure. These issues are not before the Court in this litigation, and need not be addressed; avoidance principles dictate that the agency's structure, although novel, should be presumed constitutional.

to-date with the changing marketplace will reduce the incentive for State action and increase

uniformity"); Statement of Senator Cardin, *Wall Street Reform and Consumer Protection Act—*

*Conference Report*, Cong. Rec. S5870, S5871 (July 15, 2010) ("This legislation will create a

consumer bureau . . . that is independent, so the consumer is represented in the financial

structure"); Statement of Sen. Kaufman, *id.* at S5885 (stating that the Dodd-Frank Act

"establishes an independent [CFPB] with strong and autonomous rulemaking authority . . .").

Congress created the CFPB in response to the 2008 financial crisis, which wreaked havoc in its

wake. Rampant consumer abuses in the residential mortgage market precipitated the crisis,

nearly destroying the global financial system, throwing millions of Americans out of work, and

culminating in several million home foreclosures. *See, e.g.,* KATHLEEN C. ENGEL & PATRICIA A.

MCCOY, THE SUBPRIME VIRUS:  RECKLESS CREDIT, REGULATORY FAILURE, AND NEXT STEPS 14-

148 (2011); Christopher J. Goodman & Stephen M. Marice, *Employment loss and the 2007-09*

*recession: an overview*, MONTHLY LABOR REV. 3 (Bureau of Labor Statistics, April 2011),

http://bit.ly/2ko7Es3. Post-mortems of the crisis revealed that conscious forbearance by the

federal bank regulators, who had primary responsibility for consumer financial protection at the

time, was a major contributing factor in the 2008 crisis. ENGEL & MCCOY, *supra*, at 149-205;

THE FINANCIAL CRISIS INQUIRY REPORT:  FINAL REPORT OF THE NATIONAL COMMISSION ON THE

CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES xvii-xviii, xxi, xxiii

(2011). These regulators were tasked with both ensuring bank profitability and consumer

protection and prioritized the short-term profitability of banks over consumer protection.

Part of the reason for the bank regulators' inaction was the conflict between their mission

of ensuring bank safety and soundness and their consumer protection mission.  Adam J. Levitin,

*The Consumer Financial Protection Bureau: An Introduction*, 32 ANN. REV. BANKING & FIN.

SERV. L. 321, 329-31 (2013). To address this problem, Congress transferred primary federal

authority for consumer financial protection from the existing federal bank regulators to the

CFPB, which has one sole mission:  protecting the financial well-being of American consumers.

A second problem that plagued bank regulators, however, was "regulatory capture"—

when agencies come to serve the interests of regulated industries rather than those of the public.

*See, e.g.*, Adam J. Levitin, *The Politics of Financial Regulation and the Regulation of Financial

Politics: A Review Essay*, 127 HARV. L. REV. 1991, 2041-45 (2014) (hereinafter "Levitin,

*Financial Politics*"). The concern about capture animated proposals for a consumer financial

protection agency, *see* U.S. Dep't of the Treasury, *Financial Regulatory Reform: A New

Foundation: Rebuilding Financial Supervision and Regulation* 29 (2009) (putting forth a

proposal for a federal consumer financial protection agency and expressing concerns about

regulatory capture); Oren Bar-Gill & Elizabeth Warren, *Making Credit Safer*, 157 U. PA. L. REV.

1, 99 n.325 (2008) (proposing a consumer financial protection agency and noting that

"minimizing the risk of capture is a main regulatory-design challenge in implementing our

proposal."), and is reflected in the unique structure of the CFPB. Levitin, *supra* at 2056.

Congress sought to insulate the new CFPB from industry capture and partisan politics by

vesting it with important mainstays of independence from the executive branch and the White

House. Those safeguards include formal status as an independent agency, a Director appointed

by the President and confirmed by the Senate who can be fired only for good cause, a locale

outside of the executive branch, independent funding, and exemption from reviews by OMB and

the White House.[2] Dodd-Frank's directive on the appointment of the CFPB's Acting Director is

---

[2] Congress took care to balance the CFPB's independence with checks making the CFPB
accountable to Congress, the courts, the President, and the public in multiple ways. Levitin,
*Financial Politics, supra* at 2057. The CFPB's Director must appear at least twice a year before

integral to this statutory scheme of agency independence.

### i.       Formal Independent Status

The Dodd-Frank Act provision establishing the CFPB spells out the agency's

independence: "There is established in the Federal Reserve System, *an independent bureau* to be

known as the 'Bureau of Consumer Financial Protection' . . ." 12 U.S.C. § 5491(a) (emphasis

added); *accord*, Joint Explanatory Statement of the Committee of Conference 874 (2011),

http://bit.ly/2ntHMfa (the CFPB "will be an independent bureau within the Federal Reserve

System").

