**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LEANDRA ENGLISH,

            Plaintiff,

    v.

DONALD J. TRUMP and
JOHN MICHAEL MULVANEY,

           Defendants.

Case No. 1:17-cv-02534-TJK

**<u>DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION</u>**

## Table of Contents

INTRODUCTION ........................................................................................................... 1

STATUTORY BACKGROUND ..................................................................................... 4

FACTUAL BACKGROUND .......................................................................................... 6

PROCEDURAL BACKGROUND .................................................................................. 8

LEGAL STANDARD ..................................................................................................... 8

ARGUMENT .................................................................................................................. 9

I.     PLAINTIFF HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS. ..................... 9

    A.    The FVRA Authorizes the President to Designate an Acting Director
        of the CFPB. ................................................................................................. 9

        1.    On Its Face, the FVRA Authorizes the President to Designate
                an Acting CFPB Director When a Vacancy Exists. .................................. 9

        2.    The Dodd-Frank Act Does Not Repeal the President's Authority
                Under the FVRA to Designate an Acting Director of the CFPB. .............. 12

            a.    Office-specific statutes generally supplement, rather than
                    displace, the FVRA's procedures. ................................................... 12

            b.    The Dodd-Frank Act is best read to operate alongside the
                    FVRA, rather than impliedly supersede it. ..................................... 15

            c.    Plaintiff's interpretation of the Dodd-Frank Act creates
                    practical problems and raises significant constitutional issues. ..... 23

    B.    The Senate-Confirmed Director of OMB Is Eligible to Serve As Acting
        Director of the CFPB. .................................................................................. 26

    C.    Plaintiff's Appointments Clause Argument Adds Nothing To Her Statutory
        Arguments. .................................................................................................. 28

    D.    Plaintiff Has No Cause of Action and No Right to the Relief She Seeks. ............. 31

II.    PLAINTIFF HAS NOT DEMONSTRATED THAT A PRELIMINARY
      INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM TO HER. .... 33

III.   THE PUBLIC INTEREST AND THE BALANCE OF THE EQUITIES FAVOR
      DENYING PLAINTIFF'S EXTRAORDINARY MOTION. ............................................. 39

CONCLUSION ............................................................................................................. 40

## **INTRODUCTION**

Consumer Financial Protection Bureau Director Richard Cordray's resignation left the Bureau's Director position vacant. The parties dispute which Act of Congress authorizes the designation of an acting officer to perform the Director's duties during the vacancy. One, the Federal Vacancies Reform Act ("FVRA"), refers explicitly to vacancies and resignations, is the traditional statutory authority for addressing Executive Branch vacancies, and contains limited exceptions expressly articulated in the statute itself (none of which apply here). The other, Section 5491 of the Dodd-Frank Act, does not clearly apply to a vacancy and does not include a clear statement displacing the FVRA's preexisting procedures. In view of these and other considerations, both the Department of Justice's Office of Legal Counsel and the CFPB's General Counsel (and this Court as well, in denying Plaintiff's application for a temporary restraining order) concluded that the FVRA was, at the very least, an available means for the President to designate Mr. Mulvaney as Acting CFPB Director.

Only Plaintiff says otherwise. In her view, Section 5491 of Dodd-Frank is not only an available means for identifying an Acting CFPB Director, but in fact is the *exclusive* means for doing so, thereby removing *any* role for the President in selecting the acting head of an Executive agency.

This unusual legal argument follows equally unusual developments at the Bureau. Over the two years preceding his resignation, then-Director Cordray ran the CFPB without appointing a Deputy Director. Yet in the waning hours of his last day in office, then-Director Cordray reassigned Plaintiff—a CFPB employee then serving as his chief of staff—to serve as the Bureau's Deputy Director. He made no secret of the fact that this action was an attempt to hand-select his successor.

That bureaucratic sleight-of-hand failed. On the same day that former Director Cordray tendered his resignation, effective at midnight on November 24, 2017, the President exercised his authority under the FVRA, designating Mr. Mulvaney, the Director of the Office of Management and Budget, to serve as Acting CFPB Director, effective at 12:01 a.m. on November 25, 2017.

Seeking to undo the President's designation of Mr. Mulvaney, Plaintiff claims that her few hours in the role of Deputy Director entitle her to accede automatically to the Acting Director position. Invoking the Dodd-Frank Act (but not the Federal Vacancies Reform Act), Plaintiff seeks the extraordinary remedy of a preliminary injunction ordering the President to withdraw his designation of Mr. Mulvaney as Acting Director.

Plaintiff is unlikely to succeed on the merits of her claim. The FVRA generally authorizes the President to designate any Senate-confirmed officer to perform the functions and duties of an office in an "Executive agency" when an officer subject to Senate confirmation "resigns," unless the designee has been nominated to fill the office. On its face, the FVRA applies here because the CFPB is an Executive agency; the CFPB Director is a position requiring Senate confirmation; the CFPB Director does not fall within any of the FVRA's carefully defined exceptions; and Mr. Mulvaney, as the Senate-confirmed Director of OMB, is eligible to serve as Acting Director.

There is no merit to Plaintiff's previously unraised argument that the FVRA does not apply to the office of the CFPB Director because the Director serves *ex officio* on the board of directors for the Federal Deposit Insurance Corporation. The FVRA exclusion Plaintiff invokes, 5 U.S.C. § 3349c(1), applies only to persons *appointed to the board*, not those, like the CFPB Director and the Comptroller of the Currency, who serve on the board by virtue of their appointment to a different office.

Also meritless is Plaintiff's contention that the Dodd-Frank Act impliedly displaces the FVRA. To prevail on her claim, Plaintiff must show a "clear and manifest" intent in Dodd-Frank to displace the FVRA. Neither independent agency status nor the existence of an office-specific statutory provision providing for an acting officer (both relatively common characteristics) is sufficient to take an agency outside the scope of the FVRA. Indeed, the Ninth Circuti confirmed that point just last year. *See Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 555–56 (9th Cir. 2016). That conclusion is consistent with the long-established view of the Executive Branch, and Congress's understanding when it enacted the FVRA, that office-specific statutes generally supplement—instead of supplanting—the FVRA's procedures for addressing vacancies.

*See, e.g.*, Ex. 2, Memorandum from Steven A. Engel, Asst. Att'y Gen., to Donald F. McGahn II, Counsel to the President, *Designating an Acting Director of the Bureau of Consumer Financial Protection*, at 4–8 & nn.2–3 (Nov. 25, 2017) ("OLC Op."); *see also* S. Rep. 105–250, at 15–17 (1998).

The text of the Dodd-Frank Act does not say otherwise. It declares that all federal laws dealing with officers and employees apply to the Bureau "[e]xcept as otherwise provided expressly by law." 12 U.S.C. § 5491(a). No such express command is found in Dodd-Frank. The Act's instruction that the Deputy Director "shall . . . serve as acting Director in the absence or unavailability of the Director," *id.* § 5491(b)(5), does not clearly apply to resignations and vacancies. And even if it did, the statute's use of the term "shall" does not mean that it displaces the FVRA, instead of operating alongside it as other similar statutes do. That conclusion is consistent with the presumption against implied repeals.

Nor is there any textual basis for Plaintiff's contention that Senate-confirmed officers (like Mr. Mulvaney) serving within the Executive Office of the President are excluded from the pool of officers eligible for designation under the FVRA. The FVRA includes no such limitation. Nor does Dodd-Frank. And none of the OMB-specific statutes that allow (but do not require) certain kinds of coordination between the CFPB and OMB precludes the OMB Director from temporarily serving in an acting capacity as CFPB Director.

Plaintiff's substantive theories fail in two more respects. First, they do not comply with the federal quo warranto statute, which establishes the exclusive procedure for direct challenges to an individual's right to federal office. Second, there is no authority justifying the extraordinary and inappropriate relief she seeks against the President himself.

In addition to its merits-related shortcomings, Plaintiff's motion is flawed due to its inability to demonstrate that Plaintiff will suffer irreparable harm in the absence of preliminary injunctive relief. Legally, Plaintiff never acceded to the position of Acting Director, and an alleged loss (or denial) of a position by itself does not amount to irreparable injury. More practically, the President's designation was promptly honored by the senior leadership of the CFPB; Mr.

Mulvaney has now been running the agency as its Acting Director for weeks; and CFPB staff (with the exception of Plaintiff) have been acting with the understanding that he is, in fact and in law, the Acting Director. Accordingly, Plaintiff's proposed preliminary injunction would radically upend the status quo, not maintain it.

Finally, there is no question that a preliminary injunction would impose substantial harms on the execution of the nation's consumer financial protection laws. An order compelling the President to recognize Plaintiff as Acting Director and to withdraw his designation of Mr. Mulvaney would be an extraordinary intrusion into core Executive Branch operations; it would sow confusion in the face of the consensus view that Mr. Mulvaney should be recognized as the Acting Director; it would disrupt the agency's operations; and it would lend credence to the view that the leadership of the CFPB is accountable to no one—not even the President. For these reasons, the Court should deny the motion.

## STATUTORY BACKGROUND

The FVRA establishes procedures to authorize an acting official to perform the functions and duties of an office when "an officer of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a). The FVRA's default rule is that the first assistant to a vacant office "shall perform the functions and duties of the office temporarily in an acting capacity." *Id.* § 3345(a)(1). Alternatively, the President "may direct" a person who already serves in a Senate-confirmed office or a person who has served in a senior position in the relevant agency for at least 90 of the last 365 days preceding the vacancy "to perform the functions and duties of the vacant office temporarily in an acting capacity." *Id.* § 3345(a)(2), (a)(3). These procedures are subject to precise time limitations and exceptions identified in the text of the statute. *See id.* §§ 3345–3346.

The FVRA applies to every Senate-confirmed "officer of an Executive agency" outside of certain enumerated exceptions. 5 U.S.C. § 3345(a); *id.* § 3349c; *see also* S. Rep. No. 105-250, at 2 ("The bill applies to all vacancies in Senate-confirmed positions in executive agencies with a few express exceptions."). For purposes of Title 5, the CFPB "shall be considered an Executive agency." 12 U.S.C. § 5491(a); *see* 5 U.S.C. § 105.

