# Exhibit 5
## CFPB Press Roundtable
## (December 4, 2017)

*English v. Trump, et al.*
No. 1:17-cv-02534-TJK
EXHIBITS TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

CFPB  Press Roundtable

Speakers:
**MICK MULVANEY**, Director, CFPB

2:13 p.m., EST
Monday, December 4, 2017


**TELECONFERENCE OPERATOR:**  Go ahead, please.

**MICK MULVANEY:**  Fine.  So I do not need to give any instructions?  Just jump right into it?

**TELECONFERENCE OPERATOR:**  Yep.  You are live.  Go ahead, please.

**MICK MULVANEY:**  All right.  Thanks, everybody, for stopping by.  Many of you, I think—I see some familiar faces—have participated in my regular roundtables we have across the street.  We've done probably a half a dozen of those since I've been at OMB, and it's something that I want to continue and to re-create over here.  So just as we have brought the press from time to time to sit around the table and talk for a half an hour or so at OMB, we're going to start doing that here at CFPB for as long as I happen to be here.  So thank you for doing it.

So this is just sort of an ordinary course of business.  I don't know how often we're going to do it, but we're going to do it as frequently as we possibly can.

The first week was pretty cool.  I had a chance—I was over here just—I was over here every day last week, here all day Saturday, most of the day on Sunday, and had a chance to start to get up to speed.  Most of the meetings last week were with the various senior members of the executive team and their staffs.  There's five or six sort of different categories, different operating units here that we had to get to speed on.  I've got more of those meetings planned for this week.

As I think I've mentioned before, the goal for my schedules—I try to manage time.  I sort of do Tuesdays, Thursdays, Saturdays here; Monday, Wednesday, Friday across the street at OMB.  Clearly, at the outset, it's going to require more of my time over here, which is fine.  So, again, I'll be here a little bit after this meeting today.  I expect to be here on and off every day this week and was here every day last week, but things seem to be going fairly smoothly.

The sort of step-back-and-pause that I announced on Monday, which was my first day over here, is fairly typical for any new management team that comes into a new organization.  We've been able over the course of the last couple of days to modify that in some important ways.  For example, on the first day, I had asked that all payments out of the Civil Penalties fund be held until we could get into the details.  We were able to do that last week with the folks here at CFPB who manage that fund, and I have now approved the allocations of payments out of

that fund.  I can't remember the protocols here.  I think it's 60 days between allocation and disbursement, but I don't—please don't quote me on that.  The point of the matter is that the process has started.  That hold on the distributions from the Civil Penalties hold was lifted, I think, Wednesday of last week, so back to ordinary course of business on that.

Contracting, I had asked that all contracts be held, and they were until last week when I was able to sit down with folks responsible for at CFPB.  And we went over sort of refining that program.  So now things that are relatively small, relatively mundane, relatively related to housekeeping will all be approved now going forward on an ordinary course of business basis.  I think it's a contract that's less than year, less than a million dollars, not too worried about—let those move forward.  If it is more than a year or more than a million dollars, I want to see it.  So we've modified that particular hold.

The hiring freeze.  That went into place on the first day, obviously, had a chance to talk to the human capital people here, and we've refined that a little bit more to the point where we're still going to freeze adding new people to the CFPB.  But if they are internal promotions, internal relocations, internal changes, those would be allowed to go forward.  If there were offers already extended on the day that I came over here, those will be honored, so sort of been able to refine bits and pieces of the management structure or the management tools that we put in place on Monday.

Things seem to be going extraordinarily well.  Yes, Ms. English is in the building from time to time.  I also understand she's taken up residence at the other building here in town on K Street, but I've had no interaction with her.  I've sent her a couple of emails, asked her to perform some duties as the Deputy Director, but that's the only interaction with her.  Aside from her presence here, which is a little strange—I won't lie to you—I think things are going extraordinarily smoothly and extraordinarily well.