### ii.      Term and Tenure of CFPB Director

The CFPB's leadership structure is fundamental to Congress's design of an agency free

from independence from direct daily policy control by the President. The CFPB is headed by a

Director, who "shall be appointed by the President, by and with the advice and consent of the

Senate," 12 U.S.C. § 5491(b)(2), and "shall serve for a term of 5 years." 12 U.S.C. § 5491(c)(1).

This provision protects the CFPB's autonomy by allowing the Director to serve past the four-

---

the relevant Congressional Committees and submit a comprehensive report on topics ranging from regulatory obstacles and objectives to budgetary justifications, as well as an analysis of past and anticipated agency actions. 12 U.S.C. §§ 5493(b)(3)(C), (d)(4), 5496, 5497(e)(4)(A). The Government Accountability Office conducts an annual audit of the CFPB, 12 U.S.C. §§ 5496a(b), 5497(a)(4)(D), (a)(5), and the Federal Reserve's Inspector General oversees the CFPB through reviews, 5 U.S.C. App. 3. Ultimately, Congress can also amend or repeal the authorizing legislation for the CFPB.

CFPB rulemakings are subject to the Administrative Procedure Act. 12 U.S.C. § 5491(a). The Dodd-Frank Act also made the CFPB one of only three agencies subject to the Small Business Regulatory Enforcement Fairness Act, which requires the CFPB to consult with, and gain direct input from, small businesses regarding proposed rulemakings. 5 U.S.C. § 609(d)(2). In addition, the CPFB is the only agency whose rulemakings are subject to a veto by the Financial Stability Oversight Council. 12 U.S.C. § 5513. The CFPB lacks independent litigation authority before the Supreme Court without leave of the Attorney General, 12 U.S.C. § 5564(e), and the CFPB's rulemakings and enforcement actions are subject to judicial review. 12 U.S.C. § 5491(a). Congress further has the power to overturn CFPB rules under the Congressional Review Act. 5 U.S.C. §§ 801 et seq.

year term of the President.

The Dodd-Frank Act further enhanced the independence of the CFPB by providing that that the President may only "remove the Director for inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). This provision augments the independence of the CFPB by shielding the Director from being fired because of a policy disagreement with the President. Without the for-cause removal provision, a President could credibly threaten the CFPB Director's removal unless the Director complied with the President's requests, and if the Director did not comply, the President could replace the Director with a new (and presumably compliant) Director. That, in turn, would allow a President to attempt to achieve a short-term boost to the economy by reducing consumer finance regulation and loosening credit, leaving the costs of unsustainable credit to a future administration.  Likewise, if the President could replace the CFPB Director at will, the President could freely interfere with civil enforcement decisions.

In addition, without protection from termination at will, the concentrated and well-heeled financial services industry lobby could pressure a President to relax regulations through removal or the threat of removal of the Director. Consumer advocates cannot compete with such well-heeled lobbying. For-cause-only removal helps level the playing field between industry and consumer interests by ensuring that industry or select companies cannot forestall or undo regulation simply by persuading the President to threaten the removal of the CFPB Director. Instead, it is Congress that retains the ultimate oversight over CFPB policy.

### iii.    Organizational Situs

Congress located the CFPB within the Federal Reserve System as "an independent Bureau." 12 U.S.C. § 5491(a). Because the Federal Reserve System itself is outside of the executive branch, this decision helps insulate the CFPB from undue political influence.

This arrangement—locating the CFPB outside of the executive branch—is the norm for financial regulators:  the Federal Reserve System is independently located, as are the FDIC, National Credit Union Administration, Federal Trade Commission, Federal Housing Finance Agency, Securities and Exchange Commission, and the Commodities Futures Trading Commission.  Although the Office of the Comptroller of the Currency is located within the U.S. Department of the Treasury, it enjoys statutory freedom from interference from the Treasury Secretary. 12 U.S.C. § 1; 31 U.S.C. § 321(c). Even though the OCC is the only financial regulator located within a department, it is considered independent from the executive branch, as are all the other federal regulators. *See* Henry B. Hogue, Marc Labonte & Baird Webel, *Independence of Federal Financial Regulators: Structure, Funding, and Other Issues* 25 (Cong. Res. Serv. R43391, Feb. 28, 2017), http://bit.ly/2AWAfev ("Hogue").

Congress not only provided for the CFPB to be independent of the President, but also cordoned it off from interference by the Board of Governors of the Federal Reserve. Under the Dodd-Frank Act, absent other statutory authority, the Federal Reserve Board may not:  (1) "intervene in any matter or proceeding before the Director, including examinations or enforcement actions;" (2) "appoint, direct, or remove any officer or employee of the Bureau;" or (3) "merge or consolidate the Bureau, or any of the functions of the Bureau, with any division or office of the Board of Governors or the Federal reserve banks." 12 U.S.C. § 5492(c)(2). Similarly, the Federal Reserve Board "may not delay or prevent the issuance of any rule or order of the Bureau" and "[n]o rule or order of the Bureau shall be subject to approval or review by the Board of Governors." 12 U.S.C. § 5492(c)(3).