By its terms, the FVRA is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any [Senate-confirmed] office of an Executive agency," other than by recess appointment. 5 U.S.C. § 3347(a). The FVRA ceases to be "exclusive" only when "a statutory provision expressly—(A) authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity; or (B) designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." *Id.* In such cases, the FVRA ordinarily provides an alternative procedure for addressing the vacancy. *See, e.g.*, *Hooks*, 816 F.3d at 555–56; *Authority of the President to Name Acting Attorney General*, 31 Op. O.L.C. 208, 209–11 (2007); *Designation of Acting Director of OMB*, 27 Op. O.L.C. 121, 121 n.1 (2003); *Applicability of the FVRA to Vacancies at the International Monetary Fund and the World Bank* ("*Applicability of the FVRA to the IMF and World Bank*"), 24 Op. O.L.C. 58, 60 n.2 (2000); *Guidance on Application of the FVRA*, 23 Op. O.L.C. 60, 62–63 (1999).

The FVRA's coverage is limited only by carefully delineated exclusions. One of those exclusions concerns "any member who is appointed by the President, by and with the advice and consent of the Senate to any board, commission, or similar entity that (A) is composed of multiple members; and (B) governs an independent establishment or Government corporation." 5 U.S.C. § 3349c(1). Within independent agencies, there are offices which are not covered by those criteria and which therefore are subject to the FVRA. *See Hooks*, 816 F.3d at 556 & n.6 (applying FVRA to the General Counsel of the National Labor Relations Board ("NLRB")).

The Dodd-Frank Act established the CFPB in 2010, imbuing it with "broad authority to enforce U.S. consumer [financial] protection laws." *PHH Corp. v. CFPB*, 839 F.3d 1, 15 (D.C. Cir. 2016), *rehearing en banc granted*, Feb. 16, 2017 Order (No. 15-1177). The CFPB is headed by a Director appointed by the President, with the advice and consent of the Senate, for a term of five years. 12 U.S.C. § 5491(b), (c)(1). According to a statutory removal restriction, the Director is removable by the President only for "inefficiency, neglect of duty, or malfeasance in office," *id.* § 5491(c)(3). The statute also establishes "the position of Deputy Director, who shall—(A) be appointed by the Director; and (B) serve as acting Director in the absence or unavailability of the Director." *Id.* § 5491(b)(5). The statute further provides, though, that "[e]xcept as otherwise provided expressly by law, all Federal laws dealing with . . . officers . . . shall apply to the exercise of the powers of the Bureau." *Id.* § 5491(a).

## FACTUAL BACKGROUND

From the CFPB's inception, Presidential appointees in the Treasury Department and the Executive Office of the President have played key roles in shaping the agency. Before the Bureau's first Director was confirmed, for example, the Secretary of the Treasury was authorized to perform certain functions delegated to the CFPB. *See* 12 U.S.C. § 5586(a). In 2010, President Obama appointed Elizabeth Warren (without Senate confirmation) to serve as Assistant to the President and Special Advisor to the Secretary of the Treasury on the Consumer Financial Protection Bureau. *See* Office of the Press Secretary, Warren Press Release, The White House (Sept. 17, 2010), https://obamawhitehouse.archives.gov/the-press-office/2010/09/17/president-obama-names-elizabeth-warren-assistant-president-and-special-a; *see* 12 U.S.C. § 5586(a). From her position on the President's senior staff, Warren "play[ed] the lead role in setting up the Bureau." *Id.* President Obama later nominated Richard Cordray to serve as the CFPB's first Director for a term of five years. *See* 159 Cong. Rec. S718; *see also* 12 U.S.C. § 5491(c). The Senate confirmed his nomination on July 16, 2013. *See* 159 Cong. Rec. S5715.

6

Four years into his five-year term, Director Cordray announced on November 15, 2017 that he would resign by the end of the month. *See* Renae Merle, *Richard Cordray Is Stepping Down as Head of Consumer Financial Protection Bureau*, Wash. Post (November 15, 2017), https://www.washingtonpost.com/news/business/wp/2017/11/15/richard-cordray-is-stepping-down-as-head-of-consumer-financial-protection-bureau/?utm_term=.197172ea17be. Nine days later, on Friday, November 24, 2017, Director Cordray reassigned Plaintiff, his chief of staff, to serve as Deputy Director of the CFPB, and in turn resigned, effective at midnight. *See* ECF 24-1 (Memorandum from the Director); ECF 24-2 (Letter from Richard Cordray to President Trump).

That same day, President Trump—acting pursuant to the FVRA, 5 U.S.C. § 3345(a), and consistent with legal advice from the Department of Justice, *see* OLC Op.—directed Mr. Mulvaney "to perform the functions and duties of the office of Director, Bureau of Consumer Financial Protection, until the position is filled by appointment or subsequent designation effective 12:01 a.m. eastern standard time, November 25, 2017." Ex. 1, Memorandum for Mick Mulvaney (Nov. 24, 2017). In a memorandum dated November 25, 2017, the CFPB's General Counsel outlined her "legal opinion that the President possesses the authority to designate an Acting Director for the Bureau under the FVRA" and accordingly "advise[d] all Bureau personnel to act consistently with the understanding that Director Mulvaney is the Acting Director of the CFPB." Ex. 3, Memorandum from Mary E. McLeod, CFPB General Counsel, to CFPB Senior Leadership Team, *Acting Director of the CFPB*, at 1, 3 (Nov. 25, 2017) ("McLeod Memo"). The next day, senior CFPB leadership, including the General Counsel and all of the other Associate Directors, agreed to act in accordance with the understanding that Mr. Mulvaney is the Acting Director. *See* Ex. 4, Decl. of Kate Fulton, ¶ 6.

On Monday morning, November 27, 2017, Acting Director Mulvaney arrived at CFPB headquarters, was given access to the building and the Director's office, and began his work as Acting Director for the day. *See id.* ¶ 7. He has maintained a regular schedule at the Bureau since then, while continuing to serve as OMB Director, and Bureau operations have continued with the understanding that he is the Acting Director. *See id.* ¶¶ 8–10; *see also* Ex. 5, CFPB Press

Roundtable Tr. (Dec. 4, 2017). Acting Director Mulvaney has, among other things, held meetings with senior members of the executive team and their staff, approved an allocation of money from the CFPB Civil Penalty Fund to victims of violations of the consumer financial protection laws, received memoranda requesting decisions from the Director, and issued directives that have been followed by Bureau staff. *See* Ex. 5, at 1–2; Ex. 4, ¶¶ 9–10. He has also asked Plaintiff to perform certain duties in her capacity as Deputy Director. *See* Ex. 5, at 4.

## PROCEDURAL BACKGROUND

Plaintiff filed her Complaint on the evening of November 26, 2017, and promptly filed an application for a Temporary Restraining Order ("TRO"). Following expeditious briefing and two hearings on Plaintiff's request, the Court denied her application on December 1, 2017. In so ruling, the Court held that Plaintiff did not have a likelihood of success on the merits, that Plaintiff had not demonstrated irreparable harm, and that the balance of equities did not tip in Plaintiff's favor. *See* Hr'g Tr. at 22–33 (Nov. 28, 2017). Plaintiff subsequently filed an Amended Complaint and a Motion for a Preliminary Injunction on December 6, 2017, ECF Nos. 22–25, followed by a "Corrected Memorandum" in support of her motion after hours on December 7, 2017. *See* Corrected Mem. in Supp. of Pl.'s Mot. for Prelim. Inj., ECF No. 26 ("Pl.'s Br.").

## LEGAL STANDARD

A preliminary injunction is "'an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion.'" *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)). To meet this burden, a plaintiff must establish that four factors have been met: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

Insofar as Plaintiff seeks a mandatory injunction that would alter the status quo, she faces an even greater hurdle. *See Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000).

Where a plaintiff's "requested injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act"—"Judges on this Court have required the moving party to meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016); *see also id.* at 17 n.3. Thus, "the power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969).

## ARGUMENT

## I.      PLAINTIFF HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS.

The President lawfully exercised his authority under the FVRA when he designated Mr. Mulvaney to serve as Acting CFPB Director upon the resignation of former Director Cordray. Plaintiff contends that the President lacked authority to designate Mr. Mulvaney because Plaintiff acceded to the Acting Director position by operation of law. As recognized by OLC, the CFPB's General Counsel, and this Court in denying Plaintiff's application for a TRO, Plaintiff's position is contrary to the text and context of the FVRA and not compelled by the Dodd-Frank Act. And even if the President's designation of Mr. Mulvaney to serve as Acting Director were in doubt, Plaintiff would not be entitled to the relief she seeks here, including an extraordinary and inappropriate injunction against the President himself.

### A.      The FVRA Authorizes the President to Designate an Acting Director of the CFPB.

#### 1.      On Its Face, the FVRA Authorizes the President to Designate an Acting CFPB Director When a Vacancy Exists.

As this Court correctly concluded in denying Plaintiff's application for a TRO, the FVRA on its face applies to vacancies in the office of CFPB Director. *See* Hr'g Tr. at 22 (Nov. 28, 2017). The FVRA provides several statutory means of "temporarily authorizing an acting official to perform the functions and duties" of an office of an Executive agency that ordinarily must be filled by appointment "by the President, by and with the advice and consent of the Senate." 5 U.S.C.

§ 3347(a); *see id.* § 3345(a). And the Dodd-Frank Act makes plain that the CFPB "shall be considered an Executive agency" for purposes of Title 5, which includes the FVRA. *See* 12 U.S.C. § 5491(a); *see* 5 U.S.C. § 105. Mr. Mulvaney was previously confirmed by the Senate to serve as the Director of the Office of Management and Budget, 163 Cong. Rec. S1313 (Feb. 16, 2017), and thus is among the officials whom the FVRA expressly authorizes the President to designate to perform the functions and duties of a vacant office temporarily in an acting capacity. 5 U.S.C. § 3345(a)(2). And the CFPB Director is not among the few officers excluded from the FVRA's coverage by its four carefully delineated exceptions. *See id.* § 3349c. Accordingly, the FVRA authorizes the President's designation of Mr. Mulvaney.

That much even Plaintiff did not dispute at the TRO stage. But, on the evening that she filed her preliminary injunction motion, Plaintiff amended her complaint to introduce a new argument: that the CFPB Director is in fact among the officers excluded from the FVRA's reach by Section 3349c(1) of the FVRA. That provision states that the FVRA shall not apply to "any member who is appointed by the President, by and with the advice and consent of the Senate to any board, commission, or similar entity that (A) is composed of multiple members; and (B) governs an independent establishment or Government corporation." 5 U.S.C. § 3349c(1). Under Plaintiff's new theory, the President cannot designate an Acting CFPB Director because the CFPB Director "serves on the multi-member board of the Federal Deposit Insurance Corporation (FDIC)." Pl.'s Br. at 7; *see also id.* at 16–17.