So, with that, I'd be happy to just answer any questions.  Do you guys want to go around the table, or do you want to go in order?  Do you want to jump around?  How do you want to do it?

Okay.  We'll just jump around, then.  Go ahead.  Yes, ma'am.

**QUESTIONER:**  I just want to touch base on the hearing that's set tomorrow for 11 a.m., English v. Trump.  Do you have any comments or any—

**MICK MULVANEY:**  Didn't even know about it.  I didn't think it was taking place until Friday, so no.  I'm not involved in the lawsuit.  I let the COJ and the CFPB lawyers handle it.

**QUESTIONER:**  How do you plan—

**MICK MULVANEY:**  By the way, I think it's worth pointing out—I don't know if anybody—if folks have—some of you have reported this, but not everybody has.  The CFPB lawyers, the legal folks here actually took the position prior to my appointment that—excuse me—prior to my

arrival here that I was the Deputy Director and Leandra was not.  So that is the internal CFPB lawyers who are on staff here.

**QUESTIONER:**  How do you plan on approaching sort of legal challenges to rules that you might not agree with?  I think there might be a lawsuit against the small-dollar rule at the CFPB, and also, there is a Congressional Review Act proposed in the House.  And I'm wondering if you'd support that.

**MICK MULVANEY:**  Yeah, a couple different answers.  That every administration deals with that.  Of course, the Trump Department of Justice has to look at various types of things.  How did we want to handle the lawsuit regarding the CSR payments that the House of Representatives have brought against the previous administration?  So it's not at all unusual for a new administration to change position on various lawsuits—excuse me—on various policies.  Let me be very, very clear about that—change position on policies.

As to our response to specific lawsuits, I don't want to respond.  I don't want to deal with the specifics of individual—of individual litigation.  I will tell you that I am meeting with a legal team here, have already started to go over the various—some of the more high-profile lawsuits against CFPB.  PHH decision, for example, I think, is another decision I got briefed on last week out in California that raised the same issues.  So we are going through that, as with any new management team, on a case-by-case basis.

**QUESTIONER:**  The Congressional Review Act resolution in the House?

**MICK MULVANEY:**  Yeah.  I talked to Dennis Ross—or I think I texted Dennis or talked—I can't remember if I talked to him or called, whatever it was.  I happen to think that's a good idea, and I hope they pass it.

**QUESTIONER:**  On payday rule, is there anything that you can do aside from what's going on—

**MICK MULVANEY:**  I don't think so.  We're taking a look at it now.  I think it was fairly far out the door.  By the time we had got here, it had already been sent over to the Federal Registry for printing, so I think the more appropriate place there would be for the Congress to handle it through a CRA.

If there are things that we can do—and I've asked them.  I've asked the legal team here to brief me on what options are available to the new management team to deal with the payday rule, and I do not have the results of that research back yet.

**QUESTIONER:**  So you wouldn't want to be able to do anything on payday lending since the CRA would then restrict what—

**MICK MULVANEY:**  My point has been very straightforward here.  We're going to enforce the law, okay?  And if the law says that we shall do something, we are going to do that.  If the law changes—and that's what a CRA is—we will abide by that law as well.

The question, however, dealt with the substance of the payday rule, and I think that I would support the Congress moving forward on the CRA.

**QUESTIONER:**  Are you going to resume enforcement actions after the 30-day freeze?

**MICK MULVANEY:**  Yeah, we are.  The way we got—the way we dealt with it right now, enforcement actions fall into three different categories.  There's litigation.  There's settle and sue, as a second category; and then there's ongoing investigations, which is category three.  I don't want to go into the specifics on what we've done on all of those, but we have addressed those by category and have come up with a specific policy on each of those by category, and we are continuing to move forward with some, and we are holding others in abeyance while we try and get more details on specific circumstances.