In sum, Congress took pains to assure the CFPB's independence by locating it outside of the executive branch and insulating it from Federal Reserve Board interference. Congress further

decided to fund the CFPB's operations with Federal Reserve System funds, rather than appropriated funds, to bolster the agency's autonomy, as the next section discusses.

### iv.    Independent Funding

Industry capture of agencies can occur in various ways, but agency funding is a key pressure point. Congress has historically funded federal bank regulators independently of the appropriations process to shield bank oversight from political interference. *See* Hogue, *supra,* at 25 ("[T]he annual appropriation processes and periodic reauthorization legislation provide Congress with opportunities to influence the size, scope, priorities, and activities of any agency"). For this reason, Congress exempts all federal bank regulators from Congressional appropriations for their funding.[3]  *Id.*

While the CFPB, like all other federal bank regulators, is not subject to the appropriations process, it differs from other federal bank regulators in that it does not generate its own funding. Instead, the CFPB's funding consists of transfers from the Board of Governors of the Federal Reserve, capped at twelve percent of the total operating expenses of the Federal Reserve System reported in the Federal Reserve System's 2009 annual report, adjusted for inflation. 12 U.S.C. § 5497(a)(1)-(a)(2).

Congress specifically placed the CFPB on independent financial footing due to the danger of reliance on the appropriations process. S. Rep. No. 111-176, at 163 (2010) ("[T]he assurance of adequate funding [for the CFPB from the Federal Reserve Board], independent of the Congressional appropriations process, is absolutely essential to the independent operations of

---

[3] The Federal Reserve System earns revenues from services to its members such as check-clearing, securities investments, and interest on loans. The OCC and the FHFA primarily fund themselves through fees on their regulated entities. The FDIC and the National Credit Union Administration generate revenue primarily through premiums paid by their insured entities for federal deposit and share insurance respectively. *See* Hogue, *supra*, at 26.

any financial regulator"). As the Senate Report (*id.*) accompanying the Dodd-Frank Act

explained, Congress had observed the harm of political pressure on the predecessor to FHFA:

> This was a hard learned lesson from the difficulties faced by the Office of Federal Housing Enterprise Oversight (OFHEO), which was subject to repeated Congressional pressure because it was forced to go through the annual appropriations process. It is widely acknowledged that this helped limit OFHEO's effectiveness. For that reason, ensuring that OFHEO's successor agency—the Federal Housing Finance Agency—would not be subject to appropriations was a high priority for the Committee and the Congress in the Housing and Economic Recovery Act of 2008.

The cap on the CFPB's budget is unique among federal bank regulators, and its budget is,

as a result, modest compared to the budgets of other federal financial regulators. *See id.* at 163-

164. Thus, while the CFPB is structured to be independent of the political horse-trading and

logrolling of the appropriations process, it is still kept under tighter budgetary control than any

other federal bank regulator.

### v.       Limitations on Executive Oversight

Consistent with its treatment of other independent federal bank regulators, Congress

further exempted CFPB actions from executive branch review. In one such measure, Congress

provided that legislative recommendations, testimony, and comments by the CFPB are not

subject to executive branch review, whether by OMB or any other federal officer or agency.

Specifically, Dodd-Frank states that:

> No officer or agency of the United States shall have any authority to require the Director or any other officer of the Bureau to submit legislative recommendations, or testimony or comments on legislation, to any officer or agency of the United States for approval, comments, or review prior to the submission of such recommendations, testimony, or comments to the Congress [as long as those CFPB documents indicate that the views expressed therein are the CFPB's own].

12 U.S.C. § 5493(c)(4).

In another example of independence from executive oversight, Congress gave the CFPB

a statutory exemption from budget review by OMB. Under the Dodd-Frank Act, the CFPB must

provide copies of the Director's financial operating plans, forecasts, and quarterly reports to the

Director of OMB. 12 U.S.C. § 5497(a)(4)(A). In a companion provision, however, Congress

stated that there is no "obligation on the part of the Director [of the CFPB] to consult with or

obtain the consent or approval of the Director of the Office of Management and Budget with

respect to any report, plan, forecast, or" other information provided to OMB. 12 U.S.C. §

5497(a)(4)(E); *cf.* 12 U.S.C. § 1827 (extending similar protection to the FDIC). Similarly,

nothing in the OMB reporting requirements may "be construed as implying . . . any jurisdiction

or oversight over the affairs or operations of the Bureau." 12 U.S.C. § 5497(a)(4)(E).

Finally, the CFPB, like all federal bank regulators, is free from the usual requirement that

agencies submit their rules to OMB's Office of Information and Regulatory Affairs (OIRA) for

review and cost-benefit analysis. Executive Order 12866, *Regulatory Planning and Review*, 58

Fed. Reg. 51735 (Oct. 4, 1993). Executive Order 12866 contains an express exemption for

agencies deemed to be "independent regulatory agencies" under the Paperwork Reduction Act.