That newfound position is based on a misreading of Section 3349c(1). Although the person appointed to the office of CFPB Director also serves on the FDIC board, that person is not "appointed . . . to" the board "by the President, by and with the advice and consent of the Senate." 5 U.S.C. § 3349c(1). Rather, the CFPB Director serves on the FDIC board only by the force of a statute providing that one of the members of the FDIC board "shall be the Director of the [CFPB]." 12 U.S.C. 1812(a)(1)(B). *Ex officio* positions like this one—where service on a multi-member body is an additional germane duty of the office to which the person is actually appointed—do not

fall within Section 3349c(1)'s express exception to the FVRA, which applies only to officers appointed directly to the multi-member body.[1]

The FDIC's organic statute illustrates the point, distinguishing between the Director of the CFPB and the Comptroller of the Currency—who are *ex officio* members of the board—and the board's three "appointed members." *See* 12 U.S.C. § 1812(a)(1)(C), 1812(c). Unlike the CFPB Director and the Comptroller of the Currency, the "appointed members" of the FDIC board are not covered by the FVRA, and no other statute provides for temporarily replacing them with acting officers in the event of a vacancy.

Plaintiff's expansive reading of Section 3349c(1) not only lacks support in the provision's text, but it also would lead to the implausible conclusion that Cabinet offices and other high-ranking Executive Branch officers are also implicitly excluded from the FVRA given their service on various federal boards and commissions. The Secretaries of the Treasury, Labor, and Commerce, for example, serve as members of the board of directors of the Pension Benefit Guaranty Corporation. *See* 29 U.S.C. § 1302(d). The United States Trade Representative and the Administrator for the Agency for International Development serve on the board of directors for the Overseas Private Investment Corporation, 22 U.S.C. § 2193(b), and both, together with the Secretary of State and the Secretary of the Treasury, also serve on the board of the Millennium Challenge Corporation, *id.* § 7703(c)(3); *see also* 42 U.S.C. § 12651a ("The Secretary of Education, the Secretary of Health and Human Services, the Secretary of Labor, the Secretary of the Interior, the Secretary of Agriculture, the Secretary of Housing and Urban Development, the Secretary of Defense, the Attorney General, the Director of the Peace Corps, the Administrator of the Environmental Protection Agency, and the Chief Executive Officer shall serve as ex officio nonvoting members of the Board [of the Corporation for National and Community Service]"). It

---

[1]  In addition to the "appointed members" of the FDIC, discussed below, Section 3349c(1) would apply, for example, to members of the Federal Trade Commission, 15 U.S.C. § 41, and the Securities and Exchange Commission, 15 U.S.C. § 78d, both of which are "independent establishments." Section 3349c(1) also applies to multimember boards that govern "Government corporation[s]" without regard to whether such boards are "independent."

is implausible to read Section 3349c(1) to exclude the CFPB Director and these other high-ranking Executive Branch officials from the FVRA's coverage because of their incidental service on a multi-member board that governs an independent establishment or Government corporation.

In sum, the CFPB Director is not expressly excluded from the FVRA's sweep.

> ### 2. The Dodd-Frank Act Does Not Repeal the President's Authority Under the FVRA to Designate an Acting Director of the CFPB.

Plaintiff erroneously contends that the Dodd-Frank Act, by providing that the Deputy Director shall serve as acting Director in the absence or unavailability of the Director, repeals the President's authority under the FVRA to designate an Acting CFPB Director. 12 U.S.C. § 5491(b)(5). As OLC and the CFPB's General Counsel have each independently concluded, and as this Court previously agreed, Section 5491(b)(5) is, at most, best read as *supplementing* the FVRA rather than superseding it. This interpretation reconciles the two statutes in a way that gives effect to both, resolving the tension of "unavoidable conflict" proclaimed by Plaintiff. Pl.'s Br. at 9. And even if such conflict did exist, only Defendants' interpretation would avoid the problematic and probably unconstitutional consequences of Plaintiff's position.

> #### a. Office-specific statutes generally supplement, rather than displace, the FVRA's procedures.

Confirming the conclusion that Section 5491(b)(5) of the Dodd-Frank Act operates alongside (but does not displace) the FVRA is the text of the FVRA itself. Section 3347 of the FVRA, titled "Exclusivity," provides that the FVRA is the "exclusive means" for authorizing acting service in the event of a vacancy "unless" the President makes a recess appointment or unless another statutory provision expressly:

> (A)  authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity; or
>
> (B)  designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity.

5 U.S.C. § 3347(a). Even where one of these exclusivity exceptions applies, the FVRA's procedures for addressing the vacancy continue to be available. In that case, that the FVRA is not the "*exclusive* means" of designating an acting officer, but instead one of two available options for addressing the vacancy.

This understanding is consistent with the longstanding interpretations of the FVRA. As OLC has consistently maintained, the FVRA operates alongside other statutory authorities that designate a specific official to serve as an acting officer for a vacant office or that authorize the President, a court, or the head of an Executive department to designate an acting officer. *See, e.g.*, *Acting Attorney General*, 31 Op. O.L.C. at 209–11; *Acting Director of OMB*, 27 Op. O.L.C. at 121 n.1; *Applicability of the FVRA to the IMF and World Bank* 24 Op. O.L.C. at 60 n.2; *Guidance on Application of the FVRA*, 23 Op. O.L.C. at 62–63.

The Ninth Circuit's decision in *Hooks* illustrates how the FVRA historically has been reconciled with other statutory authorities. A party in that case argued that the President could not invoke the FVRA to designate an Acting General Counsel for the NLRB during a vacancy because the National Labor Relations Act itself authorized the President "to designate the officer or employee who shall act as the General Counsel during such vacancy," but for a shorter period than the FVRA would allow. *See Hooks*, 816 F.3d at 555–56 & n.5 (quoting 29 U.S.C. § 153(d)). Rejecting that argument, the Ninth Circuit held that while the NLRA expressly provided a means for designating an Acting General Counsel, the FVRA remained available as an additional option: "[N]either the [FVRA] nor the [NLRA] is the *exclusive* means of appointing an Acting General Counsel," and "the President is permitted to elect between these two statutory alternatives." *Id.* at 556. The Ninth Circuit reached that conclusion notwithstanding that the NLRA, unlike Section 5491(b)(5), speaks explicitly to what happens in case of a "vacancy." 29 U.S.C. § 153(d).

Plaintiff attempts to distinguish these authorities on the ground that the statutory provisions they addressed authorized the President or another Executive officer to designate the acting official, while Section 5491(b)(5) "provides for the Deputy Director's automatic succession to the position of Acting Director." Pl.'s Br. at 14. Under the plain terms of the FVRA, office-specific

statutes are treated the same under the statute whether they "designate[] an officer or employee" to serve as the acting officer or instead "authorize[] the President, a court, or the head of an Executive department[] to designate" the acting officer. 5 U.S.C. § 3347(a)(1). And as a precedential matter, neither past OLC opinions nor the Ninth Circuit's reading of Section 3347 in *Hooks* turned in any way on the fact that the agency-specific statute in question permitted the President to designate the acting official. *See Hooks*, 816 F.3d at 556; OLC opinions cited *supra* at 5, 13.

The FVRA's text likewise provides no support for distinguishing Section 5491(b)(5) from other office-specific statutes that feature "mandatory language similar to Dodd-Frank but that *predate* the FVRA." Pl.'s Br. at 15. Section 3347(a)(1) applies equally to any "statutory provision expressly" providing for another procedure for identifying an acting officer, regardless of when that office-specific provision was enacted. On that score, it bears noting that an earlier version of the bill that became the FVRA, by contrast, would have treated an office-specific "statutory provision in effect on the date of enactment" differently than one enacted later. *See infra* at 15 n. 2.

Nor is Plaintiff's distinguishing of office-specific statutes that predate the FVRA consistent with the statute's historical context. While many such statutes predated the FVRA, they often postdated—and existed alongside——the pre-FVRA Vacancies Act, which had generally applied since 1868 to vacancies in the offices that headed executive departments. *See* Act of July 23, 1868, ch. 227, 15 Stat. 168; Act of September 6, 1966, Pub. L. No. 89-554, 80 Stat. 378, 424–26; Presidential Transitions Effectiveness Act, Pub. L. No. 100-398, § 7, 102 Stat. 985, 988 (1988); *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 206–07 (D.C. Cir. 1998); *cf. United States v. Lucido*, 373 F. Supp. 1142, 1151 (E.D. Mich. 1974) (holding that the Deputy Attorney General could serve as Acting Attorney General under both the Vacancies Act and an office-specific statute, which allowed acting service beyond the 30-day limit of the Vacancies Act). There is no basis for concluding that office-specific statutes enacted after the

FVRA displace the FVRA any more than similarly worded office-specific statutes enacted after the Vacancies Act displaced it.[2]

Congress, of course, has the power to exclude a new office that would otherwise be covered by the FVRA from the statute's reach. To do so, Congress could either add the office to the FVRA's list of exceptions in Section 3349c or provide with sufficient clarity in an office-specific statute that the FVRA does not apply to the office. With respect to the CFPB Director, however, Congress did precisely the opposite. It provided that "all Federal laws dealing with . . . officers . . . shall apply to the exercise of the powers of the Bureau," "[e]xcept as otherwise provided expressly by law." 12 U.S.C. § 5491(a). Here, that text is dispositive.

> **b.     The Dodd-Frank Act is best read to operate alongside the FVRA, rather than impliedly supersede it.**

In arguing that the Dodd-Frank Act supersedes (as opposed to supplements) the FVRA, Plaintiff begins with the premise that there is "an unavoidable conflict" between the two statutes, Pl.'s Br. at 9, a purported conflict that must be resolved in favor of Dodd-Frank. Plaintiff drums up this conflict based upon the terms of Section 5491(b)(5) of Dodd-Frank, which provides that

---

[2] The FVRA's legislative history is in accord. A Senate Committee Report on an earlier version of the bill noted the existence of statutes other than the Vacancies Act "that expressly authorize the President, or the head of an executive department to designate an officer to perform the functions and duties of a specified office temporarily in an acting capacity" or "that expressly provide for the temporary performance of the functions and duties of an office by a particular officer or employee." S. Rep. 105–250, at 15 (1998). The Report explained that the bill would "retain[]" these provisions, *id.* at 16, some of which "may have been passed without knowledge of the Vacancies Act," and some of which contained language not distinguishable from Section 5491(b)(5), although they might be repealed in the future "in favor of the procedures contained in the [FVRA]." *Id.* at 17. "In any event," the Report continued, "even with respect to the specific positions in which temporary officers may serve under the specific statutes this bill retains, the Vacancies Act would continue to provide an alternative procedure for temporarily occupying the office." *Id.*

This discussion related to a provision of the bill which would have addressed only "statutory provision[s] in effect on the date of enactment" of the FVRA. *See id.* at 26 (draft § 3347(a)(2)); *see also id.* at 15. The bill was subsequently amended to, among other things, remove this temporal limitation and to have § 3347 address the FVRA's exclusivity instead of its applicability, as § 3347 had in the earlier version of the bill.

the Deputy CFPB Director "*shall* . . . serve as acting Director in the absence or unavailability of the Director," *id.* (quoting 12 U.S.C. § 5491(b)(5)(B), and which purportedly conflicts with the FVRA affording the President additional options for designating an Acting Director. But no real conflict exists between the statutes, let alone an "irreconcilable" one, as Plaintiff must show. *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 141–42 (2001). The FVRA and the Dodd-Frank Act can (and therefore should) be reconciled in a manner that gives effect to both. *See, e.g.*, *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 144 (1976) ("It is not enough to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem. Rather, 'when two statutes are capable of co-existence, it is the duty of the courts to regard each as effective.'" (quoting *Morton v. Mancari*, 417 U.S. 535, 550 (1974))).