**QUESTIONER:**  Are you going to give some sort of announcement about—

**MICK MULVANEY:**  Yeah.  And I think once we get through—that is going to be probably the longest part of the transition process here because I think there's more than 100 current—but when you take litigation plus discussions where investigations have sort of concluded and we're now in this—what Mr. Cordray used to call "settle-or-sue authority," plus the stuff that's still in investigations, you add all those together, and I think you are well over 100.  And I am looking at each of those on an individual basis, so it's going to take a while to sort of get through all of those.  But, yes, we are looking at those very closely.

**QUESTIONER:**  Have you tried to meet with Leandra English yet?  I mean, she is the Deputy Director.

**MICK MULVANEY:**  I've tried to correspond with her.  It's always a challenge when you're in a workplace with someone who is suing you—and I'm a named defendant—to sort of, you know, chat around the watercooler.  So I have attempted to correspond with her via email, which I believe to be the appropriate—the appropriate manner.  I have not heard back from her.  I've written her essentially roughly half a dozen emails on three—two different topics.  One, please stop holding yourself out as Acting Director, which she continues to do; and two, please perform these duties which are a custom—customary duties to the Deputy Director.  I've heard no response to either of those types of emails.

**QUESTIONER:**  Is there a concern because there's a legal action of having face-to-face interaction or talking with her?  Do you prefer to do it in written communication?

**MICK MULVANEY:**  Oh, I just think that's just good advice to anybody anywhere that when you're—if you're the plaintiff in a lawsuit, I'm a defendant in a lawsuit, we typically don't chat.

Usually, we talk through lawyers.  It's a little different here because she's still here.  So I think email is the appropriate way to move forward.

**QUESTIONER:**  By asking her to do certain duties, is this part of some larger consideration of potentially firing her at some point?

**MICK MULVANEY:**  No.  We need everybody doing their jobs, and there was stuff that—there's a structure here, and there are certain folks within CFPB that actually answer up the food chain to the Deputy Director.  So the appropriate thing for me to do if I want information on someone who's in that part of the organizational chart would be to ask Leandra, "Please pull together a report from this person.  Please meet with this person.  Please prepare a brief for me on this topic because it falls under your jurisdiction."  That's the appropriate thing to do.

**QUESTIONER:**  Is there any consideration of firing her—

**MICK MULVANEY:**  No, absolutely not.

**QUESTIONER:**  Also, on a different topic, I was wondering of your thoughts more broadly on the CFPB's consumer surveillance efforts, looking at use of credit cards and such.  Are you concerned about Fourth Amendment issues?

**MICK MULVANEY:**  Thank you.  That's probably coming after what I just talked about over here.  I need to look at the existing enforcement before we start talking about new enforcement, so that may be a while before I can get back to you on that one.

**QUESTIONER:**  What conversations have you had around the Consumer Complaint Database?

**MICK MULVANEY:**  The Consumer Complaint Database.  Not specific to that yet because my attention when it comes to the databases here has been in another area, which is on our data security.  I think the IG's report is public.  In fact, I'm fairly certain that it is.  The IG's last report raised two yellow flags.  We won't call them red flags, but yellow flags, which was one on the travel card use here.  That's something we're certainly going to take a look at, but the one that really got my attention was the one on our data security status here that gave us a medium—I can't remember what the grade scale is, but they raised it as one of their two critical findings in the IG's report as what we need to work on here.  Data security was one of them.  That scares me to death.

And I told the folks here that I intend to do here at CFPB what we did at OMB, which is we lead by example.  We scrubbed our own budgets first at OMB before we asked other people to do it.  I think we should find a way to have as vigorous a data security program as we possibly can here before we start expecting it from the people that we oversee out in the industry.  So that was driving a lot of my decision-making about the freeze on Monday.

Until we have the data security issue buttoned down, as extensively as possible—it's never going to be perfect because it's not the world we live in, but until the folks at the IG and everybody, including inside and outside this organization, tell me that we have the very best data security, I have instructed them to stop collecting PII-level information, okay?  So no more loan-level information.  If we are collecting statistical data on the numbers of loans and the size of loans and the dollar amounts of loans, hey, that's great, okay?  But if we can trace it back to you or your business, no.