*Id.* § 3(b). The Paperwork Reduction Act's list of independent regulatory agencies includes the

CFPB and other federal bank regulators. 44 U.S.C. § 3502(5). In this way, the CFPB and other

federal bank regulators are exempt from White House review of their rules.

### 2. The Dodd-Frank Act's Directorship Succession Provision Is Integral to the Independence Congress Mandated for the CFPB

Dodd-Frank's provision on the appointment of the CFPB's Acting Director is a key pillar

supporting the architecture of agency independence that defines the CFPB. Under Dodd-Frank,

the White House's single most important role with respect to the CFPB—the appointment of the

permanent CFPB Director—may only be made "by and with the advice and consent of the

Senate." 12 U.S.C. § 5491(b)(2). In contrast, no federal statute requires Senate confirmation for

13

appointment of an Acting Director for the CFPB. Thus, if the President had authority to name the

CFPB's Acting Director under the FVRA, the President could bypass Senate confirmation of the

agency's head by appointing the CFPB's Acting Director for up to 210 days without nominating

a permanent Director. 5 U.S.C. § 3346(a)(1). Conceivably, the President could stack back-to-

back 210-day terms and delay a nomination until the end of a Presidency, resulting in up to 8

years of freely removable Acting Directors of the President's choice, followed by a 5-year term

for a duly confirmed Director of the President's nomination. To avoid that scenario, Congress

insisted that the CFPB's Deputy Director "serve as acting Director in the absence or

unavailability of the Director." 12 U.S.C. § 5491(b)(5)(B). Because the CFPB's Deputy Director

is a career civil servant who is appointed by the CFPB's Director, 12 U.S.C. § 5491(b)(5)(A), the

President may not name a political appointee as CFPB Director without Senate confirmation.

## II.     The FVRA Does Not Provide a Standing Alternative Method of Appointing an Acting Director for the CFPB.

Defendants argue that the FVRA provides a standing alternative method of filling

vacancies at federal agencies, even when another method is specified by statute. *See* White

House Statement on Director Mulvaney's Status as Acting Director of the Consumer Financial

Protection Bureau, Nov. 27, 2017, *at* http://bit.ly/2zIofxn. This claim is wrong because it ignores

the text and legislative history of the FVRA and a fundamental constitutional principle.

### A.   The FVRA Does Not Apply When a Statutory Provision Expressly Designates an Acting Officer, as the Dodd-Frank Act Does.

The FVRA provides that it is the "exclusive means for temporarily authorizing an acting

official to perform the functions and duties of any office of an Executive agency … for which

appointment is required to be made by the President, by and with the advice and consent of the

Senate, unless—(1) a statutory provision expressly—…(B) designates an officer or employee to

perform the functions and duties of a specified office temporarily in an acting capacity."  5

U.S.C. § 3347.  The Dodd-Frank Act's CPFB succession provision is "a statutory provision expressly…designat[ing] an officer or employee to perform the functions and duties of [the CFPB Director] temporarily in an acting capacity."   12 U.S.C. § 5491(b)(5)(B).  Thus the FVRA, by its own terms, does not apply to the CFPB Directorship.

The Dodd-Frank Act's use of the word "shall" in the CPFB Director succession provision is as express a statutory provision as could be conceived without requiring the use of "magic words" directly referencing the FVRA. The Supreme Court has repeatedly made clear that "magic words" are not required for a provision to be express. *See Marcello* v. *Bonds,* 349 U.S. 302, 310 (1955) ("Exemptions from the terms of the . . . Act are not lightly to be presumed in view of the statement . . . that modifications must be express[.] But . . . [u]nless we are to require the Congress to employ magical passwords in order to effectuate an exemption from the . . . Act, we must hold that the present statute expressly supersedes the . . . provisions of that Act"); *Lockhart v. United States*, 546 U.S. 142, 149 (2005) (Scalia, J. concurring) ("When the plain import of a later statute directly conflicts with an earlier statute, the later enactment governs, *regardless* of its compliance with any earlier-enacted requirement of an express reference or other 'magical password.'") (emphasis in original). The Dodd-Frank Act's CFPB Director succession provision is an express provision opting out of the FVRA succession mechanism, so the FVRA has no applicability to determining who is the rightful Acting Director of the CFPB.

### B.  The FVRA Does Not Apply to Members of Boards of Independent Agencies, and the CFPB Director Is a Member of the Board of an Independent Agency

The FVRA not only has an exclusion for express opt-outs of its coverage, but it is also inapplicable to:

> [A]ny member who is appointed by the President, by and with the advice and consent of the Senate to any board, commission, or similar entity that—

(A) is composed of multiple members; and
(B) governs an independent establishment or Government corporation.