When Congress intends to repeal a prior statutory enactment through subsequent legislation, it must do so in a "clear and manifest" manner. *Howard v. Pritzker*, 775 F.3d 430, 437 (D.C. Cir. 2015) ("Implied repeals are disfavored and not presumed unless the legislative intent is 'clear and manifest.'" (quoting *Hui v. Castaneda*, 559 U.S. 799, 810 (2010))). Congress was well aware of the FVRA when it passed the Dodd-Frank Act and would have known to speak in very clear terms if it intended to exclude the office of the CFPB Director from the FVRA's reach. It did not do so. To the contrary, the text of Section 5491, its relationship with other statutory provisions (including the FVRA), the structure of the CFPB, and the legislative history of Dodd-Frank all confirm that Section 5491 is best interpreted to supplement (not supplant) the FVRA's procedures for addressing vacancies in the office of the CFPB Director.

(1)   Far from a clear command that the FVRA does not apply to the CFPB Director, the text of the Dodd-Frank Act reinforces its applicability. Section 5491(a) of Dodd-Frank states: "Except as otherwise provided expressly by law, all Federal laws dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds . . . shall apply to the exercise of the powers of the Bureau." 12 U.S.C. § 5491(a). There is no dispute that the FVRA falls within the ambit of this provision: it is a Federal law dealing with Federal officers. *See* Pl.'s Br. at 12–13.

16

Against this plain statutory backdrop, Plaintiff contends that another paragraph of the same section, Section 5491(b)(5), both satisfies the high bar for implied repeals of previously enacted statutes, *see* Pl.'s Br. at 13, and also speaks so clearly that it overrides the instruction Congress supplied just one subsection earlier. It does not.

First, the phrase "absence or unavailability of the Director" in Section 5491(b)(5)(B) does not clearly apply to a resignation giving rise to a vacancy. The "absence or unavailability" "phrasing is unusual," OLC Op., at 2, and is ambiguous as to whether it includes resignations and vacancies. *See* McLeod Memo at 1–2 (the question is "debatable"). Unlike the FVRA and many of the other office-specific statutes that supplement it, Section 5491(b)(5)(B) is completely silent as to both vacancies and resignations. *Compare* 12 U.S.C. § 5491(b)(5)(B), *with, e.g.*, 5 U.S.C. § 3345(a), 20 U.S.C. § 3412(a)(1), 28 U.S.C. § 508, 29 U.S.C. § 153(d), 38 U.S.C. § 304, 40 U.S.C. § 302, *and* 42 U.S.C. § 902(b)(4). If Congress had intended to supersede the FVRA, instead of supplementing it, the statute would have at least referred to vacancies.

With respect to "absence[s]" of the Director, many of the officer-specific statutes that supplement the FVRA distinguish between absences and vacancies, indicating that Congress does not view a "vacancy" as a type of "absence." *See, e.g.*, 40 U.S.C. § 302; 42 U.S.C. § 902(b)(4); *cf.* OLC Op. at 3 (collecting other examples). Indeed, other provisions of the Dodd-Frank Act itself draw the same distinction. *See* Pub. L. No. 111-203, § 111(c)(3), 124 Stat. 1376, 1393 (2010) (codified at 12 U.S.C. § 5321(c)(3)) ("In the event of a vacancy in the office of the head of a member agency or department, and pending the appointment of a successor, or during the absence or disability of the head of a member agency or department, the acting head of the member agency or department shall serve as a member of the Council in the place of that agency or department head."); *see also id.* § 336(a)(2), 124 Stat. at 1540 (codified at 12 U.S.C. § 1812(d)(2)). OLC has, accordingly, opined that a statute authorizing a subordinate to perform the duties of a higher office in his superior's "absence" was not triggered when the expiration of the superior's term resulted in a vacancy. *See Status of the Vice Chairman of the Federal Reserve Board*, 2 Op. O.L.C. 394, 395 (1978) ("The term 'absence' normally connotes a failure to be present that is temporary in

contradistinction to the term 'vacancy' caused, for example, by death of the incumbent or his resignation."); *see also* OLC Op. at 3.

The term "unavailability" is not entirely clear in its meaning either. In common usage, "unavailability" often has a temporary quality. And other statutes distinguish between situations in which an office is vacant and those in which an officer is "unavailable," much like other statues distinguish between vacancies and absences. *See* 28 U.S.C. § 954. Although OLC ultimately concluded that "unavailability" should be construed to encompass vacancies, it agreed that the issue is "not free from doubt." OLC Op. at 3. At a minimum, therefore, Section 5491(b)(5)(B) could reasonably be read to refer only to an "absence or unavailability" that does not give rise to a vacancy within the meaning of the FVRA. Thus, even if Dodd-Frank's reference to "unavailability" may be read to encompass vacancies—and thereby permits the Deputy Director to serve as Acting Director in the absence of a Presidential designation under the FVRA—this remains a close question, and falls far short of the high standard of clarity required for implied repeals. *See Howard*, 775 F.3d at 437 ("Implied repeals are disfavored and not presumed unless the legislative intent is 'clear and manifest.'").

Second, even if "absence or unavailability" may be read to encompass resignations giving rise to vacancies, the statute's use of "shall" is too slender a reed to support Plaintiff's displacement argument. Although generally a mandatory term, "shall" can also be used in other ways. *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995) ("Though 'shall' generally means 'must,' legal writers sometimes use, or misuse, 'shall' to mean 'should,' 'will,' or even 'may.'" (citations omitted)); *see also Sierra Club v. Jackson*, 648 F.3d 848, 855–56 (D.C. Cir. 2011); *DirecTV, Inc. v. Barczewski*, 604 F.3d 1004, 1008 (7th Cir. 2010). Certain Federal Rules, for instance, "use the word 'shall' to authorize, but not . . . require, judicial action." *Lamagno*, 515 U.S. at 432 n.9 (citing Fed. R. Civ. P. 16(e) & Fed. R. Crim. P. 11(b)); *see also* B. Garner, Dictionary of Modern Legal Usage 939 (2d ed. 1995) ("[C]ourts in virtually every English-speaking jurisdiction have held—by necessity—that *shall* means *may* in some contexts, and vice-versa.").

Indeed, as the Court noted at oral argument, Hr'g Tr. at 24–25 (Nov. 28, 2017), one need look no further than Section 5491 of Dodd-Frank for examples of the variety of meanings the term "shall" might carry. For instance, one provision states that the Director "shall serve for a term of 5 years," 12 U.S.C. § 5491(c)(1), and another provides that the President "may remove the Director," *id.* § 5491(c)(3). Because it is clear that Section 5491(c)(3) authorizes the removal of a Director during his five-year term, this provision demonstrates that the term "may" sometimes overrides the term "shall." *See* Hr'g Tr. at 24–25 (Nov. 28, 2017). In Plaintiff's view, that "general proposition . . . is inapplicable to this case," because it involves statutes enacted at different times. Pl.'s Br. at 10. But the obligation to read statutory provisions in a way that gives effect to both is not limited to provisions enacted simultaneously. *See, e.g.*, *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, a court must give effect to both." (quoting *Wood v. United States*, 41 U.S. 342, 363 (1842))); *Radzanower*, 426 U.S. at 155.

Further examples from Section 5491 also demonstrate that the term "shall" can be read to authorize but not require a certain action. No one would read Section 5491(c)(1)'s stipulation that "[t]he Director shall serve for a term of 5 years" to prohibit an earlier resignation, for example, or to extend the commission of a recess appointee beyond the end of the Senate's next session. Likewise, the same "shall" that speaks to the Deputy Director's service as Acting Director also provides that the Deputy Director "shall . . . be appointed by the Director." 12 U.S.C. § 5491(b)(5). If this "shall" were the unqualified mandate Plaintiff claims, the former Director would have violated Dodd-Frank by leaving the Deputy Director position vacant for years leading up to his last day in office. At bottom, "shall" can take on too many meanings for this term to provide the clear statement that would be necessary for Section 5491(b)(5) to displace the FVRA.

(2)   In any event, the FVRA itself speaks in terms no less mandatory than Section 5491(b)(5) of the Dodd-Frank Act. The FVRA provides that the first assistant to a vacant office covered by the FVRA "*shall* perform the functions and duties of the office temporarily in an acting capacity" but that the President "may" direct certain other persons to perform the same functions

19

and duties, "notwithstanding" that rule. 5 U.S.C. § 3345(a) (emphasis added). Instead of interpreting one statute to be more mandatory than the other, the two statutes should be construed to operate alongside each other. *See* OLC Op. at 7.

Plaintiff's only response on this point (Pl.'s Br. at 15–16) is that the statutes cannot be read to act in parallel without rendering Section 5491(b)(5) largely superfluous, "because the FVRA already provides for the default rule that the first assistant becomes the acting official." Pl.'s Br. at 15 (citing 5 U.S.C. § 3345(a)(1)). Not so. Assuming that Section 5491(b)(5)(B) applies to vacancies, it would serve at least two purposes not served by Section 3345(a)(1) of the FVRA. First, it would allow the Deputy Director to serve as Acting Director beyond the time limitations in the FVRA. *See* 5 U.S.C. § 3346; *cf. Lucido*, 373 F. Supp. at 1151; S. Rep. No. 105-250, at 17 ("Most of these retained statutes do not place time restrictions on the length of [service of] an acting officer."). Second, it would allow the Deputy Director to serve as Acting Director in situations where the FVRA itself would not authorize such service. *See* 5 U.S.C. § 3345(b) (identifying situations in which certain persons may not serve as an acting officer under Section 3345 of the FVRA).