The way I told them to look at it, I asked them to look at it here at CFPB, was don't take anything, and if it leaks out, it makes us look bad or embarrasses the people that we took it from, so that—taking the data security very, very seriously.  I'm meeting with the IG for the first time in a detailed setting tomorrow—tomorrow?  Wednesday?  I think it's tomorrow.  So we hope to have more on that, but that's sort of priority one right now when it comes to the operations of CFPB because we cannot function properly if we cannot guarantee the safety of your data.

And by the way, everybody here agrees with it, and I want to make it perfectly clear that this is not something I uncovered.  The IG's report, I think, came out in May, and I'm satisfied that the previous leadership team also made it a priority.  I've talked to folks here, and they tell me its' getting better.  My point is simply it's not—we're not going to start collecting data under my watch until we are absolutely confident that that stuff isn't going to get hacked.

**QUESTIONER:**  There are some concerns raised about—via the Acting Director position and how you'll sit on the Financial Stability Oversight Council—

**MICK MULVANEY:**  Yeah.

**QUESTIONER:**  —Chairman, the board of the FDIC.

**MICK MULVANEY:**  Yep.

**QUESTIONER:**  How active do you plan to be on those councils, and what kind of—what kind of approach are you taking?

**MICK MULVANEY:**  I'm going to one meeting this week, and I think it's by FIAC—is another one that I'm going to next week.  I'll be an active participant in those.

I've talked to—is it Grunwald?—I think last week.  I got a call from—or a letter from Otting, O-t-t-i-n-g.  I think he's on one of my—I can't—some of the names are new to me.  I've obviously talked to Secretary Mnuchin.  We've got a meeting coming up that he's—I think that's the FSOC meeting.  So I will be a full participant in those meetings.

**QUESTIONER:**  In your review of the litigation—

**MICK MULVANEY:** Yeah.

**QUESTIONER:** —are you able to talk about how far you are through the 100 or so cases there are to review?

**MICK MULVANEY:** Not very.

**QUESTIONER:** Okay.

**MICK MULVANEY:** And here's why. We're triaging it on a—I think we're running the place the way any new management team would come in. So if the management team is here like, "Okay. What is immediately time-sensitive?" Okay. Before we sit down and try to figure out what our overarching policies are, what has to happen by the end of the day today? Is there a contract for the building security that we have to sign? Is there a contract for building maintenance we have to sign? Is there a lawsuit that has a hearing today? And the answer to that is yes, there is, and I cannot remember the name of the case. I think it's the Nexus case, N-e-x-u-s—has a hearing at four o'clock this afternoon.

There was an issue on a nationwide—I think it was nationwide—I can't remember the name of the company—that had a hearing on Friday. So those are things we sort of triage. We're taking them in that sense until we can buy enough time in order to then sit down and look at all of the cases more broadly. So there's where a lot of my time has been in the last couple of days.

**QUESTIONER:** Have you heard directly from any of the companies at issue in those cases?

**MICK MULVANEY:** No is the answer to your question. Here's why. I may have. This is why I am being sensitive to the way I answer your question. Many folks have reached out to me from both consumer groups to lobbying groups to folks who work in the financial services industries, okay? I understand that one of the folks in one of these lawsuits actually sent me a FedEx letter here. I am refusing to meet with any outside groups from any part of the spectrum this month. My views this month will be internal to CFPB. I will not be meeting with consumer groups. I will not be meeting with lobbyists. I will not be meeting with bankers. I will not, certainly, be meeting with litigants on lawsuits. That is simply not going to happen for at least the first 30 days. I don't want anybody to say that, well, Mulvaney was swayed one way or the other by somebody who sent him a FedEx package. So we're not making those—we're not taking those considerations.

**QUESTIONER:** Are you having any conversations yet with the other regulators about producing some of the regulatory overlap? There's been some talk about bank supervision and—

**MICK MULVANEY:** Not yet. Would love to do that, but no, that's not—those have not started yet. Most of our conversations to date—all of our conversations to date have been internal to CFPB.