5 U.S.C. § 3349c(1).

The CFPB Director is a member of the multi-member board of an independent

Government corporation, namely the five-member Board of Directors of the Federal Deposit

Insurance Corporation. 12 U.S.C. § 1812(a)(1)(B). Appointment as the CFPB Director, by and

with the advice and consent of the Senate, is not only an appointment to lead the CFPB, but also

to serve as a member of FDIC Board. As a multi-member board of an independent Government

corporation, the FDIC Board is therefore clearly exempt from the FVRA.[4]

There is an important policy foundation for the exclusion of multi-member boards of

independent entities from the FVRA's ambit. Multi-member boards of independent agencies and

other entities frequently have partisan balance requirements or expertise requirements or

geographic affiliation requirements. For example, the FDIC Board has a partisan balance

requirement, and a requirement that one of its members have State bank supervisory experience.

12 U.S.C. § 1812(a)(1)-(2). If the President could use the FVRA to appoint acting members of

multi-member boards of independent entities, he could circumvent the statutory qualification

restrictions on these entities. Thus, if the FVRA applied to multi-member boards of independent

agencies, the President could stack the FDIC Board solely with members of his own political

party.  The President does have considerable power to shape the membership of multi-member

boards of independent agencies, but the exercise of this power is subject to the advice and

---

[4] We note that the Office of Legal Counsel memorandum on which the Defendant
President apparently relied in appointing Defendant Mulvaney did not mention the CFPB
Director's role as an FDIC Board member, much less analyze how it affects the application of
the FVRA. Memorandum from Assistant Attorney General Steven A. Engel to Donald F.
McGahn II, Counsel to the President, Nov. 25, 2017, *at* http://bit.ly/2iSSZRQ. A post-
controversy memorandum from the CFPB's General Counsel similarly failed to consider the
CFPB Director's membership on the FDIC Board. *See* Memorandum from Mary McLeod,
General Counsel to CFPB Senior Leadership Team, Nov. 25, 2017, *at* http://bit.ly/2k0pKfO.

consent of the Senate.

It is for this reason that the FVRA does not extend to vacancies on multi-member independent agency boards. The appointment of an Acting CFPB Director is necessarily the appointment of an acting member of the FDIC Board.  This role cannot be separated from the CFPB Director's role at the CFPB; it is a mandatory statutory package, and the service of an invalidly Acting CFPB Director on the FDIC Board would jeopardize the legality of the FDIC's actions. *See FEC v. Nat'l Rifle Ass'n Political Victory Fund,* 6 F.3d 821 (D.C. Cir. 1993). Accordingly, the President cannot use the FVRA to appoint the Acting CFPB Director. Instead, the *only* applicable statute to the succession of CFPB Director is the Dodd-Frank Act.

### C.  The FVRA Does Not Apply to Subsequently Enacted Statutes that Expressly Provide for a Line of Succession.

Defendants' argument that the FVRA provides a standing alternative method of filling vacancies at federal agencies stands on a selective reading of the FVRA's legislative history that does not comport with a basic constitutional principle—an earlier Congress cannot bind a later Congress.  Defendants contend that section 3347 of the FVRA provides that the FVRA is either the exclusive or alternative succession provision for filling a vacancy; the FVRA is always an option no matter what another statute provides.  Yet, Defendants recognize that section 3347 is open to another (correct) reading, namely that the word "exclusive" simply makes clear that the FVRA applies absent an express-out out provision that cause another statute to control. Accordingly, Defendants' position stands on the legislative history of the FVRA (and on a single reported decision that also relied on the FVRA's legislative history).

### 1.  Legislative History Indicates That the FVRA Is Not an Alternative Method of Filling a Vacancy If a Subsequently Enacted Statute Expressly Provides for Another Mandatory Mechanism for Filling a Vacancy.

Defendants rely on the FVRA's legislative history to support their reading that the FVRA

is either an exclusive possibility or an alternative possibility for filling vacancies at federal agencies.  The problem with this claim is that it fails to note that the FVRA's legislative history carefully distinguishes between the application of the FVRA to existing statutes and to subsequently enacted statutes.  The FVRA's legislative history shows that the FVRA is *not* meant to serve as an alternative for the succession mechanisms in subsequent statutes, only for those in existing statutes.

The Senate Report on the FVRA explains that that there are three exceptions to its application. The first deals with *subsequently enacted statutes*, which "govern" if they "expressly provide" that they supersede the FVRA. The second deals with *existing statutes*, for which the Vacancies Act stands as an alternative appointment method for acting officers, and the third, not relevant here, deals with recess appointments:

> [Section 3347 of the FVRA] does allow temporary appointments to be made other than through the Vacancies Reform Act in three narrowly delineated exceptions. First, where Congress provides that a statutory provision expressly provides that it supersedes the Vacancies Reform Act, the other statute will govern. But statutes enacted in the future purporting to or argued to be construed to govern the temporary filling of offices covered by this statute are not to be effective unless they expressly provide that they are superseding the Vacancies Reform Act. Second, the bill retains existing statutes that are in effect on the date of enactment of the Vacancies Act of 1998 that expressly authorize the President, or the head of an executive department to designate an officer to perform the functions and duties of a specified office temporarily in an acting capacity, as well as statutes that expressly provide for the temporary performance of the functions and duties of an office by a particular officer or employee. (This includes statutes that provide for an automatic designation, unless the President designates another official). The Committee is aware of the existence of statutes specifically governing a vacancy in 41 specific offices, 40 of which would be retained by this bill....