(3)   Plaintiff's last textual argument, that Congress could have spoken more clearly if it had wanted to ensure that the President had the option of designating an Acting CFPB Director, *see* Pl.'s Br. at 11, fares no better for at least two reasons. True, as Plaintiff notes, some statues provide that a specific official shall serve as an acting officer "unless the President designates another officer" to so serve. *See id.* (citing three examples). Yet multiple statutes specific to Cabinet offices similarly designate an official who shall serve when the office of the Secretary is vacant but contain no similar caveat, and it is apparently undisputed that the FVRA remains available to address vacancies in these offices. *See, e.g.*, 10 U.S.C. § 132(b) (Secretary of Defense); 20 U.S.C. § 3412(a)(1) (Secretary of Education); 31 U.S.C. § 301(c) (Secretary of the Treasury); 29 U.S.C. § 552 (Secretary of Labor); *see also* S. Rep. No. 105-250, at 16–17.

In any event, as Defendants have shown, Plaintiff's argument that Congress could have spoken more clearly is a double-edged sword. Plainly, Congress could have spoken more clearly

if it had intended to codify Plaintiff's position; it could have expressly provided that Section 5491(b)(5) applies to vacancies in the office of the Director and that the FVRA does not. Indeed, each of the statutes cited by Plaintiff in support of her argument that Congress could have spoken more clearly refers explicitly to a "vacancy" or to a "vacant" office. *See* 38 U.S.C. § 304; 40 U.S.C. § 302(b); 42 U.S.C. § 902(b)(4). And Plaintiff's assertion that the Dodd-Frank Act should supersede the FVRA because Section 5491(b)(5) is "more specific," Pl.'s Br. at 9, runs into a similar problem. Notwithstanding its application to a broad array of Executive agencies, the FVRA is more specific than Section 5491(b)(5) in that it explicitly applies when an office becomes "vacant" because an officer "resigns." 5 U.S.C. § 3345; *see* Hr'g Tr. at 26 (Nov. 28, 2017).

At most, Plaintiff's textual arguments suggest a lack of clarity in Section 5491(b)(5) and in its relationship with the FVRA. And whatever ambiguity Plaintiff has been able to identify in the two statutes only underlines the absence of the clear and manifest statement of legislative intent that would be necessary for Section 5491(b)(5) to repeal the FVRA as it relates to the CFPB Director, especially in light of Section 5491(a). *Cf. Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691, 695–96 (2003) ("[I]f an ambiguous term . . . qualified as an express provision . . . , then the requirement of an 'expres[s] provi[sion]' would call for nothing more than a 'provision,' pure and simple, leaving the word 'expressly' with no consequence whatever. '[E]xpres[s] provi[sion]' must mean something more than any verbal hook for an argument.").

(4)   Plaintiff also claims that applying the FVRA to the CFPB Director would be inconsistent with an "overall statutory scheme" designed to give the Bureau a measure of "independence." Pl.'s Br. at 12. At bottom, Plaintiff's argument boils down to the assertion that the selection of an Acting Director of the CFPB—unlike the selection of a Director—must be entirely outside of the President's control. But Plaintiff does not dispute that Congress has authorized the President to designate acting officers at some other "independent" agencies, including the agency head. *See id.* at 11 (Commissioner of Social Security); *id.* at 14 (NLRB General Counsel); *see also* S. Rep. No. 105-205, at 15–17. Although the FVRA contains specific carve-outs for certain "independent" agencies and commissions, Congress did not include the

CFPB Director among those express exceptions. *See* Part A.1 *supra*. Because Presidential designations of acting officers are not fundamentally at odds with the nature of independent agencies—and, indeed, the Bureau itself was previously overseen by the President's senior staff and Department of Treasury officials, *see supra* at 6—there is no basis for this Court to infer an extra-statutory limitation on the President's authority.

(5)   Nor is Plaintiff correct (at 11–12) that the legislative history of the Dodd-Frank Act can substitute for an express statement in the statute that Section 5491 supersedes the FVRA. As Plaintiff notes, the House of Representatives initially passed a bill that would have provided that, "[i]n the event of vacancy or during the absence of the Director . . . an Acting Director shall be appointed in the manner provided in [the FVRA]." *See* H.R. 4173, 111th Cong. § 4102(b)(6)(B)(i) (as passed by House, Dec. 11, 2009). Under this version of the bill, there was no Deputy Director; the Director would have headed the agency only for a limited time until replaced by a commission; and the statute would not have included Section 5491(a)'s statement that federal laws dealing with officers apply to the Bureau except as expressly provided by law. The final legislation was ultimately a very different product, which, in these respects, more closely resembled the Senate-passed version of the bill. Although the final product does not expressly refer one way or the other to the FVRA, it also omits the earlier version's reference to a "vacancy" in the office of the Director and introduces new language indicating that the office is covered by the FVRA. There is no reason to infer from the decision not to enact the House-passed version that the statute as enacted precludes application of the FVRA. *See, e.g.*, *Edison Elec. Inst. v. EPA*, 2 F.3d 438, 451 (D.C. Cir. 1993) (per curiam) ("[W]e need only note that the deletion of a word or phrase in the throes of the legislative process does not ordinarily constitute, without more, evidence of a specific legislative intent.").

If anything, the evolution of the bill indicates that Congress was aware of the FVRA's provisions and intended them to apply in the final legislation. The House bill cited by Plaintiff did not include the explicit instructions, in Section 5491(a) as enacted, that the CFPB is to be considered an "Executive agency" and that it is subject to all federal laws dealing with officers

except as otherwise expressly provided. *See* 12 U.S.C. § 5491(a); H.R. 4173, 111th Cong. at § 4101. By replacing the targeted FVRA cross-reference with a provision making the CFPB subject to all federal laws governing federal officers more broadly, Congress did not somehow silently render the FVRA inapplicable. Quite the contrary—both by designating the CFPB as an "Executive agency" and by adding the language in the final Section 5491(a), Congress expressly made the FVRA applicable. Further undermining Plaintiff's claim that Section 5491 manifests congressional intent to displace the FVRA, other portions of CFPB's organic statute explicitly exempted the CFPB from specific portions of Title 5. *See* 12 U.S.C. § 5493(a)(1)(C)(i); 12 U.S.C. § 5584(c)(2). As this history demonstrates, Congress was well aware of the FVRA's provisions in crafting the CFPB. For that reason, Plaintiff's contention that Section 5491(b)(5) was a backhanded means of repealing those provisions is particularly implausible.

In sum, Plaintiff has not demonstrated that Section 5491(b)(5) of Dodd-Frank displaces the FVRA as it applies to the CFPB Director, let alone that it clearly and expressly does so.

### c.    Plaintiff's interpretation of the Dodd-Frank Act creates practical problems and raises significant constitutional issues.

Finally, if there were a true conflict between the FVRA and the Dodd-Frank Act, the Court should avoid reconciling the statutes in a way that gives rise to unintended consequences and potential constitutional difficulties. Plaintiff's position creates both types of problems.

Plaintiff's reading of the Dodd-Frank Act to displace the FVRA could lead to a number of troubling scenarios that Congress presumably did not intend. The Acting Director could for an indefinite period be someone who has never been nominated by any President or confirmed by the Senate to any position, and whom the current President does not want in the role. And there is no reason to assume, as some have suggested, that the person serving as Deputy Director when the office of the Director becomes vacant will have any more expertise or experience at the agency than the other candidates whom the President might designate under the FVRA. *See* 5 U.S.C. § 3345(a). As the facts of this case illustrate, the Director could, for reasons of his or her own, decide to pass over someone who has been serving as Acting Deputy Director and who has served

in the agency's senior management nearly since its creation. Moreover, Plaintiff's position raises the question what happens when the Director's office becomes vacant and there is no appointed Deputy Director. If, as Plaintiff contends, the Dodd-Frank Act precludes the President from invoking the FVRA, then no statutory means of designating an Acting Director would be available to address the vacancy at the top of the agency. It is unlikely that Congress intended the Dodd-Frank Act to leave the President without any statutory means to resolve such problems during the time that it may take to secure the Senate's confirmation of the next Director.[3]

Plaintiff's position also gives rise to serious constitutional questions insofar as it assumes that the Senate could keep in place indefinitely an Acting Director who assumed that position by operation of statute (along with her prior assignment to the Deputy Director position) without the President's authorization. Defendants disagree with Plaintiff's apparent assumption that an Acting Director enjoys the same removal protection as a Senate-confirmed Director. *See infra* at 27. Even with the statutory authority to remove someone from the Acting Director role, however, a President understandably would be loath to invoke that authority when doing so would leave him without any statutory means of designating a different Acting Director and when the Senate may refuse to act on his nominees, potentially leaving the agency headless for an extended period.

That is the consequence of Plaintiff's interpretation of the Dodd-Frank Act, and Plaintiff applauds it as enhancing the Bureau's independence. But, as the D.C. Circuit has explained in

---

[3] Potentially, the President could invoke his inherent authority under Article II to designate an Acting CFPB Director to serve for a reasonable period of time. *See generally The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 161-64 (1996). Although Plaintiff asserts that "this Court" has rejected the notion that such authority exists, Pl.'s Br. 18 n.3 (citing *Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision*, 732 F. Supp. 1182, 1199-1200 (D.D.C. 1990), and *Williams v. Phillips*, 360 F. Supp. 1363, 1369 (D.D.C. 1973)), she misreads both decisions. Likewise, Plaintiff ignores the D.C. Circuit's decision in *Williams v. Phillips*, 482 F.2d 669, 670 (D.C. Cir. 1973), which declined to rule out the existence of "an implied power, in the absence of limiting legislation, upon the resignation of an incumbent [officer], to appoint an acting [officer] for a reasonable period of time before submitting the nomination of a new [officer] to the Senate." In any event, the Court should not interpret the relevant statutes in a way that would raise this constitutional question.

another context, inhibiting the removal of an official who can be replaced at any time by the Senate's confirmation of someone else makes that official "less[] accountab[le] to the President" but "does not make them more independent." *Swan*, 100 F.3d at 984. Rather, it makes him "more dependent on Senate inaction than on the President," because the Senate would have the power to keep him in office by refusing to act on the President's nominees. *Id.* Such an arrangement would, at a minimum, "be pushing the constitutional envelope to the edge." *Id.* at 986; *see also id.* ("The Senate's power to keep holdover members [of the National Credit Union Administration] in office in this fashion might well raise constitutional problems, since the Supreme Court has explicitly held that Congress cannot exercise control over the tenure of executive branch officials."). Because "the Court has refused to tolerate any arrangements that could aggrandize the powers of Congress at the expense of the President, no matter how 'innocuous' these arrangements might be in practice," *id.* at 987, the Court should not accept Plaintiff's interpretation of the Dodd-Frank Act to permit the Senate to keep an Acting CFPB Director installed in that position indefinitely.