**QUESTIONER:**  There was an op-ed in the *Wall Street Journal* this week in which the writer suggested CFPB might use the Paper Reduction Act—

**MICK MULVANEY:**  Yeah.

**QUESTIONER:**  —the Paperwork Reduction Act as a way to sort of roll back regulations.  Is that something that you're considering or the Bureau is considering using that as a—

**MICK MULVANEY:**  Yeah.  I think that came up—that may have come up as part of the payday rule.  I can't remember if that was the case or if that was—I can't—yeah.  I mean, you can imagine that the Office of Management and Budget under the Trump administration might look very cautiously, even cynically, against rules that were produced by the Cordray CFPB.  So the extent it is appropriate and legal for the Office of Management and Budget's Office of Information and Regulatory Affairs to figure out a way to modify, change, or somehow impact those rules, that is absolutely going to take place.  And it would take place regardless of whether or not I was sitting here or sitting across the street.

All right.  We'll take one from the phone, I guess.

**CFPB STAFF:**  Operator, can you open the line for queue?

**TELECONFERENCE OPERATOR:**  Yes.  As a reminder for questions from the phone, press Star, 1.  We do have Stacey Cowley from *New York Times* .  Your line is open.

**STACEY COWLEY (New York Times):**  Hi . This is Stacey.  I wanted to follow up on a couple dozen cases that are in active litigation with the CFPB.  Have you made any changes yet or ordered any changes on the actions being taken by the Bureau's lawyers on any of those cases?

**MICK MULVANEY:**  Stacey, we—I want to be careful how I answer this because I don't know if this—if these changes have been articulated to the courts and to the other parties to the lawsuits, so let me answer your question generally.  And if you wouldn't mind reaching out to John Zortacky [ph] after this meeting, I can find out what I can tell you more specifically.

So for the larger group, there are two cases that we generally took the position that we were going to try and delay what was going on.  There were some briefs due, maybe a motion hearing that was due.  And I had conversations over the weekend with our legal team, and the questions generally that I asked were this, is that would a delay prejudice the CFPB, would a delay prejudice the other parties in interest, and would a delay prejudice the courts.  And on all of these, I got the unambiguous no, that a request for a delay in those actions would not prejudice any of the parties.  It would not affect the merits, not affect any of the deadlines, not worry about any statute of limitations, not create any undue sort of prejudice to any of the parties.

I have asked that we do delay two of those actions.  Those are the ones that I think we mentioned we triage first because those are the ones that were immediately pressing.  I don't know which one is next up.  I think that list is on my desk today.

**STACEY COWLEY (New York Times):**  Other than delays, though, are there any changes in position now taken by the Bureau's lawyers on any of these actions?

**MICK MULVANEY:**  Not—that's what the delay is for, and that goes back to the question somebody asked here about whether or not our position would be different on various legal matters, and that's something we're looking very closely at.  I think it's fair to say we have not made a determination, but as you can imagine, the Trump administration might feel differently about the constitutionality of a makeup of this board under the Obama administration—excuse me—the makeup of this Director's office than the  Obama administration did.

**TELECONFERENCE OPERATOR:**  And we do have a second question from the phone, if you'd like to take that?

**MICK MULVANEY:**  Sure.

**TELECONFERENCE OPERATOR:**  We have Kevin McCoy with *USA Today*.  Your line is open.

**KEVIN McCOY (USA Today):**  Hi.  With your previous contributions you received from the payday loan industry, does that color your view of the rule at the CFPB, and does that pose any kind of conflict of interest?

**MICK MULVANEY:**  I don't think so because I'm not in elected office anymore, and as I can sit here, I can tell you.  I had this conversation with my wife last night.  I have no intention of ever going back into elected office, so I don't have to worry about raising any money.  So, no, absolutely not.  If anything, my time on the House Financial Services Committee got me familiar with some of the issues that the CFPB is dealing with—the prepaid credit card rule, the short-term rule.  By the same token, the stuff that is newer that has only come up in the last year, I am not as familiar with.  I've been very candid with the staff here.  There's things that they've done in the last 8 months that I'm not familiar with because I'm on longer on that committee.