S. Rep. 105-250, 1998 WL 404532 at *15.

The Dodd-Frank Act clearly falls into the first exception contemplated in the legislative history: it is a statute enacted subsequent to the FVRA, and it has express language indicating that it supersedes the FVRA because it states that the Deputy Director "shall" serve as acting

Director in the event of the Director's absence or unavailability.

Defendants' reliance on the FVRA legislative history is founded on a selective reading of that legislative history. Defendants ignore the first exception to the FVRA discussed in the legislative history. That first exception is the one dealing with subsequently enacted statutes. Instead, the President focuses on the second exception mentioned in the legislative history, but that exception is expressly inapposite, as it deals with pre-existing statutes. Likewise, the sole reported case on the FVRA is also inapplicable as it dealt with the General Counsel of the National Labor Relations Board, one of the 40 offices specifically mentioned in the legislative history as under an existing statute. *Hooks v. Kitsap Tenant Support Services*, 186 F. 3d 550 (9th Cir. 2016). Similarly, the opinions issued by the Office of Legal Counsel on the FVRA deal with existing, rather than subsequent statutes. *See, e.g.*, *Acting Director of the Office of Management and Budget*, 27 Op. O.L.C. 121 (2003); *Authority of the President to Name an Acting Attorney General*, 31 Op. O.L.C. 208 (2007). As a result, none of these precedents applies to the CFPB Directorship.[5]

### 2. A Law Passed by an Earlier Congress Cannot Bind a Future Congress

The FVRA's legislative history's distinction between the application of the FVRA for existing and subsequently enacted statutes is also the only reading that is consistent with a fundamental constitutional principle: a law passed by an earlier Congress cannot bind a future Congress. If Defendants' reading were correct, it would mean that an earlier Congress (the FVRA Congress in 1998) could bind a later Congress (the Dodd-Frank Congress in 2010) by requiring the later Congress to have the FVRA as an alternative method of filling vacancies for any statutory position created by the later Congress, notwithstanding the later Congress's express

---

[5] Notably, the OLC opinion on the CFPB on which the President claims to have relied did not address the part of the FVRA's legislative history dealing with subsequent statutes, only that with existing statutes, despite the Dodd-Frank Act being a subsequent statute.

rejection of that alternative.   The FVRA Congress could amend previously existing statutes, but it could not require the FVRA to always be an alternative method of appointment no matter what actions a subsequent Congress would take.

It is axiomatic that one Congress cannot bind a subsequent one through legislation; were it otherwise, a Congress could exercise dead hand control even if the electorate had subsequently rejected it at the polls. *Great N. Ry. Co. v. United States*, 208 U.S. 452, 465 (1908); *United States v. Shull*, 793 F. Supp. 2d 1048, 1061 (S.D. Ohio 2011). The democratic edifice of American government cannot tolerate an earlier Congress binding a subsequent one through legislation. It is for this reason that the legislative history of the FVRA recognized that future statutes had to be treated differently than existing statutes. Accordingly, Defendants' position that the FVRA stands as a constant alternative line of succession is incorrect. The FVRA might be an alternative method for filling vacancies at agencies created under existing statutes, but it cannot be for agencies created after its enactment when a subsequently enacted statutory line of succession supersedes the application of the FVRA.[6]

### III.    The Appointment of the OMB Director as Acting CFPB Director Violates the Dodd-Frank Act's Requirement of Statutory Independence for the CFPB.

Even if the Court were to determine that the FVRA governs the CFPB Directorship succession, Defendant Mulvaney and any other OMB official should still be precluded from appointment to the Acting CFPB Director position. Defendant Trump's appointment of Defendant Mulvaney epitomizes the problem Congress sought to address by creating an exclusive mechanism in the Dodd-Frank Act for filling the post of Acting Director of the CFPB. Defendant Mulvaney is OMB Director. OMB "is an office in the Executive Office of the President," 31 U.S.C. § 501, which makes Defendant Mulvaney an official of the White House.

---

[6] For this reason, holding that the FVRA controls over the Dodd-Frank Act does not, in fact, further the goal of constitutional avoidance, contrary to the claim of certain other *amici*.

Defendant Mulvaney has told the press that he is continuing to head OMB while assuming office as the CFPB's Acting Director. *See* Renae Merle, *Dueling officials spend chaotic day vying to lead federal consumer watchdog*, WASH. POST (Nov. 27, 2017) ("Mulvaney said he plans to work three days a week at the agency and three days at OMB"). Thus, the White House effectively has taken over the CFPB by appointing Defendant Mulvaney as CFPB Acting Director while he remains head of OMB. Indeed, in a press conference on November 27, 2017, Defendant Mulvaney confirmed this turn of events, declaring: "The Trump Administration is now in charge" of the CFPB. *See, e.g.,* http://cs.pn/2AxVT65.