By adopting Defendants' interpretation of the FVRA and Dodd-Frank, in contrast, the Court would only be respecting the balance that the political branches struck in the FVRA between the interests of Congress and the President. The President need not obtain the Senate's advice and consent to select someone from the pool of eligible officials to serve "temporarily in an acting capacity." 5 U.S.C. § 3345(a). But the President has an incentive to nominate someone who can be confirmed by the Senate expeditiously, if he chooses someone other than the Deputy Director to serve as Acting Director, because anyone he designates is subject to the time limitations imposed by the FVRA. *See id.* § 3346. This is the balance that has been struck for most Executive Branch offices requiring Senate confirmation. If Congress and the President had agreed to fundamentally alter that balance in the Dodd-Frank Act, they would have made their agreement clear and manifest in the text of the statute. They did not, and the Court should not strain to read Dodd-Frank to impliedly displace the FVRA as it applies to the CFPB Director.

**B.** **The Senate-Confirmed Director of OMB Is Eligible to Serve As Acting Director of the CFPB.**

Plaintiff argues in the alternative that, even if the FVRA authorizes the President to designate an Acting CFPB Director, Mr. Mulvaney is somehow ineligible for the role. She grounds her argument either in the fact that Mr. Mulvaney occupies an office in EOP or, more specifically, in his status as the Director of OMB. Neither variation on this theme has merit.

The FVRA squarely addresses the question of whom the President may designate as an acting officer in any of the Executive agencies covered by the statute. In addition to designating someone from within the relevant agency, 5 U.S.C. § 3345(a)(1), (a)(3), the President may direct "a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity," *id.* § 3345(a)(2). There are exceptions, but none of those exceptions excludes those serving in EOP or at OMB from the pool of those who are otherwise eligible. *See id.* § 3345(b). The decision not to exclude such officers explicitly is particularly significant in light of the FVRA's repeated references to EOP in other provisions. *See id.* §§ 3345(a), 3347(a)–(b), 3348(b), 3348(e)(5), 3349(a).

Undeterred by the FVRA's lack of support for this proposition, Plaintiff insists that the designation of any "still-serving White House staffer" to serve as Acting CFPB Director conflicts with the statute establishing the CFPB as "an independent bureau" in the Federal Reserve System. Pl.'s Br. at 19, 21; *see* 12 U.S.C. § 5491(a). Plaintiff's purported concern is that any "still-serving White House staffer" would be too "susceptible to . . . direct presidential influence," in his actions as the CFPB, because he could be fired at will from his White House job. Pl.'s Br. at 21.

While Plaintiff presents her argument as limited to "White House staffer[s]," the logic of her argument sweeps much more broadly. Most other officers who are appointed with the Senate's advice and consent—and therefore eligible to serve as acting officers under Section 3345(a)(2) of the FVRA—are also subject to at-will removal by the President. And the President could also be said to have influence over lower-level officials who could serve under Section 3345(a)(1) or (3)

26

and wish to be considered for higher positions, such as a Deputy Director who might be angling for a nomination as Director. Thus, not only did Congress decline to establish the "White House staffer[s]" carve-out that Plaintiff proposes, but Plaintiff fails to explain why her theory is not really just a covert argument that the FVRA should never apply to independent agencies (or how her theory is consistent with the reliance on Treasury and Presidential staff to run the CFPB in its early days).

An unstated assumption underlying Plaintiff's argument is that the President may remove an Acting CFPB Director from the Acting post only for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). That assumption is incorrect. The Dodd-Frank Act included that for-cause removal standard only in a provision addressing the term of a Senate-confirmed Director. The text of the statute does not purport to grant removal protection to an Acting Director. Indeed, conferring for-cause removal protection on an Acting Director would raise substantial constitutional questions above and beyond the constitutional questions (now before the *en banc* D.C. Circuit) concerning for-cause removal protection for a Senate-confirmed Director. Like the holdover member of the National Credit Union Administration board whose claim to enjoy for-cause removal protection was rejected by the D.C. Circuit in *Swan*, an Acting CFPB Director serves without any statutory time limit on his or her tenure. And "[p]recluding the President from removing an executive branch official with potentially unlimited tenure arguably might 'impede the President's ability to perform his constitutional duty' under Article II to take care that the laws be faithfully executed." *Swan*, 100 F.3d at 987 (quoting *Morrison v. Olson*, 487 U.S. 654, 672 (1988)). The Court therefore should not "infer such protection absent clear evidence that Congress intended it." *Id.* at 988. That evidence is lacking here.

Plaintiff's OMB-specific argument fares no better. Contrary to Plaintiff's contention, the Dodd-Frank Act does not erect a "wall of separation . . . between the CFPB and OMB." Pl.'s Br. at 22. Even Plaintiff acknowledges that the statute requires the CFPB to "provide information regarding its finances to OMB." *Id.*; *see* 12 U.S.C. § 5497(a)(4)(A) (requiring the CFPB Director to provide the OMB Director with copies of the "financial operating plans and forecasts of the

Director" and "quarterly reports of the financial condition and results of operations of the Bureau"). To be sure, "[t]his subsection" does not "*obligat[e]*" the CFPB Director to "consult with or obtain the consent or approval of" the OMB Director with respect to information covered by this reporting requirement and does not itself imply that OMB has "any jurisdiction or oversight over the affairs or operations of the Bureau." 12 U.S.C. § 5497(a)(4)(E). But other, generally applicable statutes do broadly require CFPB to consult with OMB before issuing certain rules, 5 U.S.C. § 609, and prohibit the Bureau from engaging in the "collection of information," including imposing disclosure, recordkeeping, or reporting requirements on industry, without the approval of OMB, 44 U.S.C. §§ 3502(3), 3507(a). And, aside from the engagement with OMB required by each of these laws, no law prohibits the CFPB from engaging with OMB if it so chooses.[4]

In short, the FVRA itself identifies the individuals whom the President may designate to serve as Acting CFPB Director. As the presidentially nominated and Senate-confirmed Director of OMB, Mr. Mulvaney is among them, and Plaintiff's efforts to identify some atextual basis for deeming him ineligible should be rejected.

## C.   Plaintiff's Appointments Clause Argument Adds Nothing To Her Statutory Arguments.

The arguments offered by Plaintiff in support of her Appointments Clause claim, which she added in the Amended Complaint filed on the evening that she moved for a preliminary injunction, simply restate her statutory arguments in constitutional terms. *See, e.g.*, Pl.'s Br. at 19 (concluding that Mr. Mulvaney's designation to serve as Acting CFPB Director violates the Appointments Clause because "[t]he government's statutory arguments . . . fail"). The new packaging adds no substance to her statutory claims.

In any event, it is Plaintiff's positions in this litigation, rather than the President's designation of Mr. Mulvaney to serve as Acting Director, that raise serious constitutional questions under Article II. *See supra* at 24–25, 27. And, in reframing her statutory arguments as

---

[4] Plaintiff's parallel argument regarding separation between OMB and the FDIC, Pl.'s Br. at 22, fails for the same reasons.

constitutional ones, Plaintiff makes multiple unsupported assumptions about the operation of the Appointments Clause in the context of designating an official to serve as an acting officer in the event of a vacancy.[5]

It is by no means clear that an official who has been designated to perform the duties of an office temporarily in an acting capacity has been appointed to an office within the meaning of the Appointments Clause. For one thing, it is not clear that the position of Acting CFPB Director is an "office," considering that it is necessarily temporary in nature. *See Appointment of Department of Interior Associate Deputy Secretary*, No. B-290233, 2002 WL 31388352, at *3 (Oct. 22, 2002) (General Counsel, GAO) (noting that early cases and statutes "recognized that exercising *all* of a PAS officer's authorities, if done temporarily, does not necessarily transform an employee into an officer."); *see, e.g.*, *Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890) (concluding that a merchant appraiser was not an officer in part because "he acts only occasionally and temporarily"); *United States v. Germaine*, 99 U.S. 508, 511–12 (1878) (concluding that a surgeon was not a constitutional officer because the duties of his position "are *not* continuing and permanent, and they *are* occasional and intermittent"). *But cf. Acting Director of OMB*, 27 Op. O.L.C. at 123 n.5.

Relatedly, a person exercising the duties of an office in an acting capacity might not even be accurately said to "hold" the office in the first instance. *See Officers Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 101 n.11 (2007); *Acting Attorney General*, 31 Op. O.L.C. at 210 n.2 (distinguishing between an Acting United States Attorney and an interim United States Attorney "who would fill the office (not be an acting officer)"); *Designation of Acting Solicitor of Labor*, 26 Op. O.L.C. 211, 214–15 (2002) ("An acting official does not hold the office . . . . He is not 'appointed' to the office, but only 'direct[ed]' or authorized to discharge its functions and duties . . . ."). The Supreme Court drew this distinction in *United States v. Eaton*, 169 U.S. 331

---

[5] The FVRA does not speak of acting-officer designations in terms of "appointments." Although the statutory terminology is not dispositive with respect to the constitutional issues, and acting-officer designations are sometimes casually labeled "appointments," the statutory text provides some indication that the Congress saw a distinction when it enacted the FVRA.

(1898), in holding that Congress could constitutionally vest the appointment of a "vice consul" in the President alone and that the vice consul could then constitutionally be designated to serve as the acting consul, even though the consul was a principal officer of the United States who could only be appointed with the Senate's advice and consent. *See id.* at 343. The *Eaton* Court explained that "[b]ecause the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered." *Id.* at 343 (quoted with approval in *Morrison*, 487 U.S. at 672–73); *cf. Williams*, 482 F.2d at 670 (reserving the question of whether the President can designate an acting officer to serve for a reasonable period of time without any statutory authorization).