So, no, I do feel that my time in the House and my service there helped me, but I do not think that the campaign contributions that I took over the last 6 years create any conflicts at all.

All right.  Is that it on the phone?

**TELECONFERENCE OPERATOR:**  Yes.  We are showing no further questions.

**MICK MULVANEY:**  Great.  Okay.  I got time for one or two more.  Anybody else?

Is there anything else I'm supposed to cover?  I can't remember.

**QUESTIONER:**  Anytime a company wants to challenge an investigation, the scope of it, the timetable for it, does it trigger a process that is ultimately adjudicated by you?

**MICK MULVANEY:**  Yes, they do.

**QUESTIONER:**  Have you gotten any of those yet?

**MICK MULVANEY:**  Not yet.  I'm really looking forward to those, and good.  You know your stuff.  This is how I spent my weekend.

**QUESTIONER:**  Do you have a plan of how you're going to handle—

**MICK MULVANEY:**  I can—let me put it to you this way.  This place will be different under my leadership and under whoever follows me, the permanent appointment of President Trump.  It will be different than it was under Mr. Cordray.

I'm just learning about the civil investigative demand process.  For those of you who aren't aware, the CFPB issued the CIDs.  If you haven't seen one, I encourage you to try, and if we could put together a package, John, of what's publicly available—it doesn't give away any of our secrets—when a company gets a CID, what a generic policy might look like, I'd encourage you to take a look at it.  You probably have if you cover this industry close enough.  They're fairly broad, and they're fairly short-lived.  And they're fairly sort of burdensome.

If you don't like that, if your company got a letter from CFPB saying, "Hi.  We hereby demand all this information under penalty of law and perjury," and you don't like that, you can appeal.  Do you know who you appeal to?  The Director, the guy who approved to sending it to you in the first place.  How often do you think those appeals are successful?  I don't know the answer to that question, by the way.  I have asked to sort of have folks brief me how many appeals we actually granted, but it sounds to me like maybe there's a lack of check and balances in that process.

Yes.  I will look upon the appeals process.  My guess is differently than Mr. Cordray would have.

**QUESTIONER:**  How big of a team do you plan on bringing over here to help you run the day-to-day?  I think it was staffer—

**MICK MULVANEY:**  Oh, you're talking about—

**QUESTIONER:**  Brian Johnson, I think.

**MICK MULVANEY:**  Yeah.  Brian is here.  Brian started on, I think, Friday or full-time today.  He was here the weekend.  I have no idea.  What I want to try and create—and this is probably getting further in the weeds than you folks want—is that for—over at OMB, for every major sort of operating division—that's not what we call them over there, but that's sort of what they

are in the private sector.  We have a permanent full-time professional staffer, okay?  They're called the Deputy Assistant Director, the DADs.  If you ever come to OMB, there's DADs.  And every time a new administration comes in, they match up that DAD with a Program Assistant Director, which is a political position called a PAD.  And the PADs and DADs collectively run that operating division, and we do that.  In fact, I have a PADs and DADs meeting later on this afternoon over at OMB.

I want to try and re-create that here.  So imagine every major branch of CFPB enforcement, rulemaking, education, legal, maybe somebody in the Northeast Division, somebody in the Southeast Division, somebody out West, and try to marry whoever the most senior staffer is up with a new political person, and I would hope that that would be a system because it does work, and it works extraordinarily well at OMB, and it has worked for many generations like that over an OMB.  That the next administration to come in after the Trump administration would look upon that and say, "You know, that makes sense.  That's a good way to run the administration.  That's a good way."  Having one political person here is—that's just—I mean, come one now.  There's 1,600 people who work here.  It tells you that maybe they didn't think they needed to have any political people here because a lot of the people here were political, anyway, even though they're professional, so no.  I think getting to a more traditional structure along the lines of what we see at OMB might be the best structure going forward.  We're exploring ways to do that now.