Likewise, Defendant Mulvaney's appointment as CFPB Acting Director is in blatant violation of Congress' repeated injunctions against OMB intrusion into CFPB decisions. Congress specified in the Dodd-Frank Act that the CFPB is to be an "independent bureau," 12 U.S.C. § 5491(a), yet a top White House official has now taken control of the agency, without opportunity for Senate confirmation. Furthermore, this violates Congress' directive denying the OMB "jurisdiction or oversight over the affairs or operations of the Bureau", 12 U.S.C. § 5497(a)(4)(E).

Defendant Mulvaney's actions as putative Acting Director of the CFPB contravene other important statutory provisions that wall off the CFPB from OMB. In Dodd-Frank, Congress prohibited officials from OMB and the White House from requiring the CFPB to submit "legislative recommendations, or testimony or comments on legislation" to them for prior review or approval. 12 U.S.C. § 5492(c)(4). Yet the sitting Director of OMB now wields ultimate power to review and approve any proposed recommendations, testimony, or comments by the CFPB to Congress. The same OMB Director will now sign off on the CFPB's financial operating plans, forecasts, and quarterly reports, in violation of 12 U.S.C. § 5497(a)(4)(E).

21

Defendant Mulvaney is also reviewing and acting on CFPB rules and rulemakings while serving as OMB Director. His involvement in CFPB rulemaking is especially problematic in light of E.O. 12866, which expressly exempts the CFPB from OIRA rulemaking review. OIRA is both an office of OMB, 31 U.S.C. § 505, and an arm of the White House. *See* The White House, *OMB Offices*, http://bit.ly/2B14gdL (viewed Dec. 5, 2017). OIRA staff report to Defendant Mulvaney in his capacity as OMB Director, and Defendant Mulvaney has ultimate authority over OIRA's rulemaking review.

As a result, CFPB rulemaking is effectively under OMB review as long as Defendant Mulvaney remains the OMB Director. In fact, *American Banker* quoted Defendant Mulvaney on December 4, 2017—after he claimed to be serving as CFPB Acting Director—as saying: "You could imagine that the Office of Management and Budget under the Trump administration might look very cautiously, even cynically, against rules that were produced by" the previous CFPB Director, Richard Cordray. Ian McKendry, *Mulvaney's first days at CFPB:  payday, personnel and a prank,* AM. BANKER, Dec. 4, 2017. As this demonstrates, Defendant Mulvaney is incapable of reviewing CFPB rulemakings independently; instead, he views them from the perspective of the White House and OMB. At his November 27 press conference, Defendant Mulvaney announced one of his first decisions was to institute a 30-day freeze on all new rules, regulations, and guidance issued by the CFPB. *See, e.g.,* http://cs.pn/2AxVT65. More recently, Defendant Mulvaney halted implementation of a new CFPB final rule expanding data collection on mortgages. *See* Yuka Hayashi, *New CFPB Chief Curbs Data Collection, Citing Cybersecurity Worries*, WALL ST. J., Dec. 5, 2017. As this suggests, Defendant Mulvaney, while continuing as OMB head, has acted aggressively to put CFPB rulemaking under the White House's control.

Defendant Mulvaney's appointment as Acting Director allows OMB and the White

House to stack the CFPB rulemaking process in another way. Under the Small Business

Regulatory Enforcement Fairness Act (SBREFA), the CFPB must elicit feedback from small

businesses regarding proposed rulemakings. 5 U.S.C. § 609(d)(2). SBREFA requires the CFPB

to convene a review panel for the proposed rule "consisting wholly of full time Federal

employees of the office within the agency responsible for carrying out the proposed rule [the

CFPB], the Office of Information and Regulatory Affairs within the Office of Management and

Budget, and the Chief Counsel" for Advocacy of the Small Business Administration. The

purpose of the review panel is to issue a public report on "the comments of the small entity

representatives" and the review panel's findings. 5 U.S.C. § 609(b).

     The SBREFA panel's authorizing legislation gives room to Defendant Mulvaney to

manipulate the composition of the review panel. Recently, he announced his intent to "add more

political appointees to the [CFPB's] ranks . . . pairing them with senior civil servants in areas

such as . . . regulations." Lydia Beyoud, *Mulvaney Wants More Political Appointees in Place at

CFPB*, BNA Banking Daily, Dec. 4, 2017. This raises concerns that as Acting CFPB Director

Defendant Mulvaney would appoint his political appointees at the CFPB who were aligned with

OMB and the White House to serve on SBREFA review panels. This, in turn, would rig the

SBREFA process and help ensure that rulemakings vital to the welfare of American consumers

do not move forward.