Moreover, Plaintiff's argument suffers from another problem to the extent that she views the position of Acting Director as a principal office of the United States. Under that theory, Plaintiff herself could not constitutionally serve in the role. If Congress cannot lawfully give the President alone the authority to designate an Acting CFPB Director—because it is a principal office—then it could not effectively give such authority to the CFPB Director by providing that an inferior officer (or an employee) would accede to the principal office by operation of law.[6]

---

[6] In a one-sentence footnote, Plaintiff asserts that Mr. Mulvaney's confirmation by the Senate to serve as OMB Director "does not, *on its own*, allow the President to assign him additional duties in a position at another agency." Pl.'s Br. at 18 n.2 (emphasis added). What Plaintiff is getting at here is unclear, and she has not adequately developed her point (whatever it may be) to preserve it. *See, e.g., CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("[H]iding an argument [in a footnote] and then articulating it in only a conclusory fashion results in forfeiture."); *see also Rollins Envtl. Servs. Inc. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991). In any event, it is the FVRA in conjunction with Mr. Mulvaney's Senate-confirmed appointment that authorizes the President to designate him to serve as Acting CFPB Director. And the cases cited by Plaintiff without elaboration are inapposite. *Shoemaker v. United States*, 147 U.S. 282 (1893), held that Congress may by statute assign new duties to an officer appointed before the statute's enactment without necessitating a new appointment—at least if the new duties are "germane" to her original ones. *See id.* at 300–01. And, in *Weiss v. United States*, 510 U.S. 163 (1994), the Court cast doubt

In sum, Plaintiff's cloaking of her statutory arguments in constitutional terms raises more questions than it answers, none of which has been adequately briefed by Plaintiff.[7]

### D.  Plaintiff Has No Cause of Action and No Right to the Relief She Seeks.

Aside from the lack of substantive merit to Plaintiff's claims, two additional obstacles further undermine Plaintiff's likelihood of success: lack of a cause of action and lack of entitlement to the relief she seeks.

First, Plaintiff's action appears to be an attempted end-run around the requirements and restrictions for bringing a quo warranto action. The federal quo warranto statute, which Congress codified for historical reasons in the D.C. Code, provides a civil action against any person who, within the District of Columbia, "usurps, intrudes into, or unlawfully holds or exercises . . . a public office of the United States, civil or military." D.C. Code § 16-3501. The D.C. Circuit has indicated that the quo warranto statute is the sole means by which an interested party may make a direct attack on the authority of another person to perform the duties of a public office (as opposed to an indirect attack on his or her official actions). *See Sw. Gen., Inc. v. NLRB*, 796 F.3d 67, 81 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017) ("The de facto officer doctrine allows [direct] attacks [on an officer's authority,] but they can be brought via writ of quo warranto only." (citing *Andrade v. Lauer*, 729 F.2d 1475, 1496–97 (D.C. Cir. 1984)). Plaintiff's failure to satisfy the requirements for

---

on whether "the principle of 'germaneness' applies" when Congress authorizes someone in the Executive Branch to designate an officer to take on new duties. *Id.* at 174; *see also id.* (distinguishing *Shoemaker* because "there is no ground for suspicion here that Congress was trying to both create an office and also select a particular individual to fill the office."). If the germaneness principle did apply to acting designations under the FVRA, it would be satisfied in any case of a designee "who is already an 'Officer of the United States' and who was appointed after the enactment of the [FVRA], as any duties arising under the [FVRA] can be regarded as part and parcel of the office to which he was appointed." *Acting Director of OMB*, 27 Op. O.L.C. at 122 n.3 (citing *Weiss*, 510 U.S. 163, 174 (1994)); *cf. Legislation Authorizing the Transfer of Federal Judges from One District to Another*, 4B Op. O.L.C. 538, 540 (1980) (germaneness analysis takes into account whether the new duties fall "within the contemplation of those who were in the first place responsible for [an officer's] appointment").

[7] The Government reserves the right to contest the validity of Plaintiff's purported appointment as CFPB's Deputy Director.

a direct challenge to Mr. Mulvaney's authority to perform the duties of Acting CFPB Director itself prevents her from prevailing on the merits.[8]

Second, even if the President's designation of Mr. Mulvaney as Acting CFPB Director was not authorized by the FVRA, this Court still should not grant Plaintiff's motion to the extent that she seeks injunctive and declaratory relief against the President himself. For a century and a half, the Supreme Court has maintained that courts, "in general," have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality opinion) (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 485, 501 (1867)); *see also id.* at 826–27 (Scalia, J., concurring). A "District Court's grant of injunctive relief against the President himself is extraordinary, and should . . . raise judicial eyebrows." *Id.* at 802 (plurality opinion). "[S]imilar considerations regarding a court's power to issue relief against the President himself apply to [a] request for a declaratory judgment." *Swan*, 100 F.3d at 976 n.1. Plaintiff attempts to brush aside these substantial concerns as "highly formalistic" in light of courts' ability to issue relief against subordinate executive officers, Pl.'s Br. at 25, but "[t]he reasons why courts should be hesitant to grant such relief [against the President himself] are painfully obvious." *Swan*, 100 F.3d at 978. Granting Plaintiff's requested relief would "at best create[] an unseemly appearance of constitutional tension and at worst risk[] violation of the constitutional separation of powers." *Id.*

In any event, Plaintiff believes that her alleged "injury may be at least partially remedied by an injunction against" someone other than the President. Pl.'s Br. at 24. She seeks relief against

---

[8] Courts in this circuit have indicated that direct attacks on public officeholders may be subject to even more significant restrictions than other quo warranto actions. *See, e.g.*, *Sibley v. Obama*, 866 F. Supp. 2d 17, 20 (D.D.C. 2012) (Bates, J.) (citations omitted), *aff'd*, No. 12-5198, 2012 WL 6603088, at *1 (D.C. Cir. Dec. 12, 2012) ("With respect to plaintiff's petition for writs quo warranto, the district court was correct that, under this court's precedent, 'actions against public officials (as opposed to actions brought against officers of private corporations) can only be instituted by the Attorney General.'" (quoting *Andrade*, 729 F.2d 1475, 1498 (D.C. Cir. 1984)). But even assuming that an "interested person" with a competing claim to the office in question may bring a quo warranto action, it is clear that such an action—including compliance with its various procedures—is the "only" way to launch such an attack. *Sw. Gen., Inc.*, 796 F.3d at 81.

the President directly only because "the President could attempt to appoint another officer under the FVRA." *Id.* Plaintiff's mere speculation about an event that has not occurred, and which she offers no basis to believe is imminent, provides no basis for preliminary relief, let alone preliminary relief of the unusual and extraordinary nature requested here. *Cf. Swan*, 100 F.3d at 976–81 & nn.1–2.

*     *     *

For all of these reasons, Plaintiff cannot establish that she is likely to prevail on the merits of her challenge to the President's designation of Mr. Mulvaney to serve as Acting CFPB Director. The FVRA and Dodd-Frank are best read in harmony, not in tension, and allow the President to select an Acting CFPB Director. President Trump validly exercised that authority here.

## II.   PLAINTIFF HAS NOT DEMONSTRATED THAT A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM TO HER.

Plaintiff has also failed to establish that she "is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Plaintiff essentially abdicates any effort to satisfy this critical element of the preliminary-injunction standard. Instead, she conflates her burden under the likelihood-of-success element with her separate burden under the irreparable-harm element by labeling Acting Director Mulvaney's designation as a "usurpation of her position at the fore of a federal agency" that harms her irreparably in and of itself. Pl.'s Br. at 25. There has been no "usurpation" of Plaintiff's position at CFPB, *see* Part I.A–I.C *supra*, but even if there had been, it would not suffice to establish a likelihood of irreparable harm to Plaintiff. At bottom, Plaintiff cannot show that she faces irreparable harm because her claimed injury, distilled to its essence, is the alleged loss or denial of a position to which she (incorrectly) believes she is entitled. As innumerable courts have held, the loss or denial of a position by itself does not constitute irreparable harm as a matter of law.

The "high standard for irreparable injury"—even higher here insofar as Plaintiff requests a mandatory injunction that would alter the status quo, *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997)—requires a two-fold showing by Plaintiff: First, because an irreparable injury

"must be both certain and great," Plaintiff "must show 'the injury complained of is of such *imminence* that there is a "clear and present" need for equitable relief to prevent irreparable harm.'" *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). And second, "the injury must be beyond remediation." *Id.*

At the very threshold, Plaintiff's abbreviated argument fails to meet her burden of establishing either portion of that two-fold showing. Only in a "genuinely extraordinary situation" may loss of employment constitute irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 92 & n.68 (1974). Loss of income, face, and reputation are not such extraordinary situations. *See id.* at 89–92; *see also id.* at 92 n.68 (declining "to define in advance of their occurrence" what might constitute extraordinary circumstances, but ruling out "insufficiency of savings or difficulties in immediately obtaining other employment . . . however severely they may affect a particular individual"). And this is not such a situation. Indeed, court after court in this Circuit and others has concluded that loss of employment does not constitute irreparable harm. *See, e.g.*, *Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155, 1158 (7th Cir. 1998); *Davis v. Billington*, 76 F. Supp. 3d 59, 65–66 (D.D.C. 2014) (collecting cases); *Farris v. Rice*, 453 F. Supp. 2d 76, 79–80 (D.D.C. 2006) ("cases are legion holding that loss of employment does not constitute irreparable injury").

Plaintiff attempts to evade this weight of authority by complaining that "[r]un-of-the-mill employment cases involving the loss of a position are inapt." Pl.'s Br. at 26. But that complaint is unavailing for at least two reasons.

First, Plaintiff makes no convincing argument that this case is anything other than what she calls a "run-of-the-mill" employment case, at least as it relates to her claim to the Acting Director position. Plaintiff was reassigned by the departing CFPB Director from her previous position as Chief of Staff to the position of Deputy Director. While the President's designation of Acting Director Mulvaney prevented Plaintiff from assuming the role of Acting Director, she remains employed at CFPB as the Deputy Director. Her response to the President's designation was to bring suit asking the Court to determine that her claim to be Acting Director is better than Acting Director Mulvaney's, and on that basis issue injunctive relief ordering her to be instated to the

position. *See* [Proposed] Preliminary Injunction, ECF No. 23-1. This is a textbook employment case. And if Plaintiff means to suggest that it is otherwise by virtue of the high level of the position into which she seeks instatement, she is wrong. Courts have repeatedly rejected the notion that the deprivation of a unique, singular, or high-level position is any more of an irreparable injury than the loss of what Plaintiff might describe as a "run-of-the-mill," rank-and-file position. *See Hetreed*, 135 F.3d at 1158 (loss of position as senior manager leading audit department not irreparable injury); *Marxe v. Jackson*, 833 F.2d 1121, 1122 (3d Cir. 1987) (division manager); *Rubino v. City of Mount Vernon*, 707 F.2d 53 (2d Cir. 1983) (mayoral-appointed City Assessor); *Franks v. Nimmo*, 683 F.2d 1290, 1291 (10th Cir. 1982) (Associate Chief of Staff for Research and Development position at Department of Veterans Affairs Medical Center); *EEOC v. City of Janesville*, 630 F.2d 1254, 1256 (7th Cir. 1980) (Chief of Police); *Levesque v. Maine*, 587 F.2d 78, 79 (1st Cir. 1978) (Maine Commissioner of Manpower); *Nichols v. Agency for Int'l Dev.*, 18 F. Supp. 2d 1, 2, 4 (D.D.C. 1998) (Chief of Information Management Systems, Office of Inspector General); *Burns v. GAO Emps. Fed. Credit Union*, No. 88-3424, 1988 WL 134925, at *1–2 (D.D.C. Dec. 2, 1988) (President of Credit Union Board of Directors).