**QUESTIONER:**  Does that include like, for example, you—after you have gone through all these initial things that you're going through, would you consider bringing someone in while you go over to OMB more full-time, that you would bring someone in to kind of run more of the day-to-day—

**MICK MULVANEY:**  Well, yeah.  I mean, I've already told folks that Brian is here now full-time, and when I'm not here, the folks that people should turn to would be Brian, who is here full-time, and Emma Doyle, who is my Chief of Staff over at OMB, who is also splitting time over here on a temporary basis.  But we will be staffing up with more permanent political people so that the professional staff here have a better feel for where the administration wants to take the Bureau.

**QUESTIONER:**  What's your timeline for the staffing?

**MICK MULVANEY:**  Now.

**QUESTIONER:**  Do you intend on streamlining staff at CFPB at all?

**MICK MULVANEY:**  I haven't looked at it yet.  I'm hopeful that—again, I'm trying to do this in some reasonable order.  Triage is first.  Dealing with the data security is another.  Dealing with some of the other structural stuff, like the contracts we talked about.  Then getting my political staff here to help me on the day-to-day, and then I am going to get down in the weeds with something that I actually enjoy, which is the budget, and how the agency here is—I keep calling

it "agency."  It's a bureau.  —is funded, how it's structured, personnel, those types of things.  But that will be a couple of weeks before I get a chance to do—go with that.  We'll have a chance to talk about that at the appropriate time.

**QUESTIONER:**  Why did Ms. English move to the K Street location [unclear]—

**MICK MULVANEY:**  You have to ask her.   No, no.  Absolutely not.  I want to make that perfectly clear.  My only discussions with Ms. English—and I think there's probably been a half a dozen emails—were in two different categories.  Number one, please cease holding yourself out as Acting Director.  She was, as recently as Thursday last week, was still sending broad emails across all of CFPB saying that she was the Acting Director and actually giving people instructions, which were occasionally counter to mine.  I asked her to please stop doing that.  I thought it created confusion at the agency, put employees in a difficult situation, that I would really appreciate it if she would stop.  That was one category of communications with Ms. English.  That was entirely by email.

The second category was what I just discussed about asking her to perform certain duties that are customary to the office of the role of the Deputy Director, and that was exclusively by email as well.  I have never asked her to move.  I've asked her not to—not asked her not to move.  I have not had any communications with her other than those two subjects that I've just laid out.

**QUESTIONER:**  Have you ever received any communications from employees here about maybe their confusion between the two of you both being here, any confusion personally?

**MICK MULVANEY:**  No.  It's funny.  I actually got one email from somebody.  I apologized.  She—like Monday of last week, she sent out her first Acting Director, and I said please don't do that.  And then I actually did send out a [unclear] report.  I sent out an email to everybody here and said, "Look, I apologize for putting you all in the situation, but I am the Acting Director.  If there is another person here who is contending to be Acting Director, please disregard any instructions she gives you purporting to be as Acting Director.  If she gives you instructions as Deputy Director, that's another story, but if she gives you instructions as Acting Director, you have to disregard those instructions.  You have to let legal know.

Then she did it again midweek, and I sent her another letter saying the same thing.  And someone else wrote back and said, "I feel like we should be apologizing to you."  So I actually think it's—I don't think it's creating any ill will.  I just wish it would stop because you can imagine it probably is not, you know, conducive to the well-functioning of an operation when you have two people who say they're in charge.

But, no, the support from the folks here has been tremendous.  I've not had anybody send me a note from inside saying, "You're not my Director."  No, I have not had any of that at all.  I've gotten a lot of that from the outside world because my email has already leaked, but, you know, that's life in the big city.