     The extent of White House direct policy control over the CFPB through Defendant

Mulvaney is perhaps most clearly shown by Defendant Trump's tweet on December 8, 2017:

> Fines and penalties against Wells Fargo Bank for their bad acts against their
> customers and others will not be dropped, as has incorrectly been reported, but
> will be pursued and, if anything, substantially increased. I will cut Regs but make
> penalties severe when caught cheating!

Tweet by @realDonald Trump, 7:18am, Dec. 8, 2017, *at* http://bit.ly/2jv1m6u.  Given that the

President lacks statutory authority to determine whether the CFPB pursues an enforcement action, much less the fines it imposes or the regulations it will pass or cut, the President's tweet is a remarkable boast of having a power that Congress specifically denied the President.

In these myriad ways, Defendant Mulvaney's appointment as Acting Director of the CFPB while continuing to serve as OMB Director puts the White House in direct, day-to-day control of the CFPB. This sort of direct political control by the White House, unmediated by a for-cause removal standard, a term in office that may outlast the President's, and Senate confirmation, is a direct threat to the CFPB's statutory independence and the stated will of Congress.[7]  It is precisely these concerns that animated Congress's choice to reject the FVRA mechanism and have the Dodd-Frank Act control the CFPB Directorship succession.

* * *

For the reasons explained above, only the Dodd-Frank Act applies to determine the succession of the CFPB Directorship in the event of a vacancy, which means that until and unless a Presidential nominee is confirmed by the Senate (or installed through a recess appointment), the Deputy Director of the CFPB, Leandra English, serves as the only lawful Acting Director.

---

[7] We note that the CFPB is not the only federal bank regulatory body whose independence will be compromised. For if Mr. Mulvaney can serve the Acting Director of the CFPB, he will also be a voting member of the board of directors of the FDIC, of the Financial Stability Oversight Council, and of the Federal Financial Institutions Examination Council. 12 U.S.C. §§ 1812(a)(1)(B), (d)(2); 3303; 5321(b)(1)(D), (c)(3). His concurrent tenure as Director of OMB will threaten the independence of these additional bank regulatory bodies by substituting a sitting White House official for an independent agency head.

## CONCLUSION

For the foregoing reasons, the court should grant plaintiff's motion for a preliminary injunction.

Dated: December 8, 2017

Respectfully submitted,
/s/ Courtney Weiner
Courtney Weiner

Courtney Weiner (DC Bar No. 992797)
LAW OFFICE OF COURTNEY WEINER, PLLC
1629 K Street, Northwest, Suite 300
Washington, DC 20006
(202) 827-9980
cw@courtneyweinerlaw.com

*Counsel for Amici*

## APPENDIX OF *AMICI CURIAE*

**Ethan S. Bernstein** is an Assistant Professor in the Organizational Behavior unit and the Berol Corporation Fellow at the Harvard Business School. He previously served as the CFPB's Chief Strategy Officer and Deputy Assistant Director of Mortgage Markets.

**Benjamin P. Edwards** is an Associate Professor of Law at the University of Nevada, Las Vegas William S. Boyd School of Law.  He writes about financial regulation and consumer protection.

**Kathleen C. Engel** is a Research Professor of Law at Suffolk University. She serves on the CFPB's Consumer Advisory Board (CAB); however, the views she expresses here are her own, not those of the CAB, the CFPB, or the United States.

**Robert Hockett** is the Edward Cornell Professor at Cornell Law School, specializing in finance and financial regulation. He has previously worked at the Federal Reserve Bank of New York and the International Monetary Fund and is a Fellow of The Century Foundation.

**Dalié Jiménez** is a Professor of Law at the University of California, Irvine School of Law. From 2011-12, she served in the Research, Markets & Regulation division at the CFPB.

**Adam J. Levitin** is a Professor of Law at the Georgetown University Law Center. He previously served on the CFPB's CAB and as counsel to the Congressional Oversight Panel for the Troubled Asset Relief Program. He is currently engaged as an expert witness by the CFPB, but is not representing the Bureau in serving as *amicus curiae*.

**Patricia A. McCoy** is Professor of Law at Boston College Law School. In 2011, she founded the Mortgage Markets unit at the CFPB and oversaw the Bureau's mortgage initiatives.

**Christopher Lewis Peterson** is the John J. Flynn Endowed Professor of Law at the University of Utah's S.J. Quinney College of Law. From 2012-2016, he was Special Advisor to the Director and Senior Counsel for Enforcement Policy & Strategy at the CFPB.

**Jeff Sovern** is a Professor of Law at St. John's University School of Law where he has taught and written about consumer law for thirty years.

**Arthur E. Wilmarth, Jr.** is a Professor of Law at George Washington University Law School.  In 2010, he served as a consultant to the Financial Crisis Inquiry Commission, the body established by Congress to report on the causes of the financial crisis of 2007-09.

**CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2017, the foregoing document was filed with the

Clerk of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: December 8, 2017

/s/ Courtney Weiner
Courtney Weiner