If anything, any suggestion of harm here would be far more conclusory and attenuated than in the vast run of employment cases, where there has actually been a loss of position or non-selection resulting in a loss of salary or other financial benefits. Here, outgoing Director Cordray reassigned Plaintiff from her former Chief of Staff position into the Deputy Director position, from which she contends she should have assumed the Acting Director position upon his resignation at midnight the same day. By its own terms, that directed reassignment involved no promotion, no salary increase, and no change in "any other terms of [] employment." *See* Mem. from Richard Cordray, ECF 24-1. Her reassignment to the Deputy Director position remains in effect. In short, there has been no change in status for Plaintiff at any point, further undermining any notion of harm attributable to some loss of position, status, or remuneration.

With no actual injury to speak of, Plaintiff's claim of irreparable harm goes nowhere. But even if Plaintiff could credibly show some loss of position, status, or remuneration amounting to

an actual or threatened injury, she could not make the corollary showing that it is "beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. As the D.C. Circuit has often repeated, "[t]he key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* at 297–98 (quoting *Wis. Gas Co.*, 758 F.2d at 674). Thus, even if Plaintiff could show some ongoing loss of anything of tangible value during the pendency of this litigation, she cannot show that such loss is irreparable. And without such a showing, she cannot satisfy the irreparable-harm element.

Second, even if Plaintiff could gain some purchase by simply labeling loss-of-position case law as "inapt" in this context, she offers no alternative framework by which the Court might more "aptly" evaluate her suggestion of irreparable harm. In fact, the sum total of Plaintiff's analysis in support of irreparable harm is a cursory reliance on two district court decisions that are readily distinguishable, and which themselves have gained no jurisprudential traction in the years since they were issued.

Plaintiff's first such case—*Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983)—is offered up for the notion that a "statutory right to function" can constitute the sort of irreparable harm that would warrant preliminary injunctive relief in this context. But whatever a "statutory right to function" is, there is no credible suggestion that Plaintiff has lost it here (or that the CFPB has lost it by virtue of being temporarily directed by someone other than Plaintiff, even if that could be material to Plaintiff's assertion of irreparable harm). In *Berry*, the President sought to terminate members of the Commission on Civil Rights, an agency charged with preparing a report on deprivations of civil rights and the equal administration of justice. *See id.* at *1. By statute, the Commission dissolved after submission of that report to the President and Congress. *Id.* The members' termination would have deprived the Commission of a quorum, thus preventing it from issuing the very report that justified its existence. *Id.* at *5. Thus, the district

court held that there was irreparable injury because of "the obviously disruptive effect the *denial* of preliminary relief will likely have on the Commission's final activities"—namely the Commission's primary function. *Id.* Here, by contrast, Plaintiff's alleged loss of Acting Director status does not inhibit the CFPB's activities whatsoever, much less threaten its very reason for being. Rather, in the nearly three weeks since Acting Director Mulvaney's designation, the CFPB continues to function and to do so without any evidence of substantial disruption. And without any showing that "the [CFPB's] ability to fulfill its mandate is disrupted" by Mulvaney serving as acting director rather than Plaintiff, *id.* at *5, Plaintiff's reliance on *Berry* does nothing to support her irreparable-harm argument.[9]

Plaintiff's second such case—*Mackie v. Bush*, 809 F. Supp. 144 (D.D.C. 1993), *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993)—is similarly unpersuasive. In *Mackie*, the Department of Justice and United States Postal Service ("USPS") took different litigating positions in a case before the D.C. Circuit, and a conflict arose over which had litigating authority. *Id.* at 145. The D.C. Circuit determined that it had jurisdiction over the underlying case, which concerned in part the independence of the USPS. *Id.* at 146–47. Thus, when the President sought to remove the USPS Governors, the district court determined that the resulting threat of mooting out the pending appeal might result in harm that a subsequent damages award or declaratory judgment could not repair. *Id.* at 147. "A district court in this Circuit has the responsibility and the authority to protect the jurisdiction of our Court of Appeals, at least to the limited extent of assuring that that Court has been afforded an opportunity to address the issues pending before it," the *Mackie* court reasoned. *Id.* at 146–47. Thus, permitting the President to remove the USPS Governors would have resulted in an end run around the D.C. Circuit's ability

---

[9] In any event, *Berry* further undermines Plaintiff's suggestion that "run-of-the-mill" employment cases are inapt on its own terms. Before explaining how a threatened "loss of function" might constitute irreparable harm, the court in *Berry* assessed "the principles enunciated by the Supreme Court in *Sampson v. Murray*, the controlling case in Government personnel actions." *Berry*, 1983 WL 538, at *5. Thus, *Berry* itself demonstrates that the *Sampson* framework applies with full force to personnel who are nominated by the President and confirmed by the Senate. *Id.*

to decide "whether the [Postal Service] Board is an 'independent agency' [and] whether the Executive Branch, including the President, has the authority to direct its policy positions by operation of what may be a mere ministerial requirement that it obtain the consent of the Department of Justice to take a particular litigating position." *Id.* at 147. These concerns are wholly unrelated to this case. Cherry-picking one line from the *Mackie* decision, Plaintiff mischaracterizes the court's holding that damages or a declaratory judgment are insufficient. Insufficient as those remedies may be when a federal appellate court's jurisdiction is threatened while appeal is pending, Plaintiff has not made the requisite showing that the same is threatened here, rendering *Mackie* irrelevant to her argument. In any event, the vacated district court decision in *Mackie* is of dubious precedential value, and Defendants are aware of no court that has relied on it for any relevant proposition.

Plaintiff's final argument as to this element is that her "lost time in office" amounts to irreparable harm because this case may someday be mooted by an eventual nomination, confirmation, and appointment of a new CFPB Director. But any such harm to Plaintiff would be at least offset by the corresponding harm to Defendants if an injunction were entered. Either Plaintiff or the President's designee will be precluded from performing the duties and functions of the office of the CFPB Director while this litigation is pending. Thus, on this point, the equities are a wash at best for Plaintiff.[10]

In short, Plaintiff has offered nothing more than misdirection and conjecture to support her argument of imminent irreparable harm. She has not done enough to satisfy this critical element of the preliminary-injunction standard.

---

[10] Indeed, prior litigation over Presidential appointment authority has been conducted over years without the need for preliminary relief. *See e.g.*, *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2557–58 (2014) (discussing the two-and-a-half year history between the President's recess appointment and the Court's decision); *PHH Corp.*, 839 F.3d at 11–12 (discussing the two-year, and ongoing, history between the CFPB Director's appointment and the court's decision). Plaintiff has not demonstrated that this case should be treated any differently.

**III.      THE PUBLIC INTEREST AND THE BALANCE OF THE EQUITIES FAVOR DENYING PLAINTIFF'S EXTRAORDINARY MOTION.**

The final two factors in considering a motion for a preliminary injunction, which are merged when the Government is the non-movant, are "the harm to the opposing party and weighing the public interest." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (observing that the Government's "harm and the public interest are one and the same, because the government's interest *is* the public interest"). It is a "well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83 (quoting *Cafeteria & Rest. Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 896 (1961)); *see, e.g.*, *Jordan v. Evans*, 355 F. Supp. 2d 72, 77 (D.D.C. 2004). Thus, in the government personnel context, courts must "give serious weight to the obviously disruptive effect which the grant of the temporary relief [would] likely . . . have on the administrative process." *Sampson*, 415 U.S. at 83. Here, the disruptive effect of a preliminary injunction is considerable, tipping the final factor in favor of Defendants.

In short, the current Acting Director has been in that position for nearly three weeks, and is already directing agency policy. *See supra* at 7–8. To intervene at this point with another management reshuffle would further delay agency business and upend some of the decisions that Mr. Mulvaney, in consultation with the executive team, has made. Plaintiff contends that a preliminary injunction would not substantially injure Defendants because the President could always appoint a Director with the Senate's advice and consent. *See* Pl.'s Br. at 28 (citing *Mackie*, 809 F. Supp. at 146). But Plaintiff mischaracterizes *Mackie* once more. Permitting the President to remove USPS Governors in that case would have deprived the D.C. Circuit of jurisdiction in another case that involved the President's authority over the Postal Service Board. *Mackie*, 809 S. Supp. at 146. In that context, the district court reasoned that the public interest in maintaining the D.C. Circuit's jurisdiction outweighed any harm to the Executive Branch. *Id.* That concern is absent here, while the issuance of a preliminary injunction would significantly harm the Government in the "dispatch of its own internal affairs"—namely Mr. Mulvaney's service as

Acting Director of CFPB, pursuant to the President's direction, and consistent with the position of the CFPB senior leadership.

Finally, Plaintiff argues that the import of this case counsels in favor of issuing a preliminary injunction. *See* Pl.'s Br. at 26–28. There is no dispute that "the CFPB [has] broad authority to enforce U.S. consumer protection law," *PHH Corp.*, 839 F.3d at 15, and that this case raises serious legal issues. But particularly in a case where Plaintiff has failed to demonstrate a likelihood of success on the merits, issuing a preliminary injunction that would remove the President's choice for Acting Director and installing Plaintiff in his stead would cast the very pall of invalidity over which Plaintiff expresses concern.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction should be denied.

Dated:   December 18, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

CHRISTOPHER HALL
Assistant Director, Federal Programs Branch

*Of Counsel:*

  /s/ Matthew J. Berns
MATTHEW J. BERNS
(DC Bar # 998094)
BENJAMIN T. TAKEMOTO
(DC Bar # 1045253)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
Tel: (202) 616-8016
Fax: (202) 616-8470
E-mail: matthew.j.berns@usdoj.gov

MARY McLEOD
General Counsel
Consumer Financial Protection Bureau

JOHN R. COLEMAN
Deputy General Counsel
Consumer Financial Protection Bureau

STEVEN Y. BRESSLER
LAURA HUSSAIN
Assistant General Counsels
Consumer Financial Protection Bureau

*Attorneys for Defendants*