**QUESTIONER:**  Has she sent out any emails since that midweek one, like Wednesday when she said she was Acting—

**MICK MULVANEY:**  Yeah.  She sent out one.  I asked her to stop.  She sent out another.  I asked her to stop.  She sent out a third.  I've asked her to stop.  I don't think she's sent one since then.

**QUESTIONER:**  When was the last one?

**MICK MULVANEY:**  Thursday night.

**QUESTIONER:**  Thursday night?

**MICK MULVANEY:**  Is that right?  Thursday night?  Thursday afternoon, something like that.  And then my letter to her went out, I think, either Friday afternoon or Saturday morning.

**QUESTIONER:**  It sounds like you're preparing to be here for a while.  Do you have any insight into how long that will be?

**MICK MULVANEY:**  Yeah.  I think statutorily, I'm allowed to be here 210 days or 7 months.  I know the President wants to move expeditiously on naming somebody, but I would assume I'm going to be here—I'm here as long as he wants me to be here, and obviously, he can replace me with somebody else by naming somebody and the Senate can confirm them.  But, you know, I look at this as someplace between 5 and 7 months.

**QUESTIONER:**  Any interest—

**MICK MULVANEY:**  The Senate is not known for moving very quickly through these kinds of things.  So maybe Ms. Warren will feel more differently about approving somebody quickly when she realizes I'm still here.

**QUESTIONER:**  Do you have any interest in having the job permanently, maybe being moved over?

**MICK MULVANEY:**  No.  No, none.  Thank you.

**QUESTIONER:**  We have time for two more.

**MICK MULVANEY:**  I still—I'm not saying this just because—I'd say this.  I mean, I think I'm being fairly candid with you folks.  That's the best job I can do [unclear].

**QUESTIONER:**  What do you plan to do with the rules that the CFPB has been drafting for a long time, like the [unclear] or the debt collection?

**MICK MULVANEY:**  Yeah.  We put a hold on all new rules, new rulemaking and regulatory promulgation until I get a chance to look at them on a case-by-case basis.  I am going to need my political team in place to do that effectively because, quite simply, I don't know enough about it.  Having Brian here helps a lot, but I'm going to need some more firepower from folks here to actually understand the details of the rules and the regs before I have an informed opinion on those.  So I think you can expect the rulemaking to stop for a while.

**QUESTIONER:**  Anything you want to advance in terms of—you're talking about holding back rules, but any direction you want to take the Bureau?

**MICK MULVANEY:**  I'm working on that.  I'm working on that.  I'm trying to figure out how to articulate how things are going to be different.  Then this is the staff, and to the outside world a little bit, but the staff has a right to know—because like I came here, and I said, "Look, I'm not going to burn the place down.  What you've read about me in the press is not always entirely accurate," because the statute requires us to do certain things, and we will perform the functions the statute mandates, but it's going to be different.  And I think they get that, especially the folks who have been here, who have come to CFPB from other agencies.  If you've been at another agency, you've probably been through a transition.  If you've only ever worked at CFPB, you've never been through a transition.  So to have somebody come in who is entirely different than the person who just left is a new experience, but I think they've accepted the fact that it's going to be different.

Now it's incumbent upon me to explain to them how it's going to be different, and that's what I'm trying to figure out.  How do I best articulate to the men and women who work here how it's going to be different under the Trump administration than it was under the Obama administration?  And that's what I really need to set aside some time to do here fairly quickly.

**QUESTIONER:**  Thank you, Mr. Director.  Thank you very much.

**MICK MULVANEY:**  Gotcha.  Thanks to all.  Again, we'll do this again.  I didn't get a single question about a government shutdown.  That may be the first time I've ever had that.  That's great.

**CFPB STAFF:**  The IG meeting you referenced earlier, a week from tomorrow.

**MICK MULVANEY:**  Is it a week from tomorrow?  Okay.  All right.  Yeah, I've got—all right.  Thank you very much.  I appreciate it.

**TELECONFERENCE OPERATOR:**  Thank you for your participation.  That does conclude today's conference.  You may disconnect at this time.

[End of recorded session